1   Paul D. Asmus

2   P.O. Box 60755

3   Palo Alto, CA

4   (650) 935-2105

5   pdasmus@protonmail.com

6   Plaintiff in Pro Per

7

**FILED** ③

JAN 30 2026

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

8               UNITED STATES DISTRICT COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

12

13   PAUL D. ASMUS,            )    Case No. **C 26 00962 SVK**

14   Plaintiff,                )

15                             )

16   v.                        )    **COMPLAINT FOR DAMAGES**

17                             )    1. Defamation Per Se

18   UNITED AIRLINES, INC.,    )    2. Tortious Interference

19   Defendant.                )    3. Fraudulent Misrepresentation

20                             )    4. Civil Extortion

21                             )    5. Intentional Infliction of Emotional Distress

22                             )    6. Civil Assault

23                             )    7. Tortious Interference with Federal Duties

24                             )

25                             )    **DEMAND FOR JURY TRIAL**

26                             )

27                             )

28

COMPLAINT                                          1

1  Plaintiff **PAUL D. ASMUS** complains of Defendant **UNITED AIRLINES, INC.** and alleges as
2  follows:

4  **I. JURISDICTION AND VENUE**

6  1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332.

8  2. Plaintiff Paul D. Asmus is a citizen of the State of California.

10 3. Defendant United Airlines, Inc. is a corporation incorporated in the State of Delaware, with its
11 principal place of business in the State of Illinois.

13 4. The amount in controversy exceeds $75,000, exclusive of interest and costs.

15 5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of
16 the events giving rise to the claims occurred within this District, including at San Francisco
17 International Airport.

19 6. Intradistrict assignment to the San Jose Division is proper because Plaintiff resides in Santa
20 Clara County and a substantial portion of the injuries suffered by Plaintiff occurred in this
21 Division. Plaintiff has fully exhausted all required administrative remedies.

23 **II. NATURE OF THE ACTION**

25 7. This action is timely filed under the principles established by the Supreme Court
26 in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), and the California doctrine of **Equitable**
27 **Tolling** (*Addison v. State of California*, 21 Cal. 3d 313). Under *McDonough*, the limitations
28 period for claims based on fabricated evidence does not begin to run until the underlying

1  enforcement proceedings terminate in the plaintiff's favor; therefore, the statute did not
2  commence until **June 27, 2025**, when the U.S. Department of Transportation Administrative
3  Law Judge dismissed the charges against Plaintiff. Furthermore, under California law, the
4  statutes of limitation for all state claims were suspended during the pendency of the federal
5  administrative enforcement action (Case No. 2022FS050423). Plaintiff acted reasonably and in
6  good faith by deferring this civil action to avoid conflicting judgments while defending against
7  federal charges initiated by Defendant. Defendant suffers no prejudice from this tolling because
8  it actively monitored the proceedings. Internal corporate records confirm that United
9  management was kept informed of the specific procedural status of the FAA case, including
10  receiving updates on **December 7, 2022**, that Plaintiff had rejected a settlement and that the
11  matter was proceeding to a hearing . Because Defendant possessed continuous notice of the legal
12  dispute, it cannot claim surprise or prejudice regarding the timing of this complaint.

14  8. This case exposes a dangerous escalation in aviation enforcement: the criminalization of
15  lawful safety reporting. Federal aviation safety depends on a simple, non-negotiable principle -
16  any person who observes a safety hazard must be free to report it without fear of punishment.

18  9. Plaintiff was traveling off duty but was "engaged in the performance of official duties" as
19  defined by federal law. A Department of Transportation Administrative Law Judge has
20  definitively ruled on this specific issue, holding: **"As an FAA Inspector, Mr. Asmus was**
21  **'required' to document 'any safety-related issues' that he observed, whether on duty or off**
22  **duty"**. This mandatory duty aligns directly with Defendant's own corporate obligations under **14**
23  **C.F.R. Part 5 (Safety Management Systems)**. Pursuant to **14 C.F.R. § 5.25(a)**, Defendant's
24  CEO, J. Scott Kirby, serves as the designated **"Accountable Executive"** who **"retains ultimate**
25  **responsibility for the safety performance of the operations"**. In his formal Safety Policy
26  Letter, Mr. Kirby explicitly mandates: **"We require all employees to report hazards... so that**
27  **we can address safety and operational concerns,"** declaring safety to be a **"non-negotiable"**
28  standard. By physically removing Plaintiff for performing this mandatory safety function, United

1    Airlines did not merely refuse service to a passenger; it violated the fundamental public policy

2    ensuring **"free and uninterrupted access"** for federal safety oversight authorized by 49

3    U.S.C. § 40113 and directly contravened the standing orders of its own Chief Executive Officer.

4    Defendant's conduct exposes the profound hypocrisy of its corporate slogan, **"Good Leads The**

5    **Way"**; in this matter, Defendant proved that **retaliation leads the way**

6

7    10. **In direct retaliation for this protected conduct,** United removed Plaintiff from the aircraft,

8    imposed a lifetime travel ban, and demanded monetary "restitution." The FAA then compounded

9    that retaliation by charging Plaintiff under 14 C.F.R. § 121.580.

10

11    11. A Federal ALJ dismissed the enforcement action with prejudice, finding the crew's

12    allegations **"not credible and without merit"** [Exhibit A at 39]. The FAA failed to appeal this

13    decision within the statutory window. Therefore, pursuant to **14 C.F.R. § 13.232(d)**, the Initial

14    Decision became the **Final Decision and Order of the Administrator**. Because the FAA

15    forfeited its right to appeal, the ALJ's findings of fact - including that Plaintiff was "required" to

16    report the safety defect and that the airline's witnesses were "not credible" - are now **final,**

17    **binding, and res judicata**. In this Final Order, the Court issued a stern warning regarding the

18    conduct of both the airline and the agency, specifically noting that bringing **"charges of**

19    **intimidation"** against those who report hazards creates a dangerous environment:

20

21         *"Chilling passenger complaints about safety issues, by negatively responding to such*

22         *complaints, will lead to negative impacts. Inevitably, unreported matters **will impact the***

23         ***safety of the aircraft and the lives of all passengers on board."*** [Exhibit A at 41].

24

25    12. Despite this judicial determination, United reaffirmed its ban and financial penalty,

26    republishing the same allegations already adjudicated false. That conduct sends a clear and

27    dangerous message: those who report safety hazards risk punishment, removal, and financial

28    sanction.

13. This is not a private dispute over airline policy. It is a systemic failure that threatens the foundation of aviation safety. History shows the catastrophic cost of silence: from Air Ontario Flight 1363 (Dryden)to Aloha Airlines Flight 243, preventable disasters occurred because individuals observed visible hazards but remained silent out of fear of delay, reprisal, or professional consequences. In both cases, the failure to speak up contributed to the loss of life. Federal aviation law exists to prevent that outcome, not to institutionalize it.

14. By treating safety reporting as a punishable offense, United Airlines crossed a line that federal law, public policy, and the ALJ's Final Order expressly forbid. This Court's intervention is necessary to restore the principle that reporting a safety hazard is not a crime, and to punish and deter the egregious corporate conduct that crossed that line and recklessly put passenger lives at risk.

**III. PARTIES**

15. Plaintiff **PAUL D. ASMUS** is an Aviation Safety Inspector employed by the Federal Aviation Administration.

16. Plaintiff is a citizen of the State of California.

17. Defendant **UNITED AIRLINES, INC.** is a global air carrier conducting extensive operations within the Northern District of California.

18. At all relevant times, United Airlines acted through its officers, employees, and agents.

19. United Airlines owed a duty to encourage, not punish, the reporting of aviation safety hazards.

20. United Airlines breached that duty through the retaliatory conduct alleged herein.

## IV. FACTUAL ALLEGATIONS

### A. Motive: Plaintiff's Prior Safety Oversight

21. On or about April 23, 2020, while the 737 MAX fleet remained grounded, Boeing discovered that at least 55% of all aircraft produced prior to the grounding contained contaminated fuel tanks. Internal manufacturer records explicitly stated that findings included **"rolls of blue tape, a plastic package containing boot socks, tools, fasteners, etc."**. This gross contamination stands in stark contrast to the strict fuel purity standards mandated by **49 U.S. Code § 44714** and industry standards like **ASTM D1655**, which require fuel to be free of even microscopic particulates. Plaintiff identified that by ignoring large-scale debris while enforcing microscopic purity, Defendant created a **"Purity Paradox"** that compromised the safe operation of the 737 MAX fleet. Between 2020 and 2021, Plaintiff identified that United Airlines was operating these aircraft with this known contamination in direct contradiction of established aviation safety logic.

22. United's internal engineering and safety records—specifically an Engineering Authorization dated June 26, 2020—classified this condition as a **"Moderate Risk (4B)"** hazard. The records identified the threat that FOD **"may block the engine fuel filter elements"** causing **"possible engine operability issues,"** and acknowledged the manufacturer's recommendation to perform inspections prior to any Return to Service (RTS).

23. Despite these risks, United ferried aircraft without conducting the inspections Plaintiff and United's own engineering records determined were required. Defendant justified this deviation by utilizing a distinction for "non-revenue" ferry flights - a qualifier that appears nowhere in the manufacturer's guidance. This failure led to a formal FAA **Compliance Action Notice (File:**

**CAGL3320210009)** on May 26, 2021, which found that United failed to follow its Safety Management System (SMS) process as required by **14 CFR part 5**.

24. Plaintiff's role as a **designated inspector** in this Compliance Action created significant friction with United and FAA management responsible for safety compliance. FAA managers tried to get the Plaintiff to drop his investigation.

25. Plaintiff refused to capitulate and insisted on documenting the safety risks as required by law.

26. These actions created a shared incentive for United to remove Plaintiff from any position of regulatory exposure. Rather than conducting a basic verification of facts, Defendant utilized a minor incident as a **pretext** to permanently strip Plaintiff of his oversight authority with FAA cooperation.

27. At the time, the aircraft were also operating with the MCAS system that had not yet been fully corrected following the 737 MAX grounding.

28. Plaintiff warned that the combination of uncorrected MCAS vulnerabilities and fuel-tank contamination posed a compounded safety risk.

29. Plaintiff further emphasized that ferrying aircraft with this risk profile over populated areas endangered flight crews and persons on the ground.

30. Plaintiff's refusal to abandon documentation of the hazard threatened United's operational interests and its relationship with regulators.

31. Plaintiff also faced internal pressure from leadership within the FAA United Certificate Management Office (UA-CMO) to drop his findings.

32. Despite intense internal pressure from FAA leadership to abandon his oversight of United's SMS program, Plaintiff remained steadfast in his refusal to compromise safety standards or suppress his findings.

33. These actions created a shared incentive for United to remove Plaintiff from any position of regulatory exposure. Rather than conducting a basic verification of readily available facts, **Defendant utilized the incident as a pretext to permanently strip Plaintiff of his oversight authority.**

**B. The Incident: United Flight 1684 (May 12, 2022)**

34. The events of May 12, 2022, began with flight crew members escalating a routine cabin discrepancy and submitting inaccurate and exaggerated accounts of Plaintiff's conduct, creating a pretextual incident. United Airlines management, corporate security, and legal personnel - not the flight crew - then assumed control of the matter. At that time, United was aware of Plaintiff's prior safety enforcement activity involving United's Boeing 737 MAX fleet and the resulting regulatory exposure. United's leadership selectively relied on the initial reports and advanced a false narrative for purposes unrelated to cabin safety, including discrediting Plaintiff and inducing the FAA to remove him from any position of regulatory oversight involving United Airlines an objective they ultimately achieved.

35. On May 12, 2022, Plaintiff boarded United Flight 1684 while traveling off duty.

36. After boarding, Plaintiff observed a torn seat-back pocket at his assigned seat.

37. The torn pocket impaired the ability to secure and access the emergency briefing card. Plaintiff, holding an **FAA Airframe and Powerplant (A&P) mechanic's license since 1977** and serving as an Aviation Safety Inspector, possessed the specialized knowledge to

identify this as a discrepancy requiring maintenance intervention. This professional assessment was validated by the **FAA's own key witness**, United Check Airman John Kallen. Under oath, Captain Kallen admitted that flight crews are not qualified to determine the airworthiness of such items, stating: **"We report mechanical irregularities, and then the mechanical people decide whether it's safe to continue"**. Furthermore, Kallen was forced to recant his initial claim of "interference" during cross-examination, admitting that addressing Plaintiff's safety report did not divert the crew from their responsibilities because **"It's part of her duties to take care of things like this... she really wasn't diverted"**. This admission confirms a fundamental aviation standard known to **all pilots and flight attendants**: addressing safety discrepancies is a mandatory duty, not a distraction. Crucially, United's own Flight Attendant Operations Manual (**eFAOM 5.52.2**) explicitly mandates that crew members **"Report preflight discrepancies immediately... to the captain."** By characterizing Plaintiff's insistence on this mandatory compliance as "interference," United knowingly criminalized the very safety reporting its own manual requires.

38. Plaintiff also observed a passenger standing in the aisle during pushback.

39. Plaintiff documented these safety hazards photographically to preserve evidence of the violations.

40. Although traveling on a personal ticket, Plaintiff's actions constituted the performance of official safety duties.

41. Plaintiff's reporting of safety hazards fell squarely within the FAA's mission and was mandated by federal law and regulation.

42. Federal aviation regulations require that emergency briefing materials be present and accessible at each passenger seat.

43. A torn seat-back pocket that cannot retain the briefing card constitutes a compliance violation.

44. Federal Aviation Regulations mandate that even seemingly minor discrepancies affecting airworthiness or cabin safety must be reported and evaluated.

45. Plaintiff's report was therefore a protected act of compliance, not discretionary conduct.

**C. The Safety Mandate: Lessons from Dryden and Aloha**

46. Plaintiff's insistence on reporting the defect was mandated by Federal Aviation Regulations - a duty expressly confirmed by the ALJ - and reinforced by well-documented aviation safety history.

47. The Commission of Inquiry into the Air Ontario flight 1363 crash at Dryden, Ontario identified a **"culture of silence"** as a contributing factor to the accident.

48. That investigation criticized the failure of passengers and off-duty pilots to speak up for fear of delay or reprisal.

49. Twenty-four people died in the Dryden crash after visible hazards went unreported.

50. Plaintiff was also guided by the lessons of Aloha Airlines Flight 243.

51. In that incident, a passenger observed a fuselage crack prior to takeoff but assumed the crew was aware.

52. The aircraft later suffered an explosive decompression, resulting in the death of a flight attendant and serious injuries to passengers.

53. These accidents demonstrate the catastrophic consequences of discouraging safety reporting.

54. Plaintiff refused to repeat the fatal errors of the past by remaining silent.

55. Plaintiff's conduct was consistent with the core safety mandate of the aviation system.

**D. United's Immediate Response**

56. United flight attendants reacted hostilely to Plaintiff's regulatory knowledge. United Airlines management then exploited and ratified this unfounded hostility to justify a premeditated retaliatory campaign against a federal official.

57. Crew members accused Plaintiff of being **"combative"** regarding a prepaid seat upgrade, falsely alleging he was attempting to obtain a free seat assignment.

58. This allegation was false.

59. United's own records later confirmed Plaintiff had paid for the seat and was not demanding a free upgrade.

60. Plaintiff complied with the crew's instructions regarding the seat assignment, effectively resolving the commercial dispute.

1    **E. Premeditated Removal and False Narrative**

2

3    61. United then shifted its pretext for removal to Plaintiff's safety documentation. Flight

4    Attendant Matthew Materne falsely accused Plaintiff of taking unauthorized photographs of the

5    crew. In reality, Plaintiff had photographed the safety defects - the broken seat pocket and the

6    passenger standing during taxi - to preserve evidence for FAA review.

7

8    62. The Captain issued an ultimatum via the flight attendant: Plaintiff must show the last photo

9    on his personal device, or the aircraft would **"return to the gate"**. This coercive demand

10   directly contravened United's own policy, which explicitly admits United **"do[es] not have the**

11   **ability to compel a customer to show the photos" and instructs crew members to "refrain**

12   **from asking."** Independent witnesses confirmed the coercion, reporting that the flight attendant

13   explicitly threatened that Plaintiff **"needed to delete the photo he took or else he would be**

14   **removed from the aircraft"**. Plaintiff nonetheless complied and displayed the image. Flight

15   Attendant Materne admitted the photo depicted only the safety violation and **"no crew**

16   **members"**. Despite this conclusive proof of innocence, United elected to return the aircraft to

17   the gate.

18

19   63. Instead of departing, the aircraft remained stationary on the tarmac. **According to United's**

20   **own timeline,** the Pilot-in-Command contacted United's Flight Operations Duty Manager

21   (FODM) in Chicago at approximately 17:18 local time. This **recorded delay** confirms that

22   Plaintiff posed no imminent safety threat; rather, the time was utilized to secure corporate

23   authorization for his removal.

24

25   64. The Pilot-in-Command's written report noted Plaintiff **"had no FAA 110-A ID,"** implying

26   he was unverified. This suppressed the material fact that Plaintiff presented alternate

27   credentials which the Captain accepted, admitting he was **"convinced"** of Plaintiff's identity

28   [Exhibit A at 40]. By citing the absence of one specific form while suppressing the acceptance of

another, the report falsely portrayed Plaintiff as an unverified imposter. Furthermore, Defendant's criticism that Plaintiff failed to 'use his credentials' was made in bad faith; **FAA Order 8000.38M** explicitly prohibits Aviation Safety Inspectors from using 110A credentials to obtain benefits while traveling on personal tickets. Defendant thus attempted to punish Plaintiff for complying with his own agency's ethical restrictions."

65. Similarly, the report suppressed the outcome of the photo inspection. It acknowledged the crew "asked to see the picture" but deliberately omitted that Plaintiff complied and that Flight Attendant Materne verified the image contained "no crew members."

66. Relying on this misleading narrative - which concealed Plaintiff's verified identity and actual compliance - United corporate personnel authorized Plaintiff's removal.

67. While the aircraft was taxiing back to the gate, United sent a text message to all passengers.

68. The message stated: **"UA 1684: We're sorry for returning to the gate. We're about to save the day for a few passengers with tight connections."**

69. This contemporaneous communication demonstrates that United did not view Plaintiff as a security threat.

70. Instead, United fabricated a customer-service explanation to conceal a retaliatory action.

**F. The False "Commercial Dispute" Narrative and Executive Malice**

71. Following the incident, United Airlines management ratified the crew's retaliatory conduct by adopting a secondary false narrative: that Plaintiff was "combative" regarding a seat assignment and attempting to obtain a free upgrade.

72. This allegation was objectively false. As Plaintiff departed the aircraft, the Gate Agent explicitly confirmed to him in the jetway that the surcharge for the seat had been refunded. United's own internal transaction records—available to management immediately—proved that the financial issue was resolved instantly.

73. Despite this immediate resolution, the crew and corporate management resurrected the "free upgrade" dispute in their written reports to the FAA. Even after the refund was processed and confirmed, United's witnesses continued to testify under oath that Plaintiff was demanding a seat he had not paid for, a claim directly contradicted by United's own financial records.

74. By suppressing the fact that the refund was processed and confirmed in the jetway, United manufactured a false motive for Plaintiff's behavior. They knowingly portrayed a Federal Aviation Safety Inspector as a disruptive customer motivated by greed, rather than a regulator motivated by safety compliance.

75. United's subsequent internal review deliberately ignored these exculpatory transaction records. By advancing the materially false claim that Plaintiff was **"combative"** over a fee that had already been returned to him, United utilized a resolved commercial dispute to justify a lifetime ban and a federal enforcement action.

76. Internal correspondence reveals that United's executive leadership personally intervened to expand this commercial investigation for the specific purpose of harming Plaintiff's federal employment. On May 26, 2022, **Vice President of Corporate Safety Sasha Johnson** directed subordinates to investigate if Plaintiff had booked a **"discounted ticket,"** stating explicitly: **"I think that would be pertinent info for the FAA"** .

77. This email proves that United's executive goal was not aviation safety, but a targeted search for financial data to build a case of **character assassination**. By seeking evidence of "discounted

tickets" weeks after the incident, leadership sought to frame Plaintiff as abusing his privileges to a **"willing FAA,"** thereby discrediting his safety report.

78. Instead of reviewing the safety merits, United relied on this fabrication to issue a **"Travel Ban" notice**. They permanently banned a federal regulator based on a commercial dispute they knew was false and a "character investigation" intended to destroy his professional reputation.

**G. Validation of Plaintiff's Safety Report**

79. After being removed from the flight, Plaintiff reviewed United's maintenance records for Flight 1684.

80. Plaintiff discovered that United had applied an incorrect Minimum Equipment List / Non-Essential Furnishings deferral to the damaged seat-back pocket.

81. Plaintiff reported this regulatory violation to the FAA Certificate Management Office.

82. United subsequently admitted the error.

83. United corrected the deferral and was subjected to FAA compliance action.

84. These facts confirmed that Plaintiff's original safety report was accurate and justified.

**H. Internal Knowledge and Coordination**

85. In its internal corporate communications, specifically a **"C-Alert" Update dated May 12, 2022**, United claimed Plaintiff was an **"off duty FAA employee (unconfirmed)."**

86. This claim was false.

87. Internal United records confirm that corporate security personnel successfully identified Plaintiff the morning following the incident. At **10:12 AM on May 13, 2022**, Investigator **Laura Gimlett** located Plaintiff in the corporate directory, emailing her team: **"see this in Outlook as the team name seemed familiar"**. Minutes later, at **10:34 AM**, United's Director of Global Aviation Security, **Missy Sraga**, confirmed executive awareness via email: **"Sasha just called. He is an FAA Inspector"**. Investigator **Morgan Charles**(London) subsequently praised Gimlett for the **"amazing catch"** and confirmed Plaintiff's internal "V#". Despite this conclusive verification by multiple security officials, United proceeded to ban Plaintiff as a security threat.

88. United confirmed Plaintiff's FAA status, office assignment, and internal identification.

89. United personnel discussed whether to "discretely inquire" about Plaintiff through a United manager involved in the MAX FOD matter Plaintiff had been investigating.

90. This communication demonstrated coordination with the subject of Plaintiff's prior regulatory oversight.

91. United executives were informed of Plaintiff's identity before the FAA was formally notified of the alleged interference with crewmember duties (a violation of 14 C.F.R. § 121.580)

92. United's Vice President of Corporate Safety, **Sasha Johnson**, had prior personal knowledge of Plaintiff's regulatory role and of the specific MAX FOD investigation Plaintiff had enforced against her department.

93. United executives coordinated internally regarding how to proceed against Plaintiff.

**I. Submission of Edited Evidence and Regulatory Violation**

94. United submitted witness statements to the FAA in support of an enforcement action.

95. These statements contained disclaimers indicating they could be edited by an analyst.

96. United submitted witness statements to the FAA, including a report from the Pilot-in-Command, that presented a one-sided and materially misleading narrative. While the Pilot's written report noted the absence of a specific '110-A' credential, it **deliberately omitted** the exculpatory fact—later admitted under oath—that the Captain had verified Plaintiff's identity via alternate means and was **"convinced"** of his status **[Exhibit A at 40]**. By reducing the encounter to a technicality about a badge while suppressing the successful verification of identity, United provided a deceptive instrument that the FAA used to prosecute Plaintiff.

97. This suppression of exculpatory evidence was not an error but a coordinated effort by United senior leadership to manipulate the federal enforcement process. **Jay Lee**, United's Senior Manager of Inflight Policy and Procedures, was directly involved in framing the narrative against Plaintiff, yet conspicuously failed to disclose that **eFAOM 5.52.2** mandated the very report Plaintiff made. Despite his specific responsibility for "Policy and Procedures," Lee solicited written statements to support a "disruption" narrative while burying the corporate policies that validated Plaintiff's actions. By withholding this controlling manual and the internal "Safety Risk: N" assessment, United caused the FAA to violate its mandatory disclosure obligations under **49 C.F.R. § 5.83 (the "Brady" rule)**. This regulation requires the disclosure of exculpatory evidence in civil penalty proceedings; by actively burying the documents that exonerated Plaintiff, United's management manufactured a false evidentiary record that stripped Plaintiff of his due process rights.

98. United also omitted the crew's order directing Plaintiff to delete photographic evidence.

1    99. That order violated United's own policies permitting passenger photography.

2

3    100. By submitting these materially misleading statements while actively suppressing its

4    own Electronic Flight Attendants Operations Manual (**eFAOM**) 5.52.2 - which explicitly

5    commands crew members to **"Report preflight discrepancies immediately... to the captain"** -

6    United presented a falsified narrative to federal authorities. This deception is proven by the

7    irreconcilable contradiction in United's own records: while its external report to the FAA alleged

8    "interference" and "intimidation," its internal risk assessment explicitly classified the incident

9    as **"Safety Risk: N" (No)**. The Administrative Law Judge later exposed this duplicity, ruling the

10   crew's testimony **"not credible"** and finding that Plaintiff's actions were protected safety

11   reporting. These specific falsifications are now the subject of a formal request for investigation

12   filed by Plaintiff with the FAA Office of Audit and Evaluation (Ref: IHL-20251117-610),

13   seeking a determination of whether United violated **14 C.F.R. § 121.9** and **49 U.S.C. § 46310** by

14   knowingly submitting false operational reports to justify the retaliatory removal of a Safety

15   Inspector.

16

17   **J. PIRC Ban, Restitution Demand, and FAA Enforcement**

18

19   101. On June 2, 2022, United's Associate General Counsel James Conneely transmitted a formal

20   letter to Plaintiff's FAA management.

21

22   102. The letter attached the edited witness statements and a Passenger Incident Review

23   Committee ("PIRC") determination.

24

25   103. The PIRC determination letter justified the ban by explicitly asserting that Plaintiff's

26   presence on future flights created a **"threat to the safety of our employees and**

27   **passengers"** and an **"unsafe working environment."** This justification was materially false and

28   directly contradicted by the internal "Safety Risk" assessment referenced in Paragraph 100.

Specifically, while the PIRC letter publicly branded a federal official a "safety threat" to justify punishment, United's own internal records from the incident date had already concluded **"Safety Risk: N" (No)**. By issuing a ban based on a "threat" it knew did not exist, United acted with actual malice and in direct violation of its own safety assessment.

104. United also demanded payment of $3,153.00 in purported "restitution", conditioning the restoration of Plaintiff's travel privileges on this payment.

105. The restitution demand was based on the aircraft's return to the gate.

106. United knew the return to gate had been unnecessary and unrelated to safety.

107. United's own message to passengers characterized the return as a customer-service measure to "save the day" for connecting passengers.

108. United nevertheless attributed the delay to Plaintiff to justify punishment.

109. Based solely on United's submissions, the FAA initiated a civil penalty enforcement action against Plaintiff.

110. The FAA proposed a $10,000 civil penalty for alleged interference with crew duties.

111. The FAA conducted no independent investigation before initiating enforcement, failing to personally interview the Pilot-in-Command. Had the agency performed this basic duty, it would have discovered the Captain's admission that he was "convinced" of Plaintiff's credentials [Exhibit A at 40]—an exculpatory fact completely absent from United's written submissions. Instead, the agency acted as a mere "conduit" to present otherwise inadmissible evidence, a practice that **Plaintiff's defense counsel in the administrative proceeding** noted on the record "implies that the FAA knows that this is not reliable evidence."

1    112. This failure was driven by the FAA's position that its investigators are **"entitled to rely"** on

2    reports received from an airline without further verification. By treating United's submissions

3    as presumptively accurate, the FAA investigator admitted she had **"no reason to dispute the**

4    **authenticity"** of the reports, despite the fact the Administrative Law Judge later ruled they

5    **contained "unreliable anonymous hearsay"** [Exhibit A at 9] and **"negative**

6    **speculations"** [Exhibit A at 22].

7

8    **K. Punitive Reassignment and Career Harm**

9

10   113. The pending civil penalty was used as the sole justification to reassign Plaintiff from his

11   position.

12

13   114. Plaintiff was removed from oversight duties involving United Airlines.

14

15   115. The reassignment eliminated Plaintiff's authority to act on safety matters across United's

16   fleet including his open MAX FOD investigation.

17

18   116. United achieved its objective of removing a rigorous regulator from its oversight

19   environment.

20

21   117. The travel ban further impaired Plaintiff's ability to travel for personal and professional

22   reasons.

23

24   118. Because Plaintiff has a residence in Hawaii and United dominates key routes, the ban

25   imposed severe hardship.

26

27

28

**L. Judicial Vindication**

119. On June 27, 2025, a United States Department of Transportation Administrative Law Judge dismissed the FAA's enforcement case with prejudice [Exhibit A at 44] .

120. The Administrative Law Judge found United's witnesses not credible. Specifically, the Court ruled that Ms. Meacham's assertion that Plaintiff interfered with her duties was **"not credible"** [Exhibit A at 26] and found Mr. Materne's testimony that a violation occurred to be **"not credible and without merit"** [Exhibit A at 39].

121. The Administrative Law Judge found the interference allegations to be untrue, ruling that the FAA failed to prove that Plaintiff committed a violation of the Interference Rule (14 C.F.R. § 121.580) [Exhibit A at 44].

122. The Administrative Law Judge further found that the FAA conducted no independent investigation. The Court highlighted that the FAA's evidence consisted of **"unreliable anonymous hearsay"** [Exhibit A at 9] and unsworn narratives that were given **"no weight"** [Exhibit A at 8] because they did not bear **"sufficient indicia of reliability"** [Exhibit A at 8].

123. The Administrative Law Judge held that reporting safety hazards is a mandatory regulatory duty [Exhibit A at 41]. The Court affirmed that as an FAA Inspector, Plaintiff was **"required to document any safety-related issues that he observed"** [Exhibit A at 41].

124. The Administrative Law Judge warned that punishing such reporting would **"chill"** safety reporting [Exhibit A at 41] . The Court stated that if passengers face interference charges for reporting concerns, **"then no passenger would ever wish to tell the flight attendants about any safety problems,"** which would inevitably **"impact the safety of the aircraft and the lives of all passengers on board"** [Exhibit A at 41] .

125. **The FAA** did not appeal the Final Order, rendering these findings of fact final and binding.

126. The ALJ's findings regarding the "chilling effect" on safety reporting confirm that Defendant is operating in violation of its own **Corporate Safety Management System (SMS)**. Under **14 C.F.R. § 5.25(b)(2)**, the Accountable Executive must ensure the SMS defines a **"non-punitive disciplinary policy"** to encourage employees and passengers to report hazards without fear of reprisal. Defendant's refusal to lift the ban - even after a federal tribunal ruled Plaintiff was "required" to report the safety defect - demonstrates that its SMS exists only on paper. In practice, Defendant's legal and security departments have overridden the **"non-negotiable"** safety standards mandated by the CEO, creating a toxic culture where liability management takes precedence over airworthiness. By ratifying the punishment of a verified whistleblower, Defendant has rendered its federally mandated safety reporting system functionally inoperative.

**M. Corporate Ratification of Retaliation**

127. In November 2025, Plaintiff provided Defendant's General Counsel, Robert Rivkin, a final opportunity to cure the illegal ban and acknowledge the ALJ's findings of fact.

128. On December 8, 2025, Defendant responded, stating the matter was **"taken under advisement"** but refusing to lift the ban. In the same response, Defendant stated: **"we urge you to share it with the FAA."** This instruction was issued cynically and in bad faith, as Defendant knew Plaintiff had already shared safety information with the FAA regarding Flight 1684 and had been physically removed, banned, and fined by Defendant for doing so.

129. By refusing to rescind the ban and restitution demand after a Federal ALJ had already ruled the charges were **"not credible"** [Exhibit A at 26, 39] and **"without merit"** [Exhibit A at 29, 39], Defendant's executive leadership ratified the retaliatory acts. This transforms the initial crew misconduct into a deliberate corporate policy of suppressing a federal safety inspector and

1    chilling the reporting of safety violations [Exhibit A at 41].

2

3    **V. CAUSES OF ACTION**

4

5    **CLAIM I. DEFAMATION PER SE**

6    (Cal. Civ. Code §§ 44, 45, 45a, 46)

7

8    130. United published these false "safety" and "security" threat designations to a third

9    party. On **June 2, 2022**, United Associate General Counsel **Conneely** formally transmitted the

10   PIRC determination—containing the defamatory **"threat to safety"** and **"sustained threat to**

11   **security"** language—directly to **Keith Frable**, Manager of the United Airlines Certificate

12   Management Office at the FAA . This publication to Plaintiff's federal employer was intended to

13   trigger adverse employment action and regulatory scrutiny. Furthermore, United continues to

14   republish these libels through internal corporate records that designate Plaintiff as a banned

15   "threat" to enforce the travel restriction.

16

17   131. These statements directly impugned Plaintiff's professional integrity as an aviation safety

18   inspector by falsely branding a federal regulator as a threat to aviation safety.

19

20   132. United knew these statements were false when made. In its **June 1, 2022 PIRC letter**,

21   Defendant maliciously utilized distinct "Safety" and "Security" characterizations to maximize the

22   professional harm to Plaintiff. Specifically, United asserted that Plaintiff's presence created

23   a **"threat to the safety of our employees and passengers"** to justify the initial ban, and further

24   alleged that any future incident would constitute a **"sustained threat to the security and well-**

25   **being of our passengers"** to justify permanent exclusion. These characterizations were

26   **RISK: N" (No)**. By publicly labeling a Federal Inspector as both a "safety" and "security" threat

27   while its own internal data confirmed he posed no risk, United acted with actual malice.

28

133. Defendant further demonstrated actual malice by weaponizing protected safety data to attack Plaintiff's character. Defendant improperly transmitted a protected **Flight Operations Safety Action Program (FSAP)** report to the FAA, violating **49 U.S.C. § 40123**. This report contained baseless smears regarding "personal odor," which the ALJ ultimately found **"not credible"** [Exhibit A at 39]. Defendant knew that by laundering this smear through a federal enforcement action, it would become part of a permanent government record, shielded by the FAA's sovereign immunity. Thus, even though Defendant lost the legal case, it successfully planted a "poison pill" in Plaintiff's professional file: a humiliating personal allegation that was **memorialized in the hearing transcript, entered into evidence, and permanently recorded in the ALJ's Initial Decision.** This calculated effort to stain Plaintiff's record in perpetuity, regardless of the trial's outcome, warrants the imposition of punitive damages.

## CLAIM II. TORTIOUS INTERFERENCE WITH EMPLOYMENT
(California Common Law)

134. United knew of Plaintiff's employment relationship with the FAA as a verified Aviation Safety Inspector.

135. United intentionally interfered with that relationship by maintaining a lifetime ban and "security threat" designation against Plaintiff. This created a direct conflict of interest that made it impossible for Plaintiff to perform his specific oversight duties involving United Airlines.

136. As a direct result of United's refusal to lift the ban, the FAA was compelled to remove Plaintiff from his oversight position. On November 16, 2022, the FAA issued a Notice of Administrative Reassignment stating that the action was "solely based on a real/perceived conflict of interest with United Air Lines" due to the "open FAA Civil Penalty and current ban". By maintaining the ban, United caused Plaintiff to be stripped of his specific regulatory authority and reassigned.

1  **CLAIM III. FRAUDULENT MISREPRESENTATION**

2  (Cal. Civ. Code §§ 1709, 1710)

3

4  137. United represented to the FAA that its submissions—specifically the crew member IORs

5  and the PIRC determination—were accurate and complete accounts of the incident.

6

7  138. United knew those submissions were false or materially misleading when made. As found

8  by the Administrative Law Judge, United's reports were typed on boilerplate forms that

9  permitted an unidentified corporate "analyst" to "edit" the narratives "slightly" without the

10 author's approval. Furthermore, United deceptively omitted the dispositive fact that the Pilot-in-

11 Command had verified Plaintiff's credentials and admitted he was "convinced" of Plaintiff's

12 identity.

13

14 139. United acted with the specific intent to deceive the FAA, fully aware that the agency's

15 standard practice is to treat airline reports as presumptively authentic. United exploited this

16 known reliance - later confirmed by FAA Counsel Ms. Deason's statement that investigators

17 are "entitled to rely" on operator reports - to weaponize the regulatory process against Plaintiff.

18 By feeding "edited" and "unreliable" hearsay into a system it knew would not independently

19 verify the claims, United is the proximate cause of the resulting enforcement action. The FAA's

20 reliance was the intended result of United's scheme, not an intervening cause that absolves

21 United of liability.

22

23 **CLAIM IV. CIVIL EXTORTION**

24 **(Based on Violation of Cal. Penal Code § 518 & § 523)**

25

26 140. United demanded payment of **$3,153.00** from Plaintiff. In its letter dated **June 1, 2022**,

27 United explicitly conditioned the lifting of the "Security Threat" ban on this payment,

28 stating: **"Only after United receives full restitution... will you be allowed to travel"**.

141. This demand constitutes extortion as defined by **Cal. Penal Code § 523** (Extortion by Letter). United sent a written communication with the specific intent to extort money by threatening to maintain a false "Security Threat" designation. This created a "Pay-to-Play" security standard: United claimed Plaintiff was a **"threat to... security"** but offered to waive that threat for cash. This contradiction proves the "Security Threat" designation was fraudulent; a genuine threat to aviation safety cannot be mitigated by writing a check.

142. Furthermore, on **September 4, 2025**—after a Federal Administrative Law Judge ruled Plaintiff committed no violation—United renewed this written demand, stating again: **"Only after United receives full restitution... will you be permitted to travel"**. United knowingly continued to use the false threat of a lifetime ban to extract money it knew it was not legally owed.

143. By conditioning Plaintiff's freedom of travel on the payment of "restitution" for behavior the ALJ had already ruled was a lawful federal duty, United attempted to obtain property through the wrongful use of fear—specifically, the fear of permanent deprivation of liberty (freedom of movement) and the threat of continued publication of false accusations labeling Plaintiff a security risk.

144. Plaintiff refused to pay this fraudulent demand, resulting in the continued malicious imposition of the ban.

**CLAIM V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (California Common Law)**

145. Defendant's conduct went beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community. Specifically, Defendant threatened to unleash physical police violence against a compliant Federal Aviation Safety Inspector solely for

1    documenting safety violations. Defendant knew, or recklessly disregarded, that threatening

2    **"forcible removal"** evokes the specific terror of the **"Dr. Dao"** incident (United Express Flight

3    3411), causing Plaintiff reasonable apprehension of severe bodily injury. Furthermore,

4    Defendant retaliated against a federal official for performing mandatory safety duties. As the

5    ALJ ruled, punishing such conduct endangers the public: **"Inevitably, unreported matters will**

6    **impact the safety of the aircraft and the lives of all passengers on board"**[Exhibit A at 41].

7

8    146. Defendant held a position of power over Plaintiff, who was confined aboard Defendant's

9    aircraft. California courts recognize that behavior is more likely to be outrageous when the

10   defendant abuses a position of authority over a plaintiff who is vulnerable or unable to escape.

11   Defendant abused this power by issuing an ultimatum - **"vacate or be removed by force"** –

12   forcing Plaintiff to choose between his federal duty and his physical safety.

13

14   147. Defendant acted with **"conscious disregard"** of Plaintiff's rights. At the time of the

15   removal, Defendant's Pilot-in-Command had verified Plaintiff's credentials, stating **"I'm**

16   **convinced"** [Exhibit A at 40]. Despite verifying Plaintiff was a Federal Officer, Defendant

17   proceeded with the removal and subsequent ban. Moreover, even after a Federal ALJ ruled that

18   the allegations against Plaintiff were **"not true"** [Exhibit A at 26] and **"not credible"** [Exhibit

19   A at 39], Defendant's executive leadership ratified the outrageous conduct by refusing to lift the

20   lifetime travel ban or withdraw the fraudulent restitution demand.

21

22   148. Defendant's malicious instigation of federal enforcement proceedings was the proximate

23   cause of a severe breach of Plaintiff's information security. As a direct result of Defendant's false

24   reports, FAA (AGC) attorneys transmitted Plaintiff's unredacted **Social Security Number, Date**

25   **of Birth, Home Address, and FAA Credential Number (110A)** via unencrypted email to the

26   Court. This disclosure violated the **Privacy Act of 1974** and **49 CFR Part 15** governing

27   Sensitive Security Information (SSI). Although the FAA subsequently admitted error and

28   requested the Court return the Enforcement Investigative Report (EIR)—a tacit admission of

reckless mishandling—the damage to Plaintiff's security and peace of mind was already done. Defendant knew, or recklessly disregarded, that falsely accusing a federal official would trigger such a zealous and invasive prosecution, exposing Plaintiff to identity theft and security risks far beyond a simple fine.

149. As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe emotional distress, including acute fear of physical trauma and professional humiliation. Furthermore, the lifetime ban presents a **legal issue of first impression regarding a Common Carrier's duty to serve**: Plaintiff acts as a federal official stationed in California but maintains his permanent childhood home and property in Hawaii. As a Common Carrier defined by **Cal. Civ. Code § 2168** and holding a **Certificate of Public Convenience and Necessity mandated by 49 U.S.C. § 41101**, Defendant operates under a strict statutory duty to comply with federal law and serve the public without unjust discrimination. Defendant cannot arbitrarily refuse service once the alleged safety pretext has been judicially disproven. Because Defendant dominates the trans-Pacific market, this willful breach of its Operating Certificate and Common Carrier duties functions as a constructive eviction that effectively exiles Plaintiff from his property, preventing him from conducting necessary repairs. By leveraging its market dominance to sever Plaintiff's access to his domicile in direct violation of its federal licensure, Defendant engaged in oppression of the highest order.

**CLAIM VI. CIVIL ASSAULT**
**(California Common Law / Violation of Cal. Penal Code § 240)**

150. Plaintiff's presence and actions aboard United Flight 1684 constituted the performance of official federal safety duties. In her Initial Decision dated June 27, 2025, the DOT Administrative Law Judge expressly found: **"FAA inspectors are required to document any safety-related issues that they observe..."** [Exhibit A at 41]. The ALJ findings establish that Plaintiff was acting within the scope of his official federal duties.

151. Civil assault occurs when a defendant intentionally threatens another with the apparent ability to inflict injury, causing a reasonable apprehension of immediate bodily harm. Defendant's flight crew issued a conditional threat to Plaintiff: **"delete the photo... or else he would be removed from the aircraft".** This was a threat of "forcible removal" by law enforcement.

152. Plaintiff's apprehension of immediate bodily harm was objectively reasonable. Plaintiff was aware of United Airlines' documented history of forcibly dragging compliant passengers (e.g., the "Dr. Dao" incident). When the aircraft returned to the gate to execute this threat, Plaintiff reasonably assumed law enforcement officers were boarding to forcefully extract him.

153. Acting under this reasonable apprehension of violence, Plaintiff immediately requested to speak with the Pilot-in-Command solely to **de-escalate** the situation and avoid the threatened police intervention. Plaintiff vacated the aircraft involuntarily. When Plaintiff entered the jetway to speak with the Captain, he was **visibly shaking and humiliated,** acting under the acute physical stress of the threatened removal. That Plaintiff only felt "safe" *later* - after the Captain admitted he was **"convinced"** of Plaintiff's identity [Exhibit A at 40] and the ground supervisor (Mr. Liben) politely rebooked him - does not negate the assault that forced Plaintiff off the aircraft.

## CLAIM VII. TORTIOUS INTERFERENCE WITH FEDERAL DUTIES
**(Violation of Public Policy / 49 U.S.C. § 40113 / 14 C.F.R. § 13.2)**

154. Plaintiff is a holder of FAA Credential Form 110A. As explicitly stated on the credential, Plaintiff is authorized to perform inspections and investigations. This authority reflects the **fundamental public policy** embodied in **49 U.S.C. § 40113**, which ensures federal oversight of aviation safety. The credential mandates: **"In the performance of official duties under these provisions, free and uninterrupted access must be provided..."** Defendant's conduct did not

1 merely violate a statute; it violated the substantial public policy protecting federal safety

2 inspectors from interference, a policy essential to the safety of the traveling public.

3

4 155. Furthermore, **14 C.F.R. § 13.2** establishes a broad federal mandate that **"Any person...**

5 **should report"** violations of aviation safety regulations. On June 27, 2025, the Administrative

6 Law Judge expressly relied on this regulation, ruling that: **"it is every person's regulatory duty,**

7 **including aviation passengers, to report aviation safety concerns. 14 C.F.R. 13.2"** [Exhibit A

8 at 41]. The ALJ further found that Plaintiff was "required to document any safety-related issues

9 that he observed" [Exhibit A at 41]. Therefore, at the moment Plaintiff began documenting the

10 safety hazard, his conduct was protected by both the specific statutory authority of **49 U.S.C. §**

11 **40113** and the general regulatory duty of **14 C.F.R. § 13.2**.

12

13 156. Defendant violated this statutory mandate and public policy through a course of conduct

14 designed to impede federal oversight. First, Defendant physically removed a Federal Inspector

15 from an aircraft for performing the precise reporting duty mandated by **14 C.F.R. § 13.2**.

16 Second, in correspondence dated December 8, 2025, Defendant urged Plaintiff to share its

17 refusal with the FAA, acting as a private entity imposing private penalties distinct from the

18 agency. Third, Defendant's refusal to lift the ban despite the ALJ's finding of innocence

19 constitutes a private commercial tort, not a federal personnel action. **Because the Merit Systems**

20 **Protection Board (MSPB) lacks jurisdiction over private third-party torts, no**

21 **administrative remedy exists to address Defendant's independent liability, rendering this**

22 **Court the sole venue capable of providing redress.**

23

24 **VI. PRAYER FOR RELIEF**

25 **WHEREFORE**, Plaintiff prays for judgment against Defendant as follows:

26

27 **A. Special Damages (Economic):**

28 An award of special damages in the amount of **$250,000.00**, or according to proof, for lost

wages, out-of-pocket legal defense costs incurred during the FAA enforcement action, and future
economic harm resulting from the lifetime travel ban.

**B. General Damages (Non-Economic):**

An award of general damages in the amount of **$2,500,000.00**, or according to proof, for severe
emotional distress, professional humiliation, **invasion of financial privacy, reckless exposure
of Sensitive Security Information (SSI) and Personal Identifiable Information (PII),**
reputational harm, and loss of enjoyment of life.

**C. Punitive Damages:**

An award of punitive and exemplary damages in the amount of **$10,000,000.00**, or according to
proof, to punish and deter Defendant's willful, malicious, and oppressive conduct.

**D. Injunctive Relief:**

A permanent injunction requiring Defendant to rescind the lifetime travel ban and withdraw the
restitution demand, and to correct its internal records to conform to the Findings of Fact issued
by the DOT Administrative Law Judge in Case No. 2022FS050423.

**E. Declaratory Relief:**

A judicial declaration that Defendant's application of its Passenger Incident Review Committee
(PIRC) process to federal safety officials reporting hazards violates public policy and federal
aviation safety principles. Specifically, Plaintiff seeks a declaration that the PIRC process -
which the Administrative Law Judge judicially determined relied on **"unreliable anonymous
hearsay,"** lacked identified **"decision making authority,"** and **"improperly trespassed on the
decisional authority"** of the Courts [Exhibit A at 10 -11] cannot lawfully be used to strip a the
national air transportation system.

**F. Costs and Other Relief:**

An award of costs of suit, reasonable attorney's fees if applicable, and such other and further relief as the Court deems just and proper.

**VII. JURY DEMAND**

157. Plaintiff demands a trial by jury on all issues so triable.

**VIII. EXHIBIT LIST**

**Exhibit A:** U.S. DOT Administrative Law Judge Final Order (June 27, 2025).

DATED: _January 30, 2026_

Respectfully submitted,

Paul D. Asmus

Plaintiff

P.O. Box 60755

Palo Alto, CA 94306

(650) 935-2105

pdasmus@protonmail.com

# EXHIBIT A

**SERVED: June 27, 2025**

**U.S. DEPARTMENT OF TRANSPORTATION**
**OFFICE OF HEARINGS**
**WASHINGTON, DC**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | FAA Docket No. G13-22-73 |
| Paul D. Asmus | ) | |
| | ) | Case No. 2022FS050423 |
| Respondent | ) | |

**INITIAL DECISION OF**

**U.S. ADMINISTRATIVE LAW JUDGE**

**Charge:**   One violation of 14 C.F.R. § 121.580 (the Interference Rule).

**Held:**   Charge dismissed.

## I.   INTRODUCTION

### A.   Overview

The parties' dispute in this Interference Rule case raises two (2) questions: 1) did the FAA prove the charged violation by a preponderance of the evidence; and 2) what process(es) should an FAA employee follow when s/he sees a potential aviation safety violation when traveling off-duty on a regulated air carrier.

On May 12, 2022, the Respondent, Mr. Paul D. Asmus, boarded United Airlines Flight 1684 at the San Francisco, California airport ("SFO"). Mr. Asmus was an off-duty FAA Aviation Safety Inspector ("ASI"), traveling for vacation as a paying passenger. When he boarded the aircraft, Mr. Asmus did not introduce himself to the flight crew as an off-duty ASI. During the boarding process (i.e., while the aircraft remained parked at the SFO gate), Mr. Asmus saw and reported to a flight attendant some seatback pocket damage. He also told the flight attendant that he worked for the FAA. During aircraft pushback (i.e., while the aircraft was being towed into position), and while the aircraft was "stopped," Mr. Asmus took a photograph of a passenger

standing in the aisle in the forward aircraft cabin, while the lighted seatbelt sign was on. A male flight attendant, seated slightly behind and "catty-corner" to Mr. Asmus, began to question Mr. Asmus about the photograph. This questioning continued while the aircraft began taxiing to the SFO runway (i.e., while the aircraft was moving under its own power). When asked to produce his FAA 110A ASI identification badge, Mr. Asmus stated that he did not have it with him. Ultimately, the Captain returned the aircraft to the SFO airport gate. Mr. Asmus was asked to leave the aircraft. A United Airlines gate agent rebooked Mr. Asmus on a different United Airlines aircraft. Mr. Asmus was subsequently charged with one (1) violation of the Interference Rule (14 C.F.R. § 121.580).

### B. Pleadings Summary

#### 1. The FAA's December 9, 2022 Complaint

In its December 9, 2022 Complaint, the FAA alleged that on or about May 12, 2022, Mr. Asmus was a passenger on board United Airlines Flight 1684, a Part 121 domestic airline travelling from San Francisco, California ("SFO"), to Lihue, Hawaii. Compl. 1 § II ¶¶ 1-2. The FAA alleged that Mr. Asmus, an FAA employee, engaged in improper conduct during the boarding process and during aircraft taxiing. The FAA charged Mr. Asmus with one (1) regulatory safety violation of 14 C.F.R. § 121.580 (the Interference Rule), alleging his actions "intimidated" and/or "interfered" with one or more crewmembers in the performance of their duties. The FAA proposed a total civil penalty amount of $10,000 for the alleged violation, if proven. Compl. 3.

#### 2. Mr. Asmus' December 15, 2022 Answer

In his December 15, 2022 Answer, Mr. Asmus admitted that he had been a passenger on board United Airlines Flight 1684 on May 12, 2022. Ans. 1, § II ¶ 1. Mr. Asmus generally denied the FAA's charges against him, specifically, that he intimidated or interfered with one or more crewmembers in the performance of their duties in violation of the Interference Rule. Ans. 4-5, § II ¶ 6; § III ¶ 1. Among other things, Mr. Asmus affirmatively alleged that when he told the flight attendants about aviation safety violations, they reacted negatively. Ultimately, he

alleges that he was removed from the flight as "retaliation" for reporting two (2) safety violations to the flight attendants. Ans. 5-6, § III, ¶ 3.

## C. The Parties' Pre-Hearing Witness Dispute

On May 2, 2023, Mr. Asmus identified three (3) FAA employee witnesses in his Initial Disclosures.[1] Approximately one (1) year later, on June 24, 2024, Mr. Asmus filed a Request for Subpoenas, in which Mr. Asmus requested the issuance of three (3) Hearing witness subpoenas for the attendance of the three (3) previously disclosed FAA employee witnesses. On June 28, 2024, an Order Granting the Respondent's Request for Hearing Witness Subpoenas ("Order") was filed, issuing three (3) Hearing witness subpoenas for service upon Mr. Frable, Mr. Neal, and Mr. D'Urso. *Paul D. Asmus*, G13-22-73, 2024 WL 3326312 (June 28, 2024).

On September 9, 2024, approximately six (6) weeks before the October 22, 2024 Hearing, the FAA filed the Complainant's Motion to Quash Respondent's Subpoenas Issued for FAA Employees' Testimony ("Motion"), citing both regulatory and factual grounds. On September 18, 2024, Mr. Asmus filed the Respondent's Response to the Complainant's Motion to Quash Subpoena's [sic] ("Response"), opposing the FAA's September 9, 2024 Motion. Thereafter, oral argument was scheduled for October 2, 2024 (i.e., twenty (20) days prior to the Hearing dates). *Paul D. Asmus*, G13-22-73, 2024 WL 4331673 (Sept. 24, 2024).

On October 2, 2024, the FAA and Mr. Asmus appeared and presented oral arguments on the Motion to Quash and Response. On October 3, 2024, an Order Granting Motion to Quash, Denying Motion to Dismiss, and Granting Other Relief ("Order") was filed. *Paul D. Asmus*, G13-22-73, 2024 WL 4413782 (Oct. 3, 2024). Among other things in this October 3, 2024 Order, the Presiding Judge gave Mr. Asmus a deadline of October 4, 2024 to notify the Presiding Judge and the FAA by informal email whether he wished to: a) proceed with the Hearing as scheduled on October 22-24, 2024; or b) continue the October 22-24, 2024 Hearing to allow him an opportunity to reopen discovery and/or obtain alternate witnesses in support of his defenses to

---

[1] Specifically, on May 2, 2023, Mr. Asmus identified the following witnesses: 1) Mr. Keith Frable, an FAA employee who was Mr. Asmus' second line supervisor and the Manager of the FAA's United Airlines Certificate Management Office ("CMO") ; 2) Mr. Brian C. Neal, an FAA employee who was Mr. Asmus' Front Line Manager assigned to the United Airlines CMO; and 3) Mr. Steve D'Urso, an FAA Aviation Safety Inspector and representative of the Professional Aviation Safety Specialist Union.

the FAA's charges. *Paul D. Asmus*, 2024 WL 4413782, at \*9. On October 3, 2024, Mr. Asmus informally emailed the Office of Hearings ("OH") (cc to the FAA), stating that he would proceed with the October 22, 2024 Hearing as scheduled. On October 4, 2024, an Order Reconfirming the October 2024 Hearing Dates ("Order") was filed. *Paul D. Asmus*, G13-22-73, 2024 WL 4449390 (Oct. 4, 2024).

### D. Pre-Hearing Procedural Matters

On October 22, 2024, the parties convened in Phoenix, Arizona for the scheduled in-person Hearing. The Hearing took two (2) days and concluded on October 23, 2024. At the beginning of the Hearing, the parties: a) stipulated to Mr. Asmus' employment status; b) identified two (2) expert witnesses; and c) requested a ruling on a discovery dispute.

#### 1. Party Stipulation

The parties stipulated that at the time of the May 12, 2022 incident, Mr. Asmus was a Federal Administration Aviation ("FAA") employee, assigned to the United Airlines Certificate Management Office ("CMO"). Tr. 21:4-22:7.

#### 2. FAA Identified Experts

At the beginning of the October 22, 2024 Hearing, FAA identified two (2) FAA expert witnesses: Ms. Beth Pritchard and Mr. Randall Prine. The Presiding Judge held that these two (2) FAA employee expert witnesses could remain in the courtroom so that they could listen to other witness testimony. Tr. 9:1-18. Thereafter, the FAA called Ms. Pritchard to testify as a lay witness in its case in chief. It did not call Mr. Prine as a witness.

#### 3. Motion to Exclude Evidence Granted

At the beginning of the October 22, 2024 Hearing, Mr. Asmus moved, over the FAA's objection, to prohibit the FAA from introducing any evidence about who made the ultimate decision on May 12, 2022 to remove Mr. Asmus from the airplane. Tr. 11:13-15. It was undisputed that on July 14, 2023, the FAA provided Mr. Asmus with Captain Nastri's unsigned and unsworn narrative statement, in which Captain Nastri asserted that he contacted the "FODM" about removing Mr. Asmus from the aircraft. Tr. 13:13-5; 18:9-10. Thereafter, on

Page **4** of **44**

August 22, 2023, the FAA responded to Mr. Asmus' first discovery request with an amended response, in which the FAA affirmatively stated that it did not know who made the ultimate decision to remove Mr. Asmus from the aircraft. Tr. 11:13-15; 12:8-10. At the Hearing on October 22, 2024, the FAA acknowledged that after serving its August 22, 2023 discovery response, it did not provide any supplemental disclosure to Mr. Asmus on this issue. The Presiding Judge held that the FAA was bound by its discovery responses and granted Mr. Asmus' motion to prohibit the FAA from introducing any evidence regarding who made the ultimate decision to remove Mr. Asmus from the airplane. Tr. 18:20-19:7.

### E. Post-Hearing Judicial Notice

Judicial notice is hereby taken of the following matters:

#### 1. Regulatory Duty to Report Aviation Safety Violations

14 C.F.R. §13.2(a) provides: "Any person who knows of any violation of 49 U.S.C. subtitle VII, 49 U.S.C. chapter 51, or any rule regulation, or order issued under those statutes, should report the violation to FAA personnel." In accord with statutory laws[2] and the FAA's regulatory requirement, the FAA's published staff manual for FAA employees working in the FAA's compliance and enforcement programs requires that any FAA employee who becomes aware of an apparent aviation safety violation "by any regulated person" is tasked to "report[] such information" to the FAA program office or the FAA Hotline. FAA Order 2150.3C, *FAA Compliance and Enforcement Program*, Chapter 2, 2.7 § 6.a (Sept.30, 2021).[3]

#### 2. Face Mask Requirement

On May 12, 2022, the use of face masks while traveling aboard commercial aircraft in the United States was optional, due to an April 18, 2022 U.S. District Court decision vacating the

---

[2] Title 49 of the United States Code codifies certain federal transportation law enacted by the U.S. Congress. Subtitle VII of 49 U.S.C. codifies aviation programs approved by the U.S. Congress, including Part A "Air Commerce and Safety", which contains both Part A, Subpart III (codifying specific aviation safety statutes), and Part A, Subpart IV (codifying aviation safety investigations, enforcement, and penalties).

[3] The Sept. 30, 2021 version of FAA Order 2150.3C was in effect on the date of the May 12, 2022 incident.

February 3, 2021 federal requirement (i.e., the "Mask Mandate")[4] for individuals to wear face masks while aboard passenger aircraft traveling throughout the domestic United States. *Health Freedom Def. Fund, Inc. v. Biden*, 599 F. Supp. 3d 1144, 1154 (M.D. Fla. 2022), *vacated as moot sub nom. Health Freedom Def. Fund v. Pres. of U.S.*, 71 F.4th 888 (11th Cir. 2023).

## II.    HEARING WITNESSES AND EXHIBITS

### A.    The FAA's Witnesses and Exhibits

During the October 2024 Hearing, the FAA presented four (4) lay witnesses: three (3) United Airlines employee lay witnesses and one (1) FAA employee lay witness, specifically: 1) Ms. Dianne Meacham, a flight attendant; 2) Mr. Mathew Materne, a flight attendant; 3) Mr. John Kallen, an off-duty United Airlines pilot who was a ticketed passenger aboard the flight; and 4) Ms. Mary Elizabeth Pritchard, an FAA Aviation Safety Inspector. The FAA moved to admit ten (10) exhibits into evidence, identified as Exhibits C-1, C-2, C-3, C-4, C-5, C-6, C-9, C-10, C-11, and C-25. Mr. Asmus objected on multiple grounds to the admission of six (6) Exhibits, specifically: Exhibits C-4, C-5, C-6, C-9, C-10, and C-11. His hearsay objections to admissibility were overruled, and all ten (10) of the FAA's exhibits were admitted into evidence, subject to other objections and/or judicial rulings (*see, e.g.*, Tr. 18:1-8).

### 1.    Legal Standard - Unsworn Hearsay Statements

Our legal system is based on fundamental notions of fairness. Foremost among these concepts is the principle that accused persons should not be allowed to be convicted, or held legally liable, on the basis of unsworn testimony. The U.S. Supreme Court has held that to "allow men to be convicted on unsworn testimony of witnesses [is] a practice which runs counter to the notions of fairness on which our legal system is founded." *Bridges v. Wixon*, 326 U.S. 135,

---

[4] In the winter of 2020, the Secretary of Health and Human Services ("HHS") determined that the threat posed by the novel SARS-CoV-2 virus ("Covid 19") constituted a public health emergency. *Determination of Public Health Emergency*, 85 Fed. Reg. 7316-01 (Feb. 7, 2020). On January 21, 2021, the President issued an executive order, directing federal officials to require masks on various forms of transportation and while in transit hubs. *Executive Order 13998. See Promoting COVID-19 Safety in Domestic and International Travel*, 86 Fed. Reg. 7205 (Jan. 21, 2021). On February 3, 2021, pursuant to executive order, the Center for Disease Control and Prevention ("CDC") published a requirement, pursuant to presidential directive, that persons traveling in the United States on public conveyances wear a face mask. This requirement was commonly known as the "Mask Mandate." *Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs*, 86 Fed. Reg. 8025-01 (Feb. 3, 2021).

153–154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103, 2115 (1945). Thus, it is well-established that "unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof of wrongdoing." *U.S. v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975) (except for cases tried on agreed statements of facts, defendants pleading not guilty "should not be allowed to be convicted on the basis of unsworn testimony"); *U.S. v. Hawkins*, 76 F.3d 545, 551 (4th Cir. 1996) ("testimony taken from a witness who has not given an oath or affirmation to testify truthfully is inadmissible"); Fed. R. Evid. 603; *see also*, Rule 103 of the Model Code of Evidence (every witness, prior to offering testimony, shall be required to express his purpose to testify only to the truth, by oath or by other means "that is binding upon the conscience of the witness"). Both the oath and affirmation should be stated in a solemn manner, in order "to awaken the conscience and remind the witness of her duty to speak the truth." Wright & Miller, 27 Fed. Prac. & Proc. Evid. § 6044 Form of Oath or Affirmation (2d ed., May 2025 Update); *see also*, FAA Order 2150.3C, *FAA Compliance and Enforcement Program*, Chapter 4, 4.17 § 9.d (Sept.30, 2021) (even though hearsay is admissible in DOT Hearings, such evidence is "frequently given little weight," and counsel is encouraged to present the witness at the Hearing).

2.  Unsworn But Adopted Hearsay Narratives – Considered

Three (3) United Airlines employees, who each wrote unsworn narrative statements, testified at the Hearing as FAA lay witnesses. Each lay witness identified and adopted certain content in their previously written, unsworn, hearsay narratives. Thus, these unsworn hearsay narrative statements (i.e., Ex. C-2: Mr. Materne's narrative; Ex. C-3: Ms. Meacham's narrative; and Ex. C-9: Mr. Kallen's narrative) have been considered in conjunction with each witness's sworn testimony and given some limited weight, when in accord with and not contradicted by, a witness's sworn testimony.

3.  Unsworn and Unverified Hearsay Narratives – No Weight

As noted *ante*, Mr. Asmus' general hearsay objection to the admissibility of Exhibits C-4, C-5, C-6, and C-10 was overruled, because the FAA's Rules of Practice ("ROPs")[5] specifically

---

[5] The FAA's Rules of Practice for civil penalty enforcement proceedings may be found in Title 14 of the Code of Federal Regulations ("C.F.R."), Chapter 1, Subchapter B, Part 13, Subpart G (14 C.F.R. §§ 13.201-13.236).

allow for the admission and consideration of various hearsay material. 14 C.F.R. § 13.222(c). However, in order to consider such material, if relevant, it must be shown to be reliable, probative, and substantial. 14 C.F.R. § 13.223. In the instant case, Mr. Asmus' additional objections to the admitted hearsay narratives are sustained, because Exhibits C-4, C-5, C-6, and C-10 do not bear sufficient indicia of reliability.[6] For example, Exhibits C-4, C-5, C-6, and C-10 are all typed on boilerplate forms (typist unidentified). None of the admitted hearsay statements are in affidavit[7] or declarative[8] form. They are all unsigned, unsworn, and unverified by the alleged speakers. *See, e.g.*, FAA Order 2150.3C, Chapter 4, 4.21 § 10.a. ¶ 3 (at minimum, written witness statements should be signed, dated, and verified). None of the speakers were called to testify or subjected to cross-examination. *See, e.g.*, FAA Order 2150.3C, Chapter 4, 4.17 § 9.d (witnesses should be presented for sworn testimony at Hearing). Further, in Exhibits C-4, C-5, and C-6, there is additional boilerplate language, stating that the speaker's narrative could be edited "slightly" ("slightly" undefined; criteria for "editing" unknown) by an "analyst" (unidentified). It appears that neither the narrator nor the reader of the narrative is notified of such "analyst edits," since the boilerplate form refers all readers to seek out "the original" to determine what, if anything, was edited by person(s) unidentified. *See, e.g.*, Ex. C-4, 3.

As discussed *ante*, consideration of such unreliable hearsay material to address proof of liability in this case would violate fundamental concepts of due process, as defined by the U.S. Supreme Court. Thus, the following hearsay exhibits were given no weight and not considered: a) Exhibit C-4: Ms. Nadine Ostroski Narrative; b) Exhibit C-5: Ms. Rebecca Wrinkle Narrative;

---

[6] *See*, 27A Fed. Proc., L.Ed. § 62.649, FEDPROC § 62:649 (Mar. 2025 Update); Steven Baicker-McKee & William M. Janssen, 1175 (Thomas Reuters 2025) (the court generally will not consider unsworn affidavits or improper declarations).

[7] An "affidavit" is a voluntary written statement of fact under oath, sworn to or affirmed by the person making it, before some person who has authority under the law to administer oaths, such as a public notary or a court clerk. 3 Am. Jur. 2d Affidavits § 1, AMJUR AFFIDAVITS § 1 (Jan. 2025 Update); *see also*, FED. R. EVID. 603; 27A Fed. Proc., L.Ed., at § 62.649. The FAA's regulations recommend the use of affidavits (or declarations) in Subpart G proceedings. *See, e.g.*, 14 C.F.R. 13.218 ("affidavit" to be attached to a motion).

[8] A "declaration" is a statement certified or declared to be true under penalty of perjury by the person making it, which has not been sworn before someone authorized to administer oaths. 3 Am. Jur. 2d Affidavits at § 1. Pursuant to 28 U.S.C. § 1746, unsworn statements submitted under the penalty of perjury are permitted in lieu of affidavits. In modern federal litigation practice, a declaration satisfies the "affidavit" requirement. *See, Kersting v. United States*, 865 F. Supp. 669, 676 (D. Haw. 1994) (as long as an unsworn declaration contains the phrase "under penalty of perjury" and states that the document is true, the verification requirements of 28 U.S.C. § 1746 are satisfied).

c) Exhibit C-6: Captain Mitchel Nastri Narrative; and d) Exhibit C-10: Other Passenger Narratives (i.e., Mr. Corbin Byers, Mr. Stephen Marquez, and Ms. Erin Harding).

### 4. Exhibit C-11: United Airlines Hearsay Material – Limited Consideration

Exhibit C-11 was a two (2) page document. It included: a) a one (1) page June 2, 2022 Letter from United Airlines to FAA CMO Manager Mr. Keith Frable; and b) a one (1) page June 1, 2022 email from United Airlines to Mr. Paul Asmus.

#### a) The one (1) page June 2, 2022 Letter – Limited Consideration

The June 2, 2022 Letter is on United Airlines letterhead, with the pre-printed name and address of a United Airlines' Associate General Counsel in the upper right hand corner. However, the June 2, 2022 Letter does not identify the author of the Letter by name, and the signature under the word "Sincerely" is illegible. (Ex. C-11, 1.)

Within the June 2, 2022 Letter, there are a variety of various findings, opinions, and/or conclusions about the May 12, 2022 incident. It is hearsay material that is not sworn or verified by any individual, and could not be challenged in cross-examination by the accused. It offers unreliable anonymous hearsay on disputed issues in this case. Thus, parts of the June 2, 2022 Letter may not considered. However, the June 2, 2022 Letter has been considered reliable evidence in this limited capacity: 1) it is a United Airlines' written communication to FAA employee Mr. Frable; 2) it identifies as attaches a United Airlines' June 1, 2022 Passenger Incident Review Committee ("PIRC") informal email communication to Mr. Asmus; 3) the June 2, 2022 Letter informs Mr. Frable that the United Airlines' PIRC (persons unidentified) reviewed statements from "six crewmembers and three passengers" as well as from Mr. Asmus; and 4) based on the PIRC members' (persons unknown) review of this written material, and a comparison of the May 12, 2022 incident to "other comparable incidents" (undated and undescribed), the PIRC utilized certain criteria (undescribed) to reach a decision (legal authority for decisionmaking unknown) about Mr. Asmus and the May 12, 2022 incident.

*b)  The one (1) page June 1, 2022 Email – Limited Consideration*

The June 1, 2022 PIRC informal email communication ("Email") to Mr. Asmus is on the United Airlines letterhead. This offers some limited reliability that this hearsay material originates from United Airlines. It then identifies the author of the Email as the "Passenger Incident Review Committee" ("PIRC"). Due to the informality of email communications, the Email is not in affidavit or declaration form. It is not a sworn, signed, or verified hearsay statement. Notably, no individual PIRC representative or participating members are identified. Thus, no PIRC representative or member accepted responsibility for authoring the Email or exercising semi-tribunal authority in reviewing unsworn hearsay statements. No PIRC representative or member endorsed the various PIRC member findings, opinions, or conclusions contained within the Email. (Ex. C-11, 2.) Based on the hearsay material presented, it appears that the PIRC (number of members unknown) reviewed unsworn narratives from crewmembers (unidentified) and some passengers (unidentified). It considered a written statement by Mr. Asmus (unidentified). It is unknown whether Mr. Asmus was aware, at the time of his written statement, that the PIRC was considering unsworn hearsay materials, or the content/extent of such hearsay. It appears that the PIRC did not convene an informal hearing, or allow Mr. Asmus to confront and question any of his accusers.  It is unknown whether any PIRC members were current or former United Airlines employees, who might be subject to bias motivations. Further, in the June 1, 2022 Email, the PIRC did not identify any legal authority it was exercising, to make findings of legal liability against Mr. Asmus, based on a documentary review of unsworn narratives. The June 1, 2022 Email is unreliable in terms of probative content. Further, any findings or opinions in the Email about Mr. Asmus' legal liability on the issue of the Interference Rule, even if such could be deemed reliable, would improperly trespass on the decisional authority of the Presiding Judge on the merits of the case.

The June 1, 2022 Email has been given limited consideration as follows: 1) it is a United Airlines informal email communication that states the United Airlines' PIRC (members unidentified, number unknown, tribunal training unstated) reviewed written materials (dates unknown, number and persons unspecified, content unknown) about the May 12, 2022 United Airlines incident; 2) the PIRC also reviewed Mr. Asmus' written material (date unknown, content unspecified); 3) based on the PIRC members' written record review (review criteria

unknown), the PIRC members (potential bias unknown) reached multiple negative conclusions and opinions (unsworn, undated, and unverified) about Mr. Asmus; 4) the PIRC found Mr. Asmus liable for misconduct (authority to make legal finding unstated, liability criteria unknown); 5) the PIRC imposed a $3,153 monetary punishment against Mr. Asmus (legal authority to impose monetary calculation method unknown); 6) the PIRC conditioned Mr. Asmus' future travel on United Airlines on his payment of the $3,153 monetary punishment (legal authority for causal condition unknown); and 7) the PIRC provided a method for Mr. Asmus to file an appeal from the PIRC decision (no information specified about appellate process or non-judicial appellate forum).

### B. Mr. Asmus' Hearing Witnesses and Exhibits

In his responsive case, Mr. Asmus presented himself as his sole witness. During the Hearing, Mr. Asmus also offered (9) exhibits into evidence, identified as A, B, D, H, I, J, K, L, and N. The FAA objected to the admission of four (4) Exhibits, specifically, Exhibits A, B, H, and J. Exhibits A, B, D, I, K, L, and N were admitted into evidence, and Exhibits H and J were denied admission. (Note: Exhibit G was referenced during Mr. Kallen's testimony, but not offered for admission.)

## III.    INTERFERENCE LEGAL STANDARD

The FAA has charged Mr. Asmus with one (1) regulatory violation of 14 C.F.R. § 121.580 (i.e., the "Interference Rule"). (Compl. 3 § III.) The Interference Rule[9] provides:

> No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated under this part.

14 C.F.R. § 121.580.

---

[9] The "Interference Rule" is repeated in similarly worded regulations in other parts in Title 14. *See*, Part 91 (14 C.F.R. § 91.11); Part 125 (14 C.F.R. § 125.328); and Part 135 (14 C.F.R. § 135.120).

In the instant case, the FAA did not allege that Mr. Asmus had violated the first two (2) prongs of the Interference Rule (i.e., assault or threats)[10] while aboard United Airlines Flight 1684. Instead, the FAA alleged that Mr. Asmus violated the Interference Rule by intimidation and/or interference with one or more crewmembers in the performance of their duties. Compl. 2 § II ¶ 6. Under either alleged prong of the Interference Rule, the charged offense must be supported by sufficiently reliable, probative, and substantial admissible evidence. 14 C.F.R. § 13.223. While the FAA herein asserted that its evidentiary proof for the two (2) separate violation prongs were "all rolled into one count" (Tr. 29:2-3), each alleged prong must be supported by evidentiary proof.

### A. Applicable Definitions

To understand the scope and applicability of Section 121.580, a review of definitions is helpful. First, the Federal Aviation Regulations ("FARs") define an aircraft "crewmember" as "a person assigned to perform duty in an aircraft *during flight time*." 14 C.F.R. § 1.1 ("Crewmember" definition, emphasis added). "Flight time" of an aircraft is defined (in part) as "pilot time" that begins "*when an aircraft moves under its own power* for the purpose of flight and ends when the aircraft comes to rest after landing." 14 C.F.R. § 1.1 ("Flight time" definition, emphasis added). The "critical" phases of a Part 121 "flight" include "all ground operations involving taxi, take-off and landing, and all other flight operations conducted below 10,000 feet, except cruise flight." 14 C.F.R. § 121.542(c). An aircraft "being operated" includes any use of an aircraft for the purpose of air navigation. 14 C.F.R. § 1.1 ("Operate" definition).

### B. Aircraft Physical Movement

To prove a violation of the Interference Rule under any of the four (4) prongs, the act(s) of interference must occur when the aircraft is operated "in flight," that is – during physical movement or navigation of the aircraft under its own power.  14 C.F.R. § 1.1 ("Flight time"

---

[10] Section 121.580 is written in the disjunctive, so a person may be liable -- separately – for assault, for threatening behavior, for intimidation, and for interference. *See, e.g., Evgeniy V. Ignatov*, FAA Order No. 96-6, p. 8, 1996 WL 210098 (Feb. 13, 1996); *Artem Aylyarov*, FAA-2005-23017, 2006 WL 3147905, at *3 (Nov. 2, 2006); *Linda Johnson*, G13-22-45, 2024 WL 3849885 (Aug. 15, 2024).

definition); 14 C.F.R. § 121.542(c); *see, Careless or Reckless Ground Operation of Aircraft*, 32 Fed. Reg. 9640, 9640-41 (July 4, 1967) (the general meaning of "operate" for aviation safety means to impart "some physical movement to the aircraft" or involve "the manipulation of the controls of the aircraft such as starting or running an aircraft engine"); *see also, Demario Driver*, G13-22-37, 2023 WL 2423481, at *4 (Mar. 8, 2023) (FAA regulations specifically provide that "flight time" for Part 121 aircraft includes all operation of an aircraft moving under its own power, both on the ground and in the air).

In 2000, the FAA published a Legal Interpretation on the question of how to define "flight time" within the meaning of 14 C.F.R. §§ 1.1 and Part 121. The FAA explained that the regulatory definition in 14 C.F.R. 1.1 mandated that "flight time <u>starts</u> at the moment when the aircraft taxies under its own power from the gate" and "flight time <u>continues</u> until the moment the aircraft comes to rest at the next point of landing." FAA Legal Interpretation 1001-3, 2000 WL 35499413 (Jun. 2, 2000), 2000 WL 35499413 (emphasis in original). This is called "block to block" time. *Id.* Referring to a prior 1972 FAA Memorandum, the FAA also emphasized that "time spent in moving an airplane from the loading point to another point, not under the airplane's own power, but by means of a tractor or other conveyance that pulls the airplane into position to begin a flight" was <u>not</u> "flight time." *Id., citing* Oct. 18, 1972 FAA Memorandum to AGL-7 (emphasis added).

Ten (10) years later, in 2010, the Third Circuit Appeals Court examined the statutory and regulatory definitions of flight time "operations" that were applicable to the Interference Rule under Part 91.[11] In *Elassaad v. Independence Air, Inc.*, 613 F.3d 119 (3d Cir. 2010), the Third Circuit found that flight time "operations" principally applied *"to the takeoff"* of an aircraft, *"the 'piloting' that occurs during the flight,"* and the *"landing of an aircraft." Elassaad*, 613 F.3d at 130 (emphasis added). In reviewing the facts of the case, the *Elassaad* Court held that no violation of the Interference Rule was proven, because the aircraft had not been "operated in flight" as required by law. Rather, at the time of the alleged incident, "the aircraft had landed, taxied to the gate, and come to a complete stop." *Id.; see also, United States v. St. Amour*, 886 F.3d 1009, 1015 (11th Cir. 2018) (the word "operate" means the use of an aircraft moving on the

---

[11] The Interference Rule in Part 91 provides: "No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated." 14 C.F.R. § 91.11.

ground, which "*include[ed] the starting, taxiing, or parking of an aircraft*"); *Flores v. SkyWest, Inc.*, No. 20-17393, 2022 WL 193011, at *3 (9th Cir. 2022) (the word "operate" refers to "the pilot's operation of controls associated with navigation").

### C. Various Crewmember Duties

The Interference Rule does not identify specific flight crewmember duties covered by the Rule, but other regulations in Part 117[12] and Part 121[13] do provide guidance. For example (not inclusive), the "critical" phases of a Part 121 "flight" operation includes "all ground operations involving taxi, take-off and landing, and all other flight operations conducted below 10,000 feet, except cruise flight." 14 C.F.R. § 121.542(c). During such *critical* phases of a Part 121 flight, a flight crewmember is required to perform only "those duties required for the safe operation of the aircraft."[14] 14 C.F.R. § 121.542(a). Further, Part 121 identifies various safety responsibilities for Part 121 certificate holders, which include (but are not limited to): a) crewmembers "briefing" passengers on safety issues (14 C.F.R. § 121.571); and b) crewmembers performing various safety duties during aircraft taxiing (14 C.F.R. § 121.391(d)).

### D. Safety Risk to Aircraft Flight or Flight Personnel

The FAA's regulations do not provide a specific definition of what action (or inaction) constitutes "interference" by an aircraft passenger with a crewmember's duties under Section 121.580. Rather, the prohibited act of "interference" has been interpreted on a case-by-case basis. *See, e.g.*, Graham Keithley, *The Federal Powers to Fight Back Against Unruly Airline Passengers*, 34 No. 3 Air & Space Law 6 (2022) (the "nature of unruly [passenger] behavior will continue to evolve" as cases are charged and tried). Nevertheless, certain guidance is available.

---

[12] Part 117 may be found in Title 14 of the Code of Federal Regulations ("C.F.R."), Chapter 1, Subchapter G, Part 117 ("Flight and duty limitations and rest requirements: flightcrew members").

[13] Certain Part 117 flight attendant flight times, duty limitations, and rest provisions are incorporated into Part 121. 14 C.F.R. § 121.467(c); *see also* 14 C.F.R. §§ 117.1 and 117.3 ("Flight duty period").

[14] Thus, the flight attendant cannot perform, during critical phases of a Part 121 flight, non-safety related duties required by the airline company (e.g., ordering galley supplies, confirming passenger connections, filling out records, etc.) or "non-essential" activities (e.g., eating, casual conversations in the galley, etc.). 14 C.F.R. § 121.542(a) and (b). Flight attendants taking a rest "period" are not engaged in duty activities at all. 14 C.F.R. § 117.5 ("Rest period").

In the criminal context, "interference" with performance of a crewmember's duties "may be satisfied by proof of either an interference with the target's duties *or* a lessening of the target's ability to perform his or her duties." *United States v. Flores*, 968 F.2d 1366, 1370 (1st Cir. 1992) (emphasis in original). For example, "grabbing and shoving a flight attendant, coupled with a diatribe of profane remarks, are actions which could inhibit the performance of an attendant's duties." *United States v. Tabacca*, 924 F.2d 906, 913 (9th Cir. 1991); *see also, United States v. Hicks*, 980 F.2d 963, 975 (5th Cir. 1992) (finding of interference supported by testimony and "other evidence" that showed that "flight crew members, including a member of the cockpit crew, were forced to ignore their duties as a result of the [passenger's] intimidating words and conduct."). However, "only intimidating acts or words that actually interfere with a crew member's duties are penalized." *Hicks*, 980 F.2d at 972.

The FAA has relied on these general evidentiary proof requirements in civil penalty adjudications. For example, in 1997, the FAA Administrator held that evidence demonstrating that a passenger had repeatedly been "noncompliant" with a flight attendant's instructions and had displayed a "disregard for the safety rules" supported a finding of interference with a crewmember. *David H. Mayer*, FAA Order No. 97-12, 1997 WL 93233 at *6 (Feb. 19, 1997). In 2008, the FAA Administrator found that a passenger committed interference by verbally berating a flight attendant and refusing to comply with crewmember instructions. *Hillard Abroms*, FAA Order No. 2008-2, 2008 WL 345387, at *6 (Jan. 28, 2008). Notably, not all potentially problematic conduct rises to the level of a violation, either criminally or civilly. The FAA Administrator has also found that evidence of a "momentary and inconsequential interference" by an aircraft passenger was insufficient to prove a violation of the Interference Rule. *Sharon Dorfman*, FAA Order 99-16, 1999 WL 1279833 (Dec. 22, 1999) (passenger slow to comply with crewmember instructions did not amount to interference); *see also, Gabriel Arroyo*, G13-22-71, 2024 WL 1255298, at *6–7 (Mar. 20, 2024) (admitted evidence insufficient to prove interference).

In 2016, the D.C. Circuit Court of Appeals provided more guidance when it reviewed an FAA civil penalty adjudication and held that the FAA's regulatory prohibition against "interference" with a crewmember aboard an operating aircraft prohibits "behavior that puts at

risk" either "the safety of the 'physical aircraft or [the] air carrier personnel.'" *Wallaesa v. Fed. Aviation Admin.*, 824 F.3d 1071, 1081-82 (D.C. Cir. 2016), *cert. denied*, 137 S.Ct. 389 (Oct. 31, 2016). In that case, Mr. Wallaesa was charged with violating both seatbelt regulations (14 C.F.R. § 121.317(f) and (k)), and the Interference Rule (14 C.F.R. §121.580). The Appeals Court emphasized that Mr. Wallaesa had specifically violated the Interference Rule, separately from the charged seatbelt violations, during the final hour of the flight when Mr. Wallaesa: 1) "disrupted the crew's ability to provide a safe and orderly environment," 2) "forced the crew to stand during a potentially turbulent descent in violation of the captain's command to remain seated," and 3) "put[] at risk the safety of [the] flight." *Wallaesa*, 824 F.3d at 1081, 1084; *see also, Michael Lankford*, FAA-G13-22-52; 2023 WL 183474, at *8 (Jan. 12, 2023).

## IV.    SEATBACK POCKET INCIDENT

In its December 9, 2022 Complaint, the FAA identified two (2) distinct interactions the flight attendants had with Mr. Asmus while he was aboard United Airlines Flight 1684, that the FAA alleged supported its Interference Rule charge. Based on the FAA's fact pleadings[15] and witness testimony, the first incident occurred during passenger boarding, when United Airlines Flight 1684 was parked at the San Francisco California ("SFO") airport gate. Mr. Asmus was seated in his assigned seat in Row 22. He reported seatback pocket damage to the flight attendant standing in the aircraft aisle at Row 21.

### A. Preliminary Matters

1.  <u>Aircraft Parked at the Gate</u>

During the seatback pocket incident, a variety of individuals (e.g., passengers, gate crew, and even a mechanic) were boarding and/or leaving the parked aircraft. Flight 1684 was not in

---

[15] In its Complaint, the FAA improperly alleged the following pleading as a fact in Section II, ¶ 6: "Respondent's above-described actions intimidated or interfered with one or more crewmembers in the performance of their duties aboard an aircraft being operated under 14 C.F.R. part 121." (Compl. 2 § II ¶ 6.) The FAA then reiterated this pleading as a legal conclusion. (Compl. 2-3 § III ¶ 1.) Section II, ¶ 6 in the FAA's fact allegations is not included in the discussion of facts herein, because it is not a fact allegation – it is a legal conclusion. *See, e.g., Deidrea Philbrick*, G13-22-024, 2024 WL 4331671, at *5 (Sept. 24, 2024) (allegation in the fact section of the FAA's Complaint that respondent committed the regulatory offense of "interference" is not a fact, rather, it is a legal conclusion).

"flight operations" during the "seatback pocket" incident (i.e., the first alleged incident), because the aircraft was parked at the gate and not moving under its own power. 14 C.F.R. §§ 1.1. and 121.542(c); *Elassaad*, 613 F.3d at 130. Thus, any proof offered about this seatback incident, which occurred while the aircraft was parked at the gate, is not proof of an Interference Rule violation, because the incident did not occur during flight operations, and did not impact the aircraft during flight, or impact the safety of the flight personnel during flight. *Elassaad* at 130; *Wallaesa*, 824 F.3d at 1081-82. However, evidence about this alleged seatback pocket incident may serve as background for the second alleged incident (i.e., "the photograph incident") that is alleged to have occurred during aircraft "pushback" and taxiing.

### 2. FAA Pleadings and "Threat" Evidence

As discussed *ante*, the FAA specifically pleaded that Mr. Asmus violated two (2) prongs of the Interference Rule: intimidation and interference. (Compl. 2 § II ¶ 6.) The FAA did not plead that Mr. Asmus violated the Interference Rule by "threats." The FAA is bound by its pleadings. Therefore, any testimonial evidence offered by United Airline witnesses who asserted they felt "threatened" by Mr. Asmus cannot be utilized to prove that Mr. Asmus violated the Interference Rule under the "threat" prong. Such evidence may, however, be evaluated as part of a claim of interference by "intimidation."

### 3. United Airline Witnesses' Discussions About Mr. Asmus

The evidence demonstrates that on May 12, 2022, Ms. Meacham and Mr. Materne were "flying partners" on Flight 1648, working in tandem in the aft section of the aircraft. Mr. Kallen, a United Airlines pilot flying as a passenger on the aircraft, introduced himself and his United Airlines employee status to them (and the other flight crewmembers) when he boarded the aircraft. After Mr. Asmus was re-seated in the back of the aircraft in Row 38, Ms. Meacham returned to Row 21 to talk with Mr. Kallen (who was seated in the middle seat in Row 21). They discussed Mr. Asmus' claim that he was an FAA employee. During that first discussion, Mr. Kallen recommended to Ms. Meacham that she ask Mr. Asmus to produce his FAA 110 ASI identification badge.

Once all passengers were boarded and were seated, Ms. Meacham and Mr. Materne seated themselves directly across from each other in their jumpseats, in the back of the aircraft. They were located behind Mr. Asmus and the aft lavatory. They talked quietly about Mr. Asmus and their concerns about him. Once the aircraft began its "pushback," Mr. Materne took the lead in approaching Mr. Asmus. He questioned Mr. Asmus about a photograph Mr. Asmus had taken. In between his interactions with Mr. Asmus, Mr. Materne consulted with both Ms. Meacham and the Captain in the cockpit. Mr. Materne ultimately asked Mr. Asmus to produce his FAA 110 ASI identification badge.

Once the Captain returned the aircraft to the gate, Ms. Meacham gave Mr. Asmus permission to leave his seat to talk with the Captain. After Mr. Asmus went up to the jetway, Ms. Meacham and Mr. Materne walked up to Row 21 to talk with Mr. Kallen, who remained seated in Row 21 amidst other passengers. Ms. Meacham, Mr. Materne, and Mr. Kallen discussed their perceptions, opinions, and conclusions about Mr. Asmus. Mr. Kallen then left his seat and went up to the cockpit to talk with the Captain. After Mr. Asmus left the aircraft, the United Airlines flight was delayed on the tarmac for approximately two (2) hours, before the aircraft flew to Hawaii, which took approximately five (5) hours. It is unknown what other conversations (if any) occurred between Ms. Meacham, Mr. Materne, and Mr. Kallen about Mr. Asmus, before the aircraft landed in Hawaii. In light of their known shared discussions about Mr. Asmus on May 12, 2022, their post-flight unsworn narratives, as well as their subsequent testimonial statements, must be carefully reviewed and considered.

4. Mr. Kallen's "Frightened Passenger" Allegations – No Weight

Mr. Kallen alleged in both his 2022 unsworn narrative and 2024 sworn testimony that passengers around Mr. Asmus in Row 22 were frightened or scared. *See, e.g.*, Tr. 103:18-25. This testimony is given no weight for multiple reasons. First, Ms. Meacham, who interacted directly with Mr. Asmus in Row 22, did not corroborate Mr. Kallen's assertion about "frightened" passengers. Second, Ms. Meacham conducted part of her seatback pocket conversation with Mr. Asmus from both Row 21 and Row 20, over the heads of multiple passengers (including Mr. Kallen). This casual behavior by Ms. Meacham, while Mr. Asmus was seated in Row 22 surrounded by other passengers, does not demonstrate that Ms. Meacham

perceived Mr. Asmus' statements as inciting fear in others. Third, none of the passengers aboard Flight 1648, within hearing distance of Mr. Asmus in Row 22 (or Mr. Kallen in Row 21) were called to testify as witnesses. Thus, any "fright" attribution by Mr. Kallen to unnamed passengers (who Mr. Kallen may not have even seen from his seated position) is pure speculation. Fourth, Mr. Asmus' statements reporting seatback pocket damage do not support, under an ordinary reasonable person standard, any reasonable presumption that other passengers, overhearing Mr. Asmus's report of seatback pocket damage, would fear that Mr. Asmus was a threat, or alternatively, that the aircraft was not "safe" or "airworthy." Fifth, any concerns passengers might have experienced on Flight 1648 about Mr. Asmus might equally be attributed to Mr. Kallen, Ms. Meacham, and/or Mr. Materne, when they gathered in Row 21 to talk negatively about Mr. Asmus.

**B. Undisputed Fact Testimony - Seatback Pocket Incident**

Ms. Meacham testified that on May 12, 2022, there were four (4) Flight Attendants and two flight deck crew assigned to United Airlines' Flight 1684. Tr. 37:18-21. The flight to Hawaii was scheduled to last five (5) hours. Tr. 32:23-24. Ms. Meacham was designated as Flight Attendant No. 2, at position "Two Right." Tr. 36:8-22; 37:9-13. Her "Two Right" position meant she worked in the back (or aft) of the aircraft, on the right side facing the cockpit. Tr. 32:16-17. During the passenger boarding process at the SFO gate, Ms. Meacham was standing in the aisle, near the exit rows. Ms. Meacham observed Mr. Asmus when he boarded and took his window seat. At that time, she had no problems or concerns at all with him. Tr. 60:15-25.

Mr. Kallen, a United Airlines pilot employee, testified he and his fiancé were passengers aboard Flight 1684. They were flying to Hawaii to get married. When Mr. Kallen boarded Flight 1684, he "flashed his [pilot] badge to the flight attendants" and got them to hang up his fiance's wedding dress. Tr. 81:8-9. He sat down in his seat, which was the middle seat. Tr. 75:19-76:8; 105:5-11. Mr. Asmus was seated "behind me and to my right." Tr. 82:15-17; 105:8-11.

### C. Discussion of Witness Evidence – Seatback Pocket Incident

All three (3) United Airline employee witnesses, as well as FAA employee Ms. Pritchard, testified as lay witnesses. Only certain testimonial highlights will be discussed, to assist the reader to understand the decision.

#### 1. Mr. Asmus' Damage Report

Mr. Asmus was seated in Row 22, Seat F, a "non-economy plus" window seat. Tr. 38:2-6; 42:17-19. According to Ms. Meacham, Mr. Asmus caught Ms. Meacham's attention (while Mr. Asmus remained seated) and said: "Excuse me. This seat back pocket is going to impede me in an evacuation." Tr. 38:2-6; 43:8-10. Both Ms. Meacham and Mr. Kallen concurred that Mr. Asmus had used polite language in reporting his concern.[16]

#### 2. FAA Employee Status and Authoritative Tone

Upon hearing Mr. Asmus' damage report, Ms. Meacham told Mr. Asmus that the damaged seat back pocket would "probably" not be replaced before the aircraft departed, because it would delay the flight. Tr. 38:18; 39:10-15; *see also*, Ex. C-3, 2. In response, Mr. Asmus then told Ms. Meacham that "I work for the FAA." Tr. 39:21-22; Tr. 311-13. Ms. Meacham agreed that Mr. Asmus acted as if he worked for the FAA. Tr. 49:29-23. Mr. Kallen characterized Mr. Asmus' as speaking "gruffly," Tr. 88:14-17, but Mr. Asmus was clearly someone "in the industry." Tr. 82:25-83:18. Mr. Asmus' "tone" of voice demonstrated he was "somebody of authority," like "a mechanic." Tr. 83:11-18. Mr. Kallen recalled thinking that since Mr. Asmus had the ability to check the maintenance log, he either "works for us in some sort of an oversight position, or he works for the FAA – right?"[17] Tr. 87:3-7.

---

[16] Mr. Kallen recalled Mr. Asmus stating: ""Excuse me. My seatback is torn, and it's going to affect my ability to egress the aircraft in the case of an emergency." Tr. 82:19-22.

[17] Inconsistent with his sworn testimony, Mr. Kallen opined in his unsworn narrative that Mr. Asmus couldn't have been an FAA Inspector, because Mr. Asmus didn't appear to understand that "the deferral of a furnishing would be quickly dispatched and would cause little delay." Ex.C-9, 3.

### 3. Mr. Asmus' Offer to Move to Different Seat to Avoid Flight Delay

Mr. Kallen consistently reported, both in his narrative and sworn testimony, that Mr. Asmus told Ms. Meacham that if he could move to a different seat, the seatback pocket matter could be resolved without any delay to the flight.[18] Ex.C-9, 2; Tr. 124:11-21. This indicates that Mr. Asmus understood that the seat pocket damage repair could be deferred, with the seat remaining vacant, if a different seat was found for him. Mr. Asmus also told Ms. Meacham he would check the logbook later to see that the maintenance was performed.[19] However, both Ms. Meacham and Mr. Kallen considered this logbook remark as "threatening" and intimidating. The logbook testimony is further addressed in the Intimidation section, *infra*.

### 4. Loud Voice – Not Probative of Intimidation

Both Ms. Meacham and Mr. Kallen criticized Mr. Asmus for using a "loud" voice (volume undescribed) when speaking with Ms. Meacham while seated in Row 22, Seat F. Tr. 39:21-22; 156:10-19. The evidence demonstrated, however, several reasons why Mr. Asmus used a "loud" voice during a short conversation. Specifically, Mr. Asmus was trying to talk with Ms. Meacham from his window seat. Another passenger was already seated next to Mr. Asmus in the middle seat, so Mr. Asmus could not easily stand up or move towards Ms. Meacham. During part of the conversation, Ms. Meacham was standing two (2) rows away from Mr. Asmus. Tr. 85:8-13; 86:16-24. Other passengers were boarding. Mr. Asmus was also wearing a face mask. Tr. 60:2-7; 148:13-15. Ms. Meacham conceded that passengers wearing face masks sometimes had to "speak louder" to be heard. Tr. 60:8-11. The totality of the FAA's evidence supports a finding that Mr. Asmus was speaking "loudly," but this evidence, alone, is not proof of either rudeness or intimidating behavior.[20]

---

[18] Mr. Kallen confirmed in his unsworn narrative that Mr. Asmus suggested that Ms. Meacham just assign him a different seat, so the flight would not be delayed. (Ex.C-9, 2.)

[19] At first Mr. Kallen testified that Mr. Asmus tell Ms. Meacham: "Tell them I'm going to check." Tr. 83:22-25. However, later Mr. Kallen said he could not remember exactly when Mr. Asmus talked about "checking." He said it might have been when the flight attendant had been in "Row 19, 20" and had already started making her way up the aisle. Tr. 83:6-24.

[20] Notably, during Mr. Asmus' responsive case, he recalled that Ms. Meacham also spoke "loudly." Tr. 293:24.

5. Lay Witnesses' Damage Assessments

Both Ms. Meacham and Mr. Kallen conceded that they were not trained in mechanics. They did not make decisions about airplane maintenance safety issues. Tr. 62:22; 130:6-19. Mr. Kallen explained that the job of pilots and flight attendants was not to diagnose mechanical damage or irregularities. Rather, pilots and flight attendants were supposed to report such matters so that "mechanical people [could] decide whether it is safe to continue." Tr. 130:6-19. Mr. Kallen agreed that safety concerns could occur for all types of reasons. Even a broken latch on an overhead bin was a matter that the flight crew were required to report to the Captain, and at a minimum, a logbook maintenance entry was required to be made. Tr. 135:13-136:10.

Nevertheless, both Ms. Meacham and Mr. Kallen repeatedly attacked Mr. Asmus' seatback damage report. For example, Ms. Meacham acknowledged that there was "slight" damage to the seat back pocket. Tr. 38:9. She described it as "a little bit of a sag." Tr. 38:10. She perceived it as "a nonissue." Tr. 38:13. She opined that Mr. Asmus was wrong in his assertion that it was a safety issue that needed to be addressed, because, in her opinion, "[a] slight sag or a bent wire is not going to impede anybody in an evacuation." Tr. 40:19-23. Similarly, Mr. Kallen opined that Mr. Asmus' seat back complaint was "not a big...deal." Tr. 83:7. It was just "a little tear" that could have been fixed anytime, "so long as it's not a safety hazard." Tr. 92:21-93:10. Mr. Kallen opined that Mr. Asmus made a "big deal" out of a little "bent wire." Tr. 101:22-24. Mr. Kallen also speculated that the broken wire in the seatback pocket could have been easily repaired, by just removing both the wire and the "entire seat back." Tr. 106:21-107:13. Mr. Kallen also repeatedly speculated[21] that Mr. Asmus had reported the damage to try and "get...a new seat." Tr. 83:3. Mr. Kallen's negative speculations about Mr. Asmus were neither probative, nor supported by the evidence [22], and have been accorded no weight.

---

[21] Mr. Kallen speculated in both his narrative and sworn testimony that Mr. Asmus reported the seatback damage to try and get a seat upgrade.

[22] For example, Mr. Asmus refused to accept another passenger's offer trade seats. Tr. 88:14-17. Mr. Kallen chose to interpret this refusal as an "angry" attitude by Mr. Asmus (Tr. 88:19), and a continuing attempt by Mr. Asmus to obtain a seat upgrade (Tr. 145:7-17), rather than trying to protect another passenger from potential harm. *See, e.g.,* Tr.308:12-24 (Mr. Asmus testifying about potential harm to another passenger). Further, Mr. Kallen interpreted Mr. Asmus' request for a $21 reimbursement of the Row 22 seat cost, if he was assigned to a less expensive "economy" seat in the back of the aircraft, as a continuing attempt to obtain a more expensive seat in the forward cabin.

Page 22 of 44

Ms. Meacham and Mr. Kallen's attempts to criticize and devalue Mr. Asmus' damage report were troubling on multiple grounds. They agreed they did not have the needed expertise to assess the seatback pocket damage or its safety hazard. They also agreed that all such damage reports were supposed to be taken seriously and reported. But they assigned negative value to Mr. Asmus' report, and then offered their damage assessment opinions. Notably, during cross-examination, Mr. Kallen appeared to contradict or retreat from some of his dismissive damage opinions. For example, Mr. Kallen explained that an aircraft's seat "pitch,"[23] provided the average size adult male only two (2) or three (3) inches between his body and contact with the seatback in front of him. Tr. 138:19-139:8. Under certain circumstances, a seatback pocket could impair someone's ability to egress from the airplane. Tr. 129:25-130:5. Mr. Kallen then confirmed that if the damaged seatback pocket in Row 22 had had a broken spring, Mr. Asmus would have had "a realistic concern" that a wire sticking out could injure a passenger. Tr. 137:17-138:1; 143:17-19.

6.  New Seat Assignment

Ms. Meacham returned to Row 22 and told Mr. Asmus that the Captain had notified maintenance to come aboard, but the repair might be deferred. Ex. C-3, 2. Ms. Meacham also told Mr. Asmus that she had found an alternate seat at the back of the plane, which he accepted. He asked about the seat cost, and was told there was no difference.[24] Mr. Asmus then immediately moved to Seat D, the alternate aisle seat in Row 38, in the back of the aircraft. Tr. 44:3-6.

Mr. Kallen stated in his unsworn statement that Mr. Asmus expressed displeasure with the new seat assignment.[25] He opined that Mr. Asmus was "angry" about the seat assignment in

---

[23] Mr. Kallen described the "pitch" of a seat as "the distance between the seat… and the passenger['s]" body. 4 Tr. 138:15-16.

[24] Mr. Asmus asked if he would get a refund for any extra money he'd paid for his seat in Row 22 (which he thought cost more than the seat in Row 38). Ms. Meacham contacted "the CS agent" (i.e., the United Airlines gate agent), via her cell phone about the seat costs. The CS agent checked, and then came aboard the aircraft and told Mr. Asmus that he had not paid more for Row 22 than the cost of a seat in Row 38.

[25] In Mr. Kallen's unsworn narrative, he stated that "[t]his new seat did not please" Mr. Asmus, but he did move to the new seat. Ex.C-9, 2. Mr. Kallen interpreted a "grumble" [undescribed further] by Mr. Asmus as a statement of displeasure about the new seat.

the back of the plane. Tr. 88:18-19. However, during cross-examination, Mr. Kallen amended his opinion, and stated that Mr. Asmus complied with Ms. Meacham's offer of a seat reassignment to the back of the aircraft without any hesitation or argument. Tr. 125:4-9. This amended testimony appeared in accord with Ms. Meacham's testimony.

After Mr. Asmus was reseated, Ms. Meacham testified that she returned to her "duties in the aisle." Tr. 46:7-10. The evidence demonstrates, however, that she also spent time at Row 21, discussing with Mr. Kallen her concerns about Mr. Asmus' alleged FAA employee status. This meeting is discussed in more detail, *infra*.

    7.  <u>Safety of Flight Issue and Damage Repair</u>

Mr. Kallen confirmed that once aircraft discrepancies were reported, a pilot could choose to either defer maintenance, or, if the discrepancy was a "safety of flight" issue, have a mechanic come aboard to fix it. Tr. 83:3-7; 145:23-146:3. It was undisputed that once the Captain heard Ms. Meacham report Mr. Asmus' damage concern, the Captain immediately radioed for a mechanic to come aboard to look at the seatback pocket damage. Tr. 43:6-14. This evidence supports a finding that Mr. Asmus reported a potential "safety of flight" damage issue.

After Mr. Asmus moved to the back of the aircraft, a mechanic came aboard the aircraft and examined the seat back pocket damage in Row 22. According to Mr. Kallen, this happened "quickly" (i.e., less than 15 minutes) after Mr. Asmus had reported the damage.[26] Tr. 106:21-107:13. Neither Ms. Meacham nor Mr. Kallen could state with clarity what the mechanic did to the seatback pocket when he came aboard to fix it. Tr. 132:7-8. Ms. Meacham testified, however, that after the repair was finished, the mechanic approved the aircraft for flight.[27] Tr. 63:20-64:16. After the mechanic left the aircraft, Ms. Meacham went back to Row 38 and asked Mr. Asmus if he'd like to return to Row 22. Despite Mr. Kallen's negative seat upgrade

---

[26] In Mr. Kallen's unsworn narrative, he alleged that Mr. Asmus had been disrespectful to "the Maintenance technicians". (Ex.C-9, 3.) Mr. Kallen did not offer any sworn testimony repeating this allegation. It was undisputed at the Hearing that Mr. Asmus had no contact with the mechanic who came aboard the aircraft to fix the seatback pocket.

[27] In contrast, Mr. Kallen speculated that the mechanic who came aboard the aircraft "determined" that the seat back pocket damage was "not a safety hazard." Tr. 94:10. This speculation was not probative, particularly since Mr. Kallen did not speak with the mechanic and had no knowledge of what the mechanic did to fix the damage.

Page 24 of 44

speculations and opinions,[28] Mr. Asmus appeared content with his new economy seat in Row 38 and replied "no." Tr. 44:10-12.

 8. Alleged Interference

Ms. Meacham testified that Mr. Asmus interfered with her "safety-sensitive" duties[29] as a flight attendant, because she had to leave the passenger aisle to go to the cockpit to report his complaint about the damaged seat back pocket. Tr. 45:12-46:1. According to Ms. Meacham, Mr. Asmus' seatback pocket damage report pulled her "away" from her regular duties, because she had to "swim upward" the aisle (i.e., as passengers were boarding) to go to the cockpit and report the matter to the Captain. Tr. 45:22-23. Thus, she was "no longer in the aisle" welcoming and assisting passengers who were boarding the aircraft. Tr. 45:24-46:1; 158:21-159:2.

It was undisputed that Ms. Meacham left her aisle post temporarily. However, her testimony that she had to leave the aisle to go to the cockpit to talk to the Captain was not true. First, when discussing Mr. Asmus' seat reassignment, Ms. Meacham admitted that she had (and knew how to use) a United Airlines' iPhone, which she possessed for the purpose of communicating with other United Airline employees. Ms. Meacham had used it to contact the gate agent (see also, Ex. C-2, 2: having a "chat" with gate agent). Tr. 43:17-20. Second, after Ms. Meacham finished testifying, Mr. Kallen (who had been sequestered from the courtroom during Ms. Meacham's testimony) was called as a witness. Mr. Kallen explained that Ms. Meacham did not "have" to go up in person to the cockpit to report damage (or anything else) to the Captain. Instead, Ms. Meacham could have remained in the aisle, and used her cell phone to report Mr. Asmus' damage concern to the Captain and/or to any of the other flight attendants.[30] Alternatively, instead of using her cell phone, Ms. Meacham could have: a) walked to the aft galley (i.e., moving with the flow of passengers boarding), or b) to the forward galley (moving

---

[28] In Mr. Kallen's unsworn narrative, he interpreted a "grumble" by Mr. Asmus [undescribed further] as a statement of displeasure about the new seat. Mr. Kallen also opined that Mr. Asmus had been "angry" about the Row 38 seat. Ex.C-9, 2.

[29] Ms. Meacham did not identify any specific "safety-sensitive" duties she was or should have been performing in the aircraft aisle while the aircraft was parked at the SFO gate.

[30] Using her iPhone, Ms. Meacham could have called (or chatted) with any other flight attendant on the aircraft who were close to the cockpit or to one of the aircraft galleys, to ask them to notify the Captain.

against the flow of passengers), to call the Captain via the galley intercom. The fact that Ms. Meacham simply chose to leave her aisle post and "swim" up to the cockpit (i.e., past approximately 20 rows of seats) to speak personally with the Captain was Ms. Meacham's personal choice. Tr. 105:13-106:17.

Further, Ms. Meacham's testimony that Mr. Asmus interfered with her regular duties as a flight attendant, because she had to leave her post, was also not true. Mr. Kallen confirmed, during cross-examination testimony, that Ms. Meacham had not been diverted from her regular duties at all. Rather, it was fully part of her regular flight attendant safety duties to take Mr. Asmus' damage report, and then notify the Captain about Mr. Asmus' seatback pocket damage complaint. Tr. 162:8-24. The totality of the FAA's evidence demonstrated that Ms. Meacham's assertion that Mr. Asmus interfered with her flight attendant duties was not credible.

## V.    FIRST AISLE MEETING – MS. MEACHAM AND MR. KALLEN

In her unsworn narrative, Ms. Meacham stated that Mr. Kallen "witnessed" the entire seatback pocket interaction between herself and Mr. Asmus. Ex. C-2, 2. She did not, however, disclose (either in her narrative or in her sworn testimony) that she had also consulted with Mr. Kallen about Mr. Asmus.

Mr. Kallen testified that, after Mr. Asmus was seated in Row 38, Ms. Meacham began talking with Mr. Kallen (seated in the middle seat in Row 21) about her concerns that Mr. Asmus might be an FAA Safety Inspector. Notably, at that time Ms. Meacham did not allege any obnoxious, combative, interfering, and/or intimidation behavior by Mr. Asmus. Instead, Ms. Meacham's focus in her discussion with Mr. Kallen was that Mr. Asmus had claimed to "work[] for the FAA." Tr. 91:8-10; 101:8-9.

Although Mr. Kallen testified at the Hearing that he had immediately recognized Mr. Asmus as "a passenger of authority" (10/22/24 Tr. 87:22-9) who worked in the industry (Tr. 82:25-83:18) and might be an FAA ASI (Tr. 92:14), he told Ms. Meacham on May 12, 2022 that he was "incredulous" to hear that Mr. Asmus might work for the FAA. Tr. 91:9-10. Mr. Kallen testified that he had felt "incredulous" in May 2022 because the damage Mr. Asmus reported was minor and would not justify a seat upgrade. Tr. 93:2-93. It was just "a little tear" that could have

been fixed anytime, "so long as it's not a safety hazard." Tr. 92:21-93:10. According to Mr. Kallen, Mr. Asmus made a "big deal" out of a little "bent wire." Tr. 101:22-24. During his discussion at Row 21 with Ms. Meacham about Mr. Asmus' FAA employee status, Mr. Kallen advised Ms. Meacham to ask Mr. Asmus to produce "his 110A" FAA identification badge.[31] Tr. 91:11-16. Mr. Kallen testified that he also expressed doubt to multiple flight attendants on Flight 1648 (various discussion times and attendants unspecified) about Mr. Asmus' status as an FAA Safety Inspector. Tr. 146:4-10. In his testimony,[32] Mr. Kallen explained that he had specifically advised various flight crew members to ask Mr. Asmus for his 110A FAA Inspector badge, because of "the authority" Mr. Asmus projected in his communications, as well as Mr. Asmus' assertion that he would be "able to check the logbook" of the aircraft. Tr. 92:8-14.

## VI.    INTIMIDATION - LEGAL STANDARD AND DISCUSSION

### A. Legal Standard

Intimidation occurs when a person makes a targeted threat against another, which instills an objective, reasonable fear in the intended recipient. In 1996, the FAA Administrator held that proof of intimidation in passenger misconduct cases is: "sufficient" when "the conduct and words" of one person, would place the recipient of the conduct and words "in fear." The recipient's "fear" must be assessed utilizing an ordinary, reasonable person standard. *Evgeniy v. Ignatov*, FAA Order No. 96-6, 1996 WL 210098, at *7 (Feb. 13, 1996), *quoting U.S. v Tabacca*, 924 F.2d 906, 911 (9th Cir. 1991). In passenger misconduct cases, the crewmember who is the target of the intimidating speech and/or behavior must experience it directly from the alleged wrongdoer. *See, Fabian Jolivet*, FAA No. CP99WP0011, 2000 WL 34229113, at *7 (May 10,

---

[31] Title 14, Chapter 1, Subchapter 1, Part 153, Subpart A provides that "FAA Form 110A" is ""the credential[] issued" by the FAA "to qualified Aviation Safety Inspectors... for use in the performance of official duties." *See, Greater Orlando Aviation Authority*, FAA-2018-0659, 2021 WL 1237080, at *6 (Apr. 1, 2021) (within Subpart A, Section 153.5 reiterates that the FAA Form 110A credential is the only official identification needed by FAA personnel).

[32] This particular testimony of Mr. Kallen was inconsistent with his unsworn narrative, in which Mr. Kallen opined (among other things), that Mr. Asmus could not have been an FAA Inspector because "his personal odor was offensive." Ex. C-9, 3. During his sworn testimony, however, he withdrew this (and other) narrative opinion, stating that he that he wasn't sure that the body odor he smelled had actually come from Mr. Asmus. Tr. 150:16-19; 151:3-6. Notably, neither Ms. Meacham nor Mr. Materne, who interacted directly with Mr. Asmus and sat near him, reported any body odor issues.

2000) (flight attendant could not identify individual(s) responsible for alleged intimidating acts). As discussed *ante*, the alleged intimidation must occur during flight operations (i.e., when the aircraft is moving under its own power), and it must be demonstrated that the intimidation conduct and speech impacted either the aircraft flight or the crew's "safety-related duties during the critical phases" of flight. *Robert D. Brians*, FAA No. CP02WP0007, 2003 WL 23119332, at *4 (July 14, 2003) (passenger who stood up, directed "profanity-laced threats," "snarling curses," and "thrust" his body towards the flight attendant, telling her that he "would have her job," engaged in intimidation).

1. Words and Conduct Elements

Words, standing alone, are insufficient to prove violation of the Interference Rule by intimidation. The words must be accompanied by some type of conduct. *Evgeniy v. Ignatov*, 1996 WL 210098; *see also, Howard Gotbetter*, FAA Order No. 2000-17, 2000 WL 33125270 (Aug. 11, 2000) (a passenger's words alone did not cause intimidation, but by gripping the flight attendant's shoulder, the passenger caused the flight attendant to reasonably fear that he would hit her). To prove a violation of the Interference Rule, a passenger must engage in some conduct to lend an immediate threat to any expressed language. *Peter Houtenbos*, FAA Order No. 2002-24, 2002 WL 31957047 (Nov. 18, 2002) (intimidation proved when passenger shoved flight attendant, accompanied by verbal threats, such as "[y]ou don't know what kind of trouble I can create").

2. Profanity Element[33]

Profanity, which is vulgar speech, can be misconduct that helps creates an "atmosphere of intimidation" sufficient to support a finding of the Interference Rule by intimidation. *Piotr T. Sikora*, FAA No. CP02EA0013, 2003 WL 23119318, at *5 (fn. 3 *dicta*) (Jan. 30, 2003) (citing to *Avigdor Shallit*, CP99EA0051,2000 WL 34229117 at *2 (Sept. 22, 2000) (respondent liable for violation of the Interference Rule under Part 91 after assaulting one flight attendant, and then threatening to kick a second flight attendant, using profanity); *see also, Roddy L. Cox*, FAA-

---

[33] This section on profanity is included because the FAA alleged profanity in its Complaint. Compl. § 2 ¶ 3(o). However, none of the testifying witnesses in this case alleged that Mr. Asmus utilized any profanity in his communications directly with them, or within their hearing range. The FAA failed to prove this fact allegation.

2010-0623, 2011 WL 4957394, at *1 (Oct. 14, 2011) (passenger "created a generalized and entirely reasonable fear" by acting belligerent and hostile, storming off to the rear of the aircraft, and calling the flight attendant a "f-- idiot" and using other antagonistic language); *Artem Aylyarov*, FAA-2005-23017, 2006 WL 3147905, at *3 (Nov. 2, 2006) (passenger snatched money from flight attendant's hand, threw napkins at flight attendant, and yelled in a curse-filled tirade to stay away from him or he would "smash [the flight attendant's] head"); *Christopher Bull Hench*, CP97SO0004, 1998 WL 34189518 (Jan. 27, 1998) (unruly passenger's "hostile and defiant conduct," as well as his "words, tone, and physical actions," such as "pointing his finger and standing very close to those to whom he was addressing" constituted intimidation).

### B. Alleged "Altercation"

Ms. Meacham confirmed that it was not uncommon for passengers to report "smaller, minor issues" with their seat. Tr. 41:2-23. She agreed that any passenger-reported damage issues should be repaired or deferred for repair. Tr. 41:25-42:2. Nevertheless, Ms. Meacham characterized Mr. Asmus' report of seatback pocket damage (i.e., while he remained seated in his assigned seat) coupled with his statement that he worked for the FAA, as an "altercation," in part because he had not previously identified himself as an FAA inspector to the flight crew when he boarded the aircraft. [34] Tr. 61:4-23. She admitted, however, that she did not know whether Mr. Asmus was required to identify himself to flight crew as an FAA inspector upon boarding the aircraft when he was travelling off-duty. Tr. 68:9-19. This testimony, asserting that Mr. Asmus was involved in an "altercation" was without merit.

### C. Alleged Intimidation

In her narrative statement, Ms. Meacham characterized Mr. Asmus as "combative," because he said he worked for the FAA and "wanted a different seat." Ex. C-3, 2. In her testimony, Ms. Meacham agreed that Mr. Asmus appeared to be an FAA employee. She explained that Mr. Asmus used "terminology that we hear in our emergency training" when he said the seatback pocket damage would "impede" him in an evacuation. Tr. 38:24-39:3. An

---

[34] Ms. Meacham opined that "other" passengers complaining to her about seat problems had complained differently (undescribed) than Mr. Asmus. Tr. 42:3-6. She provided no basis for the difference in these other passenger complaints, aside from Mr. Asmus' disclosure that he was an FAA employee.

ordinary passenger would never say something like that. Tr. 38:4-6. Ms. Meacham told Mr. Asmus that the damage would not be repaired because it would delay the flight. Tr. 38:17-19; 39:21-23. She testified that Mr. Asmus then got "verbal" about it. Tr. 38:19.

In short, Ms. Meacham had assessed the seatback pocket damage as minor.  Mr. Asmus was "verbal" because he told Ms. Meacham that she needed to report the damage to the Captain. Ms. Meacham perceived Mr. Asmus negatively ("verbal") because he stated that the damage needed to be repaired, and he would be checking the logbook later to make sure it got repaired. Tr. 39:20-23. Ms. Meacham opined that Mr. Asmus was being "aggressive" over something that was, in her opinion, "a non-issue." Tr. 40:19-21. She felt "intimidated" because Mr. Asmus didn't have his FAA credentials, and therefore, she didn't know "who this man is." Tr. 50:1-4. Because Ms. Meacham felt "a little bit intimidated" by Mr. Asmus (Tr. 40: 13-14), she decided to go up to the cockpit to talk to the Captain.

1.   Alleged Attack on United Airlines and its Employees

Mr. Kallen testified that he perceived Mr. Asmus' statement that he would later "check the logbooks" as an "attack[]" on the flight crew. Tr. 103:8. He characterized Mr. Asmus' "tone" as "threatening." Tr. 93:23-24. Mr. Kallen testified that, as a United Airlines employee, he was offended on behalf of the crew, who, he opined, had done "everything properly according to vetted FAA policies and procedures." Tr. 103:7-11. Mr. Kallen also testified that he himself, as a United Airlines employee, felt personally threatened by Mr. Asmus. He opined that Mr. Asmus was "questioning whether the job was going to be done properly." Tr. 103:1-3. Mr. Asmus "was making us [i.e., United Airlines and its employees] look bad in front of all these paying passengers and making them feel like the airplane was somehow not airworthy." Tr. 103:12-16. According to Mr. Kallen, Mr. Asmus' statement that he would "check the logbooks" was "kind of threatening. Right?" Tr. 84:1-2. Mr. Kallen generally characterized Mr. Asmus as "threatening" and "disruptive." (Id.) In his narrative statement, Mr. Kallen opined that Mr. Asmus had "embarrassed" both United Airlines (the commercial regulated air carrier) as well as the flight crew of Flight 1648 (the air carrier employees), "in front of the entire aircraft" by inferring that the seatback pocket damage "would not be handled correctly." Ex. C-9, 1. Mr.

Kallen expressed outrage, on behalf of United Airlines and its multiple airline crews, about how passengers have become "increasingly brazen and disrespectful." *Id.*

    2.   Brief Discussion

First, as noted *ante*, Mr. Asmus' seatback pocket damage report occurred while the aircraft was parked at the gate. Thus, any allegedly expressed "intimidation" that may have occurred during this incident cannot be proof of an Interference Rule violation, because the alleged intimidation did not occur during flight operations and did not impact the safety of the aircraft or the flight personnel during flight. *Elassaad*, 613 F.3d 119. Second, if any intimidation speech and conduct had occurred, and Ms. Meacham felt threatened in any way, she could have reported it promptly to the Captain when she went up to the cockpit. Here, no such report is in evidence.[35] Third, Ms. Meacham's "intimidation" allegation arises from Mr. Asmus: a) using polite language,[36] b) reporting seatback pocket damage; c) identifying himself as an FAA employee; and d) stating that he would later check to make sure that United Airlines took action to repair the damage he saw and reported. None of Mr. Asmus' statements targeted Ms. Meacham, nor offered any targeted threat against the aircraft and/or Ms. Meacham.[37] Fourth, Ms. Meacham's claim that she felt "intimidated" centered on Mr. Asmus disclosure of his FAA employee status and telling her that he expected her to do something she is required to do (i.e., listen to his safety concern and report aircraft damage to the Captain).

Fifth, as summarized *ante*, intimidation occurs when a person makes a targeted threat against another, which instills an objective, reasonable fear in the intended recipient. The recipient's "fear" must be assessed utilizing an ordinary, reasonable person standard. *Evgeniy V. Ignatov*, 1996 WL 210098, at *7. In the instant case, the evidence shows that Mr. Asmus did not engage in any words or conduct that, under an objective reasonable person standard, would have

---

[35] If Ms. Meacham had made such a report, the Captain could have immediately and easily removed Mr. Asmus from the aircraft, while the aircraft was still parked at the gate with its front passenger door open.

[36] Both Ms. Meacham and Mr. Kallen agreed that Mr. Asmus stated: "Excuse me," when seeking Ms. Meacham's attention to report the seatback pocket damage.

[37] Mr. Kallen's testimony that, as a United Airlines employee, he also felt personally threatened by Mr. Asmus (even though Mr. Asmus was not speaking with him or to him), is not probative evidence of what Ms. Meacham might have felt, or whether Ms. Meacham's feelings were reasonable, under an ordinary reasonable person standard.

instilled personal fear in Ms. Meacham, the person to whom Mr. Asmus' directed his report of seatback pocket damage. At best, Mr. Asmus told Ms. Meacham he was an FAA employee, and he planned to confirm that United Airlines complied with its regulated safety duties. An ordinary reasonable person, upon hearing such a statement, would have no fear of imminent bodily or personal harm, or fear there was imminent harm to the aircraft. Rather, an ordinary reasonable person might respond simply, by saying: "okay", or "thanks for letting us know" and/or "feel free to check anytime." Mr. Asmus acted to ensure the safety of the aircraft during passenger boarding. He did not say or do anything that put the aircraft, or Ms. Meacham's personal safety, at risk.

Lastly, Mr. Kallen's bright line and reiterated defense of United Airlines' honor and reputation, in arguing that intimidation by threat occurred, shows that any alleged "intimidation" was not about the aircraft or Ms. Meacham's personal safety. Instead, it was about United Airlines, and – in Mr. Kallen's perception – a belief that Mr. Asmus, as a perceived person of authority, had verbally slighted United Airlines' safety program in front of paying passengers when Mr. Asmus made a damage complaint and said he would later check the logbooks.

## VII.    THE PHOTOGRAPH INCIDENT

The photograph incident began while United Airlines Flight 1684 was in in "push back" mode and continued while the aircraft was taxiing to the runway. While the aircraft was in "pushback" or stop mode (i.e., being towed from the gate and then stopped) Mr. Asmus took a photograph of a passenger standing in the aisle while the seatbelt sign was lighted. Tr. 296:14-18; 308:25-309:10. After the photograph was taken, Mr. Materne initiated a discussion with Mr. Asmus.  This discussion continued as the aircraft began taxiing to the runway. Only certain testimonial highlights will be discussed, to help explain the decision.

### A.  Undisputed Facts – Photograph Incident

Ms. Meacham and Mr. Materne were travel "partners," who worked together in the aft section of the aircraft. The evidence demonstrates that, before the photograph incident occurred, Ms. Meacham had told Mr. Materne about Mr. Asmus (and possibly her discussion with Mr.

Kallen).[38] Notably, neither Ms. Meacham nor Mr. Materne approached Mr. Asmus to simply ask him to produce his FAA 110A badge. Instead, they prepared the aircraft cabin for "pushback" before the doors were "armed", and then they sat down in their jumpseats, behind Mr. Asmus and the lavatory, while the aircraft engaged in "push back."

Mr. Kallen explained that cabin preparation for "push back" required flight attendants to make sure that passengers were seated. Flight attendants then notified the Captain of that fact, so that the Captain would approve closure of the aircraft door and release the aircraft brake.[39] Tr. 133:14-135:8. Mr. Kallen explained that "push back" after brake release also involved a ground vehicle "that's hooked up the nose wheel of the aircraft." Tr. 155:1-2. Even after releasing the brake for "push back," the Captain was not moving the aircraft under its own power. Instead, the Captain releases:

> [T]otal control of the aircraft to the person that's driving that ground vehicle, and they push the aircraft backwards, and then sometimes pull us forward into a proper position or spot. From that point, we set the brakes and release them. We [then] start the engines and go under our own power.

Tr. 155:1-10.

During ground vehicle "pushback" and aircraft taxiing (i.e., when the aircraft moves under its own power), the seatbelt sign is on, and all passengers in the aircraft are supposed to comply with the seatbelt sign. Passengers could get injured if they stand in the aisle during taxiing. Tr. 137: 9-16. If a passenger ignores the seatbelt sign and gets up while the aircraft is moving, the flight attendants "should immediately tell the person to take their seat [and] comply with the seatbelt sign." Tr. 156:19-25. If a passenger fails to comply, the flight attendants must call the flight deck and notify the Captain. Tr. 157:1-4.

---

[38] Ms. Meacham confirmed that after she and Mr. Materne were seated in the back of the aircraft, Mr. Materne took the lead in talking to Mr. Asmus. Ms. Meacham recalled Mr. Materne describing their joint knowledge of Mr. Asmus as: "we have [already] had all this...negative interaction" with Mr. Asmus. Tr. 48:16-18. They then decided that Mr. Materne would call the Captain and report their continuing concerns about Mr. Asmus.

[39] Mr. Kallen testified that before "pushback," the gate agent will ask if all is ready and secure, and if it is okay to close the doors. The Captain won't release the aircraft brake to begin "pushback" "until the flight attendants have assured [the Captain] that all the passengers are secured." Tr. 154:9-12. If the flight attendants confirm everything is okay, the Captain will approve door closure and release the aircraft brake. Tr. 152:8-153:21.

## B. Mr. Asmus' Alleged "Odd" Behavior

On May 12, 2022, the flight attendants confirmed with the Captain that all passengers were seated, and the aircraft was ready for "pushback." Both Ms. Meacham and Mr. Materne then took their seats in the back of the aircraft, to watch the safety video. Ms. Meacham explained that their jumpseats were behind both Mr. Asmus' seat and the lavatory. Tr. 47:25-48:4. Mr. Materne explained that Mr. Asmus was in Row 38, Seat D (i.e., the aisle seat), which was "catty-corner" in front of him (past the lavatory). Tr. 208:6-7; 211:12-14.

Mr. Materne testified that he "first noticed" Mr. Asmus when he sat down. Tr. 172:15-23. This "first noticed" testimony was inconsistent with the totality of the FAA's evidence. Based on the totality of evidence, by the time Mr. Materne decided to watch Mr. Asmus, Ms. Meacham had already told Mr. Materne all about her interaction with Mr. Asmus, and the fact that Mr. Asmus claimed to be an FAA employee.[40] Mr. Materne was also likely aware, either from Ms. Meacham or from Mr. Kallen directly,[41] that Mr. Kallen recommended asking Mr. Asmus to produce his FAA 110A ASI identification badge

Mr. Materne then opined that Mr. Asmus appeared "visibly agitated and annoyed" (Tr. 173-1-2), and "looking over his shoulder." Tr. 173:10. Mr. Materne thought it was "odd" that Mr. Asmus was looking "into the aisle, over the seats in front of him[,] and behind him." [42] Tr. 180:23-181:1. He decided to keep "a close eye" on Mr. Asmus and began watching him. Tr. 173:3-5.

---

[40] *See* fn. 37.

[41] *See* Section V, *ante*. Mr. Kallen confirmed that he spoke with "multiple flight attendants" about Mr. Asmus and his claim that he was an FAA Safety Inspector. Tr. 146:4-10. Mr. Kallen recommended to "multiple" flight attendants that they should ask Mr. Asmus to produce his FAA 110A ASI Identification badge.

[42] Based on Mr. Materne's testimony, any single passenger sitting in an aisle seat who was looking ahead or across the aisle, or around themselves (and not looking down at a book, movie, telephone, or sleeping), would be behaving "oddly".

## C. The Photograph and Flight Crew Anxiety

Ms. Meacham confirmed that she and Mr. Materne had "just armed our doors" and "completed the final safety checks for the flight." Tr.47:13-19. They took their jumpseats and waited for pushback. After the United Airlines Flight 1684 door closed, Mr. Asmus took a photograph of a passenger who was standing in the aisle while the seatbelt sign was on. Compl. 2 § II ¶ 3(h); Ans. 2-3 § II ¶ 3(h).

Mr. Materne testified that he saw Mr. Asmus raise his cell phone to take a photo. Tr. 173:14-16; 174:21-175:1-2; 176:10-11. He opined that Mr. Asmus was taking "a selfie" which might include Mr. Materne and Ms. Meacham. Tr. 173:14-16; 175:14-18. Mr. Materne asserted that taking this photograph "didn't reconcile with the surroundings and the people around him and the environment" (no further explanation). Tr. 173:17-20. According to Mr. Materne, Mr. Asmus turned around, saw Mr. Materne watching him, and then "abruptly" put his phone down. Tr. 17:14-16.

Mr. Materne said he was "confused" about why he (Mr. Materne) would be in "a selfie" photograph, and/or whether Mr. Asmus had taken "a selfie." Tr. 177:14-16. He testified that it didn't seem like a "normal selfie," since Mr. Asmus was traveling alone.[43] Tr. 178:14-16; 19. He asked Mr. Asmus if he had included Mr. Materne and his flying partner (Ms. Meacham) in "that selfie." Tr. 173:22-25;176:10-11; 179:1-9. Mr. Asmus said "no" in a firm tone. Tr. 179:10-11; 178:14-15. Mr. Materne characterized Mr. Asmus' "no" response to his question as "aggressive" behavior (no explanation).[44] Tr. 180:1-15.

Mr. Materne conferred quietly with Ms. Meacham. He asked her if she felt "safe" with Mr. Asmus continuing to be aboard the flight. Ms. Meacham said "no." Tr. 48:16-20. Mr. Materne then called the lead flight attendant (also referenced as the purser), to express his concern and discomfort about Mr. Asmus. Tr. 181:5-12; 19-20. A few minutes later, the Captain

---

[43] No evidence was proffered to support the idea (or implied policy) that a single traveler taking a photograph aboard an aircraft should be viewed with suspicion because s/he was travelling alone.

[44] Mr. Materne did not offer any "non-aggressive" alternative speech that he believed Mr. Asmus should have used to answer his question.

called on the aft galley intercom. The Captain asked if "the passenger at 38 Delta was still seated." Mr. Materne said, "he is." Tr. 182:6-8. The Captain directed Mr. Materne to tell Mr. Asmus to show Mr. Materne the photograph, or the Captain was going to return to the SFO gate. Tr. 182:9-12. Mr. Materne repeated the Captain's instructions to Mr. Asmus. Tr. 182:14-19. Mr. Asmus showed Mr. Materne a photograph of the cabin, with a woman standing in the aisle. Tr. 182:20-24. The Captain asked Mr. Materne to ask Mr. Asmus to explain why he had taken that photo. Mr. Asmus explained that he worked "with the FAA, and I need to report a violation that I witnessed." Tr. 183:3-9; *see also*, 14 C.F.R. § 13.2. Mr. Materne testified that he was "confused and intimidated" because he "wasn't sure" that there was "a violation that needed to be reported."[45] Tr. 189:14-190:4. According to Ms. Meacham, the Captain then "asked us to ask him to show us his FAA license, and he told us he did not have it." Tr. 49:21-23.

### D. Alleged Intimidation

After Mr. Asmus took the photograph, Ms. Meacham said she felt "intimidated" because Mr. Asmus was taking "pictures," and acting like he worked for the FAA, but didn't "have proof" that he worked for the FAA. Tr. 50:3-8. She noted that they were scheduled to be in the air for a "five-hour flight." Tr.49:2-3. She testified, "If all this is bothering him right now, what else could transpire once we get in the air?"[46] Tr.49:4-5. She and the other flight attendants wanted to make sure that all the passengers were "safe and secure," and that there would be "no distractions or harm" during the flight to Hawaii. Tr. 50:22-24.

Mr. Materne echoed Ms. Meacham when he testified that he "didn't feel safe" because Mr. Asmus said he didn't have his FAA credentials with him. Tr. 184:20. Mr. Materne thought FAA aviation safety inspectors (ASI) were required to identify themselves to the flight deck or

---

[45] This testimony reveals part of the underlying tension on May 12, 2022 between the United Airlines employees and Mr. Asmus. Ms. Meacham, Mr. Kallen, and Mr. Materne all perceived that the two (2) matters Mr. Asmus was concerned about were minor in nature. Based on the evidence, both Ms. Meacham and Mr. Materne also believed that such problems either did not "need" to be reported or, alternatively, did not rise to the level of concern that Mr. Asmus expressed about them.

[46] This testimony reveals Ms. Meacham's and Mr. Materne's shared underlying concern about Mr. Asmus. They were prepared for a routine five (5) hour flight to Hawaii. They were not prepared, however, for a five (5) hour flight with Mr. Asmus, an FAA employee who appeared to have authoritative regulatory knowledge, where he might see and record multiple safety problems (or violations) for which they might later be held accountable.

the gate agent, so that the crew could be informed that an FAA official was on board. Tr. 204:14-18. Mr. Materne opined that Mr. Asmus' actions in the back of the aircraft, without showing any FAA identification, were "suspicious" and created a "safety issue" for the flight. Tr. 185:1-21.

During cross-examination, however, Mr. Materne retreated from his testimony that Mr. Asmus' act in taking a photograph was "odd." For example, Mr. Materne agreed that other passengers took photos while on aircraft. Tr. 197:11-18. He normally did not demand that passengers show him any photographs they took. Tr. 197:19-20. It was not part of his flight attendant duties to demand that passengers delete any photographs they take. Tr. 197:22-24. Further, Mr. Materne retreated from his "safety issue" testimony, and admitted that the fact that Mr. Asmus had taken a photograph did not create a security risk. Tr. 202:14-19; 208:8-11. He agreed that Mr. Asmus had remained in his seat while the aircraft was taxiing when he took the photograph. Tr. 208:8-14. He also admitted that he did not know what, if any, identification needed to be shown by an off-duty FAA Inspector who flew as a passenger. Tr. 204:19-24. Further, Mr. Materne admitted that if the photograph had been taken while the aircraft had been taxiing, it would show a safety violation committed by the standing passenger. Tr. 200:11-15. He believed that Mr. Asmus took the photograph while the aircraft was taxiing.[47] Tr. 200:16-18.

As discussed *ante*, intimidation occurs when a person makes a targeted threat against another, which instills an objective, reasonable fear in the intended recipient. The standard for review of the recipient's fear is an objective, reasonable person standard. The alleged intimidation must also show that it impacted the crew's "safety-related duties during the critical phases" of flight. *Robert D. Brians*, FAA No. CP02WP0007, 2003 WL 23119332, at *4 (July 14, 2003). Here, even if it was assumed that Mr. Asmus took the photograph during taxiing, the evidence demonstrates that Mr. Asmus did not engage in any speech or conduct targeted at Mr. Materne that an objective, reasonable person would find intimidating.[48] Further, Mr. Materne

---

[47] Mr. Asmus testified that he took the photograph during pushback, while the aircraft was moving under tow. Tr. 296:14-15. Taking a photograph during a tow is an action that occurs prior to the aircraft being in "flight." *See, e.g.*, FAA Legal Interpretation 1001-3, 2000 WL 35499413 (Jun. 2, 2000) ("time spent in moving an airplane from the loading point to another point, not under the airplane's own power, but by means of a tractor or other conveyance that pulls the airplane into position to begin a flight" was <u>not</u> "flight time.")

[48] *See, e.g., Michael Bengry*, FAA Order No. 2003-9, 2003 WL 22480445 (Sept. 10, 2003). Mr. Bengry "attempt[ed] to take a photograph [of flight attendants] with threats to use the photograph for a lawsuit." Mr. Bengry was "angry," "loud," "actively hostile," and created an "ongoing disturbance" on the flight. *Id.* at *1, 2. The FAA

testified that he was primarily worried about being in a "selfie." Thus, after he checked Mr. Asmus' phone and saw that neither he nor Ms. Meacham had been photographed, Mr. Materne's stated "selfie" worry should have been completely assuaged. But, as the evidence demonstrates, both he and Ms. Meacham reported to the Captain that they did not "feel safe," and wanted further action taken about Mr. Asmus. Lastly, Mr. Asmus did not interact with Ms. Meacham directly at all during the photograph incident, so her feelings of "intimidation" because of a photograph Mr. Asmus took of a passenger standing in the aisle are simply non-probative regarding the "photograph" incident.

### E. Alleged Interference

Mr. Materne testified that his "duties were to ensure that the aircraft was ready for take-off," which involved "making sure that exit rows and the aircraft in general was ready to be evacuated in the very unlikely event that there was a sudden evacuation." Tr. 4-8. Specifically, Mr. Materne's duties were "to make sure that everyone had their seat belts on, that the tray tables were all stowed away properly, [and] that all seat backs were fully upright." Tr. 188:9-12.

Mr. Materne alleged in his testimony that Mr. Asmus had violated the Interference Rule during the photograph incident. According to Mr. Materne, his attention while seated in his jumpseat was supposed to have been "on the cabin…to make sure that its safe and secure for take-off" instead of on Mr. Asmus. Tr. 187:17-19. According to Mr. Materne, his attention was drawn away from cabin passengers, because he needed to watch Mr. Asmus' actions while Mr. Asmus was seated in Row 38. Tr. 187:19-24. Mr. Materne testified that because he was watching and talking with Mr. Asmus, he wasn't able to complete his review and safety check of "all the rows" prior to take-off. Tr. 188:23-189:9.

There were multiple problems with this testimony, but only a few highlights will be discussed. First, as discussed *ante*, Mr. Materne decided he would watch Mr. Asmus while Mr.

---

Administrator found that "many ordinary, reasonable people would find it intimidating to be photographed by someone threatening them with a lawsuit and negative media exposure." *Id.* at *2. The FAA Administrator also found that Mr. Bengry had exhibited "antagonistic and intimidating" behaviors sufficient to satisfy a violation of 14 C.F.R. § 91.11 (the companion Interference Rule regulation of 14 C.F.R. § 121.580). *Id.*

Page 38 of 44

Asmus was seated in Row 38. There is no evidence to show that Mr. Materne could not have scanned the aircraft cabin at the same time. Second, if there had been any passenger who needed assistance, nothing prevented Mr. Materne (or Ms. Meacham) from addressing such concerns. The evidence demonstrates that Mr. Asmus sat in his assigned seat, had his seatbelt on, and complied with all crewmember instructions. Third, Mr. Materne's assertions that his safety checks were interrupted and incomplete was directly rebutted by Ms. Meacham, his flying partner. She testified that all their safety checks had been completed before she and Mr. Materne had seated themselves in their jumpseats. Tr.47:13-19. Fourth, during cross-examination, Mr. Materne began changing his "safety check" testimony. He first testified that he would have performed his final safety checks after the safety video was finished. He then admitted, however, that in his written narrative he had affirmed that he had finished his safety checks before he saw Mr. Asmus take a photograph from his seat. Tr. 195:1-25. In additional cross-examination testimony, Mr. Materne then claimed that his "final" safety checks were "fluid" and could be done twice, once before the video, and once after the video. Tr. 196:15-18. Notably, neither Ms. Meacham nor Mr. Kallen offered any support for Mr. Materne's contradictory assertions.

Mr. Materne's testimony that he wasn't able to complete his review and safety check of "all the rows" prior to take-off, because of his interactions with Mr. Asmus, was not supported by the evidence. It was also directly rebutted by Ms. Meacham (and indirectly rebutted by Mr. Kallen in describing flight attendant duties to secure the cabin). Mr. Materne's testimonial assertion that a violation of the Interference Rule had occurred (based on alleged general interference) during the photograph incident is not credible and without merit.

## VIII.   AIRCRAFT RETURNS TO THE GATE

It was undisputed that after Mr. Asmus told Mr. Materne that he did not have his FAA identification with him, the aircraft sat for "about 15 minutes" on the terminal. Tr. 302:18-22. The Captain then returned the aircraft to the SFO gate, shut the engines down, and opened the aircraft doors. Tr. 186:13-16; 303:3-6; 328:17-21. Mr. Asmus asked Ms. Meacham if he could go up and talk with the Captain. Tr. 187: 7-9. Mr. Materne recalled that Ms. Meacham said okay, but to "make sure you bring all your stuff with you." Tr. 187:11-13. According to Mr. Asmus, Ms. Meacham just said "Sure." Tr. 303:13.

Page 39 of 44

### A. Second Meeting at Row 21 – Ms. Meacham, Mr. Materne, Mr. Kallen

Shortly after Mr. Asmus left his seat to go the jetway, Ms. Meacham and Mr. Materne walked up to Row 21 to discuss with Mr. Kallen (who remained seated in his middle seat) their most recent interactions with Mr. Asmus in the back of the aircraft. Mr. Kallen recalled that one of the flight attendants "mentioned" that Mr. Asmus had reiterated that he worked for the FAA. The second flight attendant then reported to Mr. Kallen that Mr. Asmus had "continu[ed]" behaving "disruptively" (undescribed) in the back of the aircraft. Tr. 83:3-7. Mr. Kallen testified: "They asked me to go up and talk to the captain." Tr. 101:5-13. Mr. Kallen left his seat and went up to the front of the aircraft to talk to the Captain about Mr. Asmus.

### B. Jetway Discussion with the Captain

It is not known whether Mr. Kallen spoke to the Captain before, during, and/or after the Captain met with Mr. Asmus. It is undisputed, however, that when Mr. Asmus spoke with the Captain on the jetway bridge, the flight attendants were "right nearby" standing "in the galley, watching." Tr. 337:23-25.  Mr. Asmus told the Captain that he didn't have his FAA 110 ASI identification badge, but he did have his green "AoA" badge. Tr. 301:5-10. Mr. Asmus testified that he re-entered the aircraft, retrieved his bags, found his green AoA badge, and returned to the jetway with his bags. He showed his green "AoA" badge to the Captain. Tr. 27:5-8; 303:25-304:5. Mr. Asmus explained that he worked for the FAA and was assigned to the FAA's United Airlines Certificate Management Office ("CMO"). The Captain said: "I'm convinced." Tr.304:11-13. The Captain then walked away, and Mr. Asmus heard the Captain repeat "exactly what I said" to someone else (unidentified). Tr.301:23-25. Mr. Asmus was then asked to leave Flight 1648. Tr. 328:24-25. The Captain did not give any "other" reason[49] for asking him to leave the flight. Tr.329:12-14. Mr. Asmus complied without any argument or challenge. He was later rebooked on another United Airlines flight to Hawaii. Tr. 304:14-25.

---

[49] The evidence did not demonstrate whether the Captain provided any reason to Mr. Asmus when he asked Mr. Asmus to leave the aircraft.

## IX.    BRIEF ADDITIONAL DISCUSSION

First, it is not intimidation or interference behavior for a passenger to orally report a potential violation of aviation safety.  Rather, it is every person's regulatory duty, including aviation passengers, to report aviation safety concerns. 14 C.F.R. 13.2. It is also well established that ensuring safety and compliance with aviation safety regulations is part of the flight crew's normal job flight responsibilities.  Part of these required flight crew safety-related duties is to listen to a passenger (or other person's) report of aircraft damage and/or safety concerns, and to relay such reports to the Captain for logbook entry and action.  Second, it should not matter whether Mr. Asmus was an FAA employee or an off-duty FAA Safety Inspector, or just an anonymous traveler. Any passenger on any regulated aircraft should be able to report any perceived potential safety violations without fear of dismissal, reprisal, public criticism, or personal vilification. Third, passengers should be encouraged to be mindful of safety issues, and report aircraft damage and/or safety concerns, even if such issues might later be deemed "minor" by either knowledgeable mechanics or other aircraft experts.  Fourth, if passengers are faced with possible charges of intimidation or interference for reporting potential safety violation problems, "gruffly," assertively, firmly, or "loudly," then no passenger would ever wish to tell the flight attendants about any safety problems. Chilling passenger complaints about safety issues, by negatively responding to such complaints, will lead to negative impacts. Inevitably, unreported matters will impact the safety of the aircraft and the lives of all passengers on board.  In short, flight crewmembers who take pride in saying that safety is their "number one priority" should be willing to hear and act upon passenger safety complaints, and be appreciative of such proffered assistance in carrying out their safety duties.  Tr. 33:12-15; 168:13-16.

Fifth, Mr. Asmus was correct when he testified that  FAA employees are tasked to "say something" if they "see something." Tr. 337:8-13; *see also*, 14 C.F.R. §13.2; FAA Order 2150.3C, Chapter 2, 2.7 § 6.a (Sept.30, 2021).  As an FAA Inspector, Mr. Asmus was "required" to document "any safety-related issues" that he observed, whether on duty or off duty. Tr.334:21-23. After May 12, 2022, Mr. Asmus did "follow[] up" and checked United Airlines Flight 1648 logbook to "see if the seat back issue" had been reported. Tr. 329:19-22. He also testified, without dispute, that the FAA assigned Mr. Asmus to open an investigation about the

May 12, 2022 incident. Tr.330:11-25. Ms. Pritchard confirmed that Mr. Asmus asked United Airlines to provide any/all reports about the flight from crewmembers and ground personnel involved in the May 12, 2022 incident. Tr. 221:24-222:6; 222:23-24; 224:9-21; *see also*, Ex. C-1. However, sometime thereafter (date unspecified) the FAA temporarily reassigned Mr. Asmus to a different air carrier. Tr.332:11-23. It is unknown if any further safety investigation of United Airline Flight 1648 occurred after Mr. Asmus was re-assigned.

Sixth and finally, this case reveals certain discord between: 1) the broad scope of the FAA's mission to ensure safety in aviation; 2) its directive to its employees (and others) to report air carrier regulatory safety violations whenever observed; 3) its commitment to work collaboratively with its commercial, regulated air carriers; and 4) United Airlines expectations, as a regulated air carrier, for formal notice and partnership collaboration when the FAA engages in safety inspections, investigations, and regulatory enforcement actions.

In this case, the evidence shows that Mr. Asmus was rejected as a passenger aboard Flight 1648, not because he engaged in acts of intimidation and interference, but because he straddled the fence between being a paying passenger and acting as an FAA official, without an FAA 110A identification badge or notification to United Airlines that a safety inspection might occur on Flight 1648. The Captain and the flight attendants did not know, when Mr. Asmus first gained Ms. Meacham's attention, that they had an FAA employee on board, or that they should be prepared to collaborate with an FAA ASI's regulatory scrutiny. Thus, when Mr. Asmus did identify himself as an FAA employee, Ms. Meacham (and others) were unsettled and uncertain. Mr. Asmus had not identified himself formally when he had first boarded the aircraft, as they believed should always occur. Further, when asked to produce his FAA 110A ASI identification badge, Mr. Asmus was unable to produce it.

There was no evidence to show that Mr. Asmus was wrong in reporting seatback pocket damage to Ms. Meacham. Mr. Asmus' reporting of a potential seatback pocket safety violation was not to *divert* Ms. Meacham from performing her safety-related duties, but rather to *ensure* that she and United Airlines continued to perform their safety-related duties. There was also no evidence to show that Mr. Asmus was wrong in taking a photograph while he sat in Row 38. As

Page 42 of 44

noted *ante*, there is no basis to assert that a single traveler may not take a photograph on the aircraft, whatever the subject.

It should be noted that the FAA might wish its FAA Inspectors to monitor regulated air carriers' safety programs by both open partnership and/or by surveillance. In this case, there was no intent for surveillance. Rather, Mr. Asmus saw problems and began to report and/or record them. The flight attendants were unprepared when Mr. Asmus morphed from an anonymous paying passenger into an unexpected FAA authority on the aircraft. It is no surprise that Ms. Meacham and Mr. Materne expressed uncertainty and anxious feelings. They did not know how to respond to Mr. Asmus' sudden announcement of FAA employment, coupled with his investigative behavior. The evidence shows they communicated their distress repeatedly to the Captain. They did not want Mr. Asmus to take their photographs. They also did not want the "distraction" of dealing with Mr. Asmus on a five-hour flight to Hawaii, unless he absolutely proved that he had FAA ASI credentials, and showed that he had the right to watch and criticize the events and/or crew actions on the aircraft.

It is beyond the scope of this proceeding for the Presiding Judge to address the underlying problems that this case has revealed, and/or to suggest certain steps to avoid such problems in the future. Nevertheless, it might be helpful for the FAA to review and consider the issues raised in this case, both by Mr. Asmus and the United Airlines employees. In short, FAA employees need to be able to perform their required safety violation reporting even when traveling off-duty, while at the same time, regulated air carriers want to have clear guidelines about investigative practices for off-duty FAA personnel, so that air carriers can communicate such guidelines to their employees and continue to serve as collaborative regulatory partners with the FAA on aviation safety related issues.

## X.    CONCLUSION

Pursuant to 14 C.F.R. §§ 13.205 and 13.223, and having reviewed the case file, all pleadings and motions, all relevant caselaw, statutes, regulations, rules, and authority, and being fully advised;

Page 43 of 44

**IT IS HEREBY ORDERED:**

1. The FAA failed to prove, by a preponderance of the evidence, that on May 12, 2022, Mr. Paul D. Asmus committed a violation of the Interference Rule (14 C.F.R. § 121.580) either by intimidating or interfering with a crewmember in the performance of the crewmember's duties.

2. The Interference Rule charge (14 C.F.R. § 121.580) against Mr. Paul D. Asmus is dismissed with prejudice.

3. Pursuant to 14 C.F.R. § 13.232(d), this Initial Decision shall be considered a final order unless either party files a notice of appeal within 10 days of service of this Initial Decision pursuant to 14 C.F.R. § 13.233.

Judge J.E. Sullivan
U.S. Administrative Law Judge

Attachment: Service List