Paul D. Asmus

P.O. Box 60755

Palo Alto, CA 94306

(650) 935-2105

pdasmus@protonmail.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | | |
|---|---|---|
| PAUL D. ASMUS, | ) | Case No.: 5:26-cv-00962-BLF |
| | ) | |
| Plaintiff, | ) | PLAINTIFF'S OPPOSITION TO |
| | ) | DEFENDANT'S MOTION TO DISMISS |
| v. | ) | |
| | ) | |
| UNITED AIRLINES, INC., | ) | Hearing Date: July 9, 2026 |
| | ) | |
| Defendant. | ) | Time: 9:00 a.m. |
| | ) | Courtroom: 1, 5th Floor |
| | ) | Judge: Hon. Beth Labson Freeman |
| | ) | |
| | ) | |

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................5

II. THE COMPLAINT DOES NOT PLEAD A SIMPLE ONE-DAY AIRLINE DISPUTE ........6

III. DEFENDANT'S SEPTEMBER 4, 2025 LETTER STATES AN INDEPENDENT TIMELY DEFAMATION CLAIM ..................................................................................8

    A. The September 4, 2025 Letter Republished the Defamatory Narrative .........................8

    B. Defendant Cannot Defeat This Claim on Third-Party Publication Grounds ................9

    C. The September 4, 2025 Letter Demonstrates Actual Malice ......................................10

IV. THE BROADER CLAIMS DID NOT ACCRUE UNTIL THE FAA PROCEEDING CONCLUDED ..................................................................................................11

    A. McDonough Applies Here by Close Analogy ...............................................11

    B. California Authorities Support the Same Timing Logic .................................12

    C. Earlier Filing Would Have Been Practically Impossible ...............................13

V. ADDISON EQUITABLE TOLLING APPLIES AS A FALLBACK ...................................14

    A. United Had Continuous and Documented Notice ........................................14

    B. United Suffers No Prejudice ...............................................................15

    C. Plaintiff Acted Reasonably and in Good Faith ...........................................16

VI. RESPONSE TO THE COUNTS ..............................................................................16

VII. LEAVE TO AMEND ...........................................................................................27

VIII. CONCLUSION ................................................................................................27

**TABLE OF AUTHORITIES**

**CASES**

*Addison v. State*, 21 Cal. 3d 313 (1978) ...............................................................5, 14, 28

*United States v. Acosta-Sierra*, 690 F.3d 1111 (9th Cir. 2012) ...................................24

*Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185 (2013) ..............................6

*Babb v. Superior Court*, 3 Cal. 3d 841 (1971) .......................................................5, 12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................................5

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015) .........................................................12

*Cantrell v. Forest City Publishing Co.*, 419 U.S. 245 (1974) .................................................7

*Carrico v. City & County of San Francisco*, 656 F.3d 1002 (9th Cir. 2011) ..............................27

*Chang v. Chen*, 80 F.3d 1293 (9th Cir. 1996) .........................................................................27

*CrossTalk Productions, Inc. v. Jacobson*, 65 Cal. App. 4th 631 (1998) ....................................21

*Gilbert v. Sykes*, 147 Cal. App. 4th 13 (2007) ......................................................................17

*Geernaert v. Mitchell*, 31 Cal. App. 4th 601 (1995) ..............................................................20

*Hardy v. Vial*, 48 Cal. 2d 577 (1957) ...................................................................................12

*Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir. 1980) ....................................................6

*Hughes v. Pair*, 46 Cal. 4th 1035 (2009) ..............................................................................22

*Jimenez-Bencebi v. Arizona*, 2024 U.S. Dist. LEXIS 102484 (D. Ariz. 2024) ...........................13

*McDonough v. Smith*, 588 U.S. 109 (2019) ...................................................................5, 11, 13

*McKinney v. County of Santa Clara*, 110 Cal. App. 3d 787 (1980) ...........................................9

*Muldrow v. City of St. Louis*, 601 U.S. 346, 144 S. Ct. 967 (2024) ....................................18, 22

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ........................................................7, 10

*Noel v. River Hills Wilsons, Inc.*, 113 Cal. App. 4th 1363 (2003) ............................................17

*Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965 (1993) .................................................22

*Randi W. v. Muroc Joint Unified Sch. Dist.*, 14 Cal. 4th 1066 (1997) .......................................20

*Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004) ...........................................................................18

*Saint Francis Memorial Hospital v. State Dept. of Public Health*, 9 Cal. 5th 710 (2020) ...........15

*Schaeffer v. Cavallero*, 54 F. Supp. 2d 350 (S.D.N.Y. 1999) ..................................................21

*Shively v. Bozanich*, 31 Cal. 4th 1230 (2003) .........................................................................8

*Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980) ........................................................26

*Valle v. Morgado*, 2021 U.S. Dist. LEXIS 226877 (N.D. Cal. 2021) ........................................13

**STATUTES**

49 U.S.C. § 40113; 49 U.S.C. § 44713(b) ........................................................................25, 26

49 U.S.C. § 44902(b) ...............................................................................................................21

Cal. Civ. Code § 47(c) ............................................................................................................17

Cal. Code Civ. Proc. § 340(c) ..................................................................................................8

Cal. Civ. Code §§ 1709 and 1710 ..........................................................................................19

Cal. Penal Code §§ 518 and 523 .............................................................................................21

Cal. Penal Code § 240 .............................................................................................................23

**REGULATIONS**

14 C.F.R. § 13.2 ...............................................................................................................25, 26

14 C.F.R. § 13.232(d) .........................................................................................................6, 7

14 C.F.R. § 13.233(a) .........................................................................................................6, 7

14 C.F.R. § 121.547 ...............................................................................................................9

14 C.F.R. § 121.548 ...............................................................................................................9

**OTHER AUTHORITIES**

73 Fed. Reg. 47824 (Aug. 15, 2008) …………………………………………………….26

//

//

## I. INTRODUCTION

Defendant's motion fails for three independent reasons, any one of which is sufficient to deny dismissal in its entirety. United's motion is fundamentally a limitations motion. Its subsidiary pleading sufficiency arguments demand a level of evidentiary detail that *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562 (2007) does not require -- plausible factual allegations suffice, and the Complaint's specific, documented facts clear that bar. The granular proof United demands belongs at summary judgment, not here.

First, Defendant's September 4, 2025 letter independently states a timely defamation claim. That letter -- sent ten weeks after the ALJ's final ruling -- reaffirmed travel restrictions and repeated the demand that Plaintiff pay US$3,153 as restitution for conduct the ALJ had already ruled was a mandatory regulatory duty. Plaintiff filed this action on January 30, 2026, less than five months later, well within California's one-year limitations period for defamation. No tolling is required for this claim.

Second, the broader claims did not fully accrue until July 8, 2025, when the ALJ's June 27, 2025 ruling became final, because the false narrative United created was actively being used against Plaintiff in a federal enforcement proceeding throughout that entire period. Forcing Plaintiff to challenge the truth of United's narrative in civil court while the FAA was simultaneously prosecuting him based on that same narrative would have created parallel litigation over identical disputed facts with the risk of inconsistent judgments -- the precise concern that delayed accrual doctrine addresses. See *McDonough v. Smith, 588 U.S. 109 (2019); Babb v. Superior Court*, 3 Cal. 3d 841 (1971).

Third, even if some claims accrued earlier, equitable tolling under *Addison v. State*, 21 Cal. 3d 313 (1978), applies. United had continuous documented notice of this dispute from the night of the incident through the conclusion of the FAA proceeding. United suffers no prejudice because the

relevant documents are its own preserved records. And Plaintiff acted in objectively good faith by deferring this action pending final adjudication of the same disputed narrative. The ALJ's June 27, 2025 ruling became a final order on July 8, 2025 when no appeal was taken within the 10-day period under 14 C.F.R. § 13.233(a), and became a final order of the Administrator pursuant to 14 C.F.R. § 13.232(d). That ruling found United's witnesses "*not credible*," their allegations "*without merit*," and Plaintiff's conduct a "*required*" regulatory duty. (Exhibit 1 at 26, 29, 39, 41). Defendant now asks this Court to dismiss before examining conduct that a federal tribunal has already adjudicated in Plaintiff's favor. The motion should be denied.

## II.  THE COMPLAINT DOES NOT PLEAD A SIMPLE ONE-DAY AIRLINE DISPUTE

Defendant's motion rests on a false premise -- that this case is about conduct that was complete in May or June 2022. The Complaint alleges otherwise. United relies on the rule that where the face of the complaint shows a claim is time-barred, dismissal is appropriate. See *Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir. 1980). But the face of the Complaint here shows the opposite: a September 4, 2025 republication of the defamatory narrative filed within one year of suit; a continuing travel ban producing fresh harm each day; and a July 8, 2025 accrual date when the ALJ's ruling became final. The limitations defense does not appear on the face of this pleading. The Complaint does not allege a routine passenger dispute. It alleges that United created a false narrative, transmitted that narrative to Plaintiff's federal employer to trigger enforcement action, and has continuously maintained and republished that narrative from the evening of May 12, 2022 through the present day. The travel ban issued against Plaintiff on the night of the incident has never been lifted. It remains in effect today.

Under California's continuing tort doctrine, where a defendant's wrongful conduct is ongoing and each day produces a new injury, the limitations period does not begin to run from the first wrongful act. *Aryeh v. Canon Business Solutions, Inc.,* 55 Cal. 4th 1185, 1192 (2013). Each day that United maintains its travel ban against Plaintiff -- branding him a safety threat based on conduct a federal

tribunal found not credible and without merit -- is a fresh wrong causing fresh harm. Plaintiff cannot fly on United today. He could not fly on United yesterday. The harm is not historical. It is present and ongoing. United reaffirmed that ban explicitly on September 4, 2025, ten weeks after the ALJ's final ruling, repeating the US$3,153 demand and attributing it to Plaintiff's "behavior." United has not retracted, corrected, or withdrawn any part of its narrative at any point since May 12, 2022. The FAA enforcement proceeding that United's submissions set in motion remained active and adversarial until June 27, 2025. United's own witnesses testified at the October 2024 hearing in Phoenix.

The ALJ's ruling became a final order of the Administrator pursuant to 14 C.F.R. § 13.232(d) on July 8, 2025 when no appeal was taken within the 10-day period under 14 C.F.R. § 13.233(a).

Furthermore, United's decision to maintain the ban and reaffirm it on September 4, 2025 -- after a federal tribunal had already found its narrative not credible and without merit -- is not a neutral business decision. It is a knowing, deliberate act. The actual malice standard requires that a defendant publish or maintain a false statement with knowledge of its falsity or in reckless disregard of the truth. *New York Times Co. v. Sullivan*, 376 *U.S. 254, 280 (1964); Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 252 (1974) (actual malice standard applies in false light privacy claims). Once a federal tribunal has adjudicated the factual predicate of a statement to be false, a defendant who continues to enforce that statement can no longer claim ignorance of its falsity. United had actual knowledge, through the ALJ's findings, that the justifications for the ban were invalid. United cannot claim good faith reliance on its own narrative after a federal ALJ dismantled that narrative on the record. Every day the ban continues after July 8, 2025 supports a strong inference of knowing malice. Defendant's limitations argument depends on treating the initial transmission of United's June 1, 2022 no-fly ban letter as the only relevant act and ignoring everything that followed. The Complaint alleges a continuing course of wrongful conduct that has never stopped. Each day produces a new harm. The claims are timely, and each argument is addressed in turn below.

## III.   DEFENDANT'S SEPTEMBER 4, 2025 LETTER STATES AN INDEPENDENT TIMELY DEFAMATION CLAIM

Even setting aside the continuing tort doctrine, delayed accrual, and equitable tolling entirely, Defendant's September 4, 2025 letter independently states a timely defamation claim that requires no tolling argument whatsoever. Plaintiff filed this action on January 30, 2026 -- less than five months after that letter. California's statute of limitations for defamation is one year. *Cal. Code Civ. Proc.* § 340(c). The claim is timely on its face.

### A.  The September 4, 2025 Letter Republished the Defamatory Narrative

The September 4, 2025 letter was not a neutral administrative notice. [Exhibit 5]. It was sent ten weeks after the ALJ's final ruling. It opened by falsely stating that Plaintiff had submitted an appeal "*the appeal you submitted*" when no appeal had ever been filed. It expressly reaffirmed restrictions arising from "the incident onboard flight 1684 on May 12, 2022." It repeated the demand for "US$3,153" as restitution for costs United claimed it incurred "*as a result of your behavior*." It upheld the travel ban in its entirety. And it declared the matter "*closed*" with no acknowledgment of the ALJ's findings, no correction of the false narrative, and no retraction of any kind. The fabricated appeal framing is itself a defamatory statement: it falsely implies that Plaintiff had formally contested the PIRC decision and lost on the merits, when in fact no appeal was ever filed and the PIRC had never adjudicated any appeal at all. Each of those acts republished the defamatory narrative. Under California law, each new publication of a defamatory statement gives rise to a new cause of action with its own limitations period. *Shively v. Bozanich*, 31 Cal. 4th 1230, 1242 (2003). The September 4, 2025 letter is a fresh publication, made with actual knowledge that a federal tribunal had already found the underlying narrative not credible and without merit.

**B. Defendant Cannot Defeat This Claim on Third-Party Publication Grounds**

Defendant will likely argue that the September 4, 2025 letter was sent only to Plaintiff and therefore lacks the third-party publication required for defamation. That argument fails under California's doctrine of compelled self-publication. California recognizes defamation by compelled self-publication where the defendant has reason to expect that the person defamed will be under strong compulsion to repeat the defamatory statement to a third party. *McKinney v. County of Santa Clara*, 110 Cal. App. 3d 787, 796-98 (1980).

That doctrine squarely applies here. Plaintiff is a Federal Aviation Administration Aviation Safety Inspector. His employer -- the FAA -- had already reassigned him from his United Airlines oversight position in November 2022 specifically because of the conflict created by Defendant's ban. The FAA's Notice of Administrative Reassignment states explicitly that the action was "*solely based on a real/perceived conflict of interest with United Air Lines (United)*" due to the "*open FAA Civil Penalty and current ban*." [Exhibit 4]. When Defendant reaffirmed that ban on September 4, 2025 [Exhibit 5], Plaintiff was under a professional and regulatory obligation to disclose the continued restriction to his FAA supervisors. He could not ignore a continuing travel ban that directly impaired his ability to perform official duties involving United Airlines. The FAA's own reassignment memo -- which attributed his removal from United Airlines oversight duties directly to the "*open FAA Civil Penalty and current ban*" compelled disclosure: any continuation of that ban necessarily required Plaintiff to report it to his supervisors as an ongoing conflict affecting his regulatory duties. Disclosure to his employer was not merely foreseeable -- it was required by the very regulatory framework that Defendant's ban had already set in motion. United's ban also creates an independent and continuing obligation to disclose that goes beyond the United Airlines oversight conflict. FAA Aviation Safety Inspectors are required to travel on any carrier that best fits official travel policy or assignment requirements. See 14 C.F.R. §§ 121.547, 121.548. United operates routes that are frequently the most direct or only cost-efficient option for official FAA travel. A permanent ban that prevents Plaintiff from boarding United

aircraft does not merely affect personal travel -- it directly impairs his ability to meet official duty requirements on any assignment requiring United routing. Had the ALJ not ruled in Plaintiff's favor, the FAA could have used Plaintiff's inability to meet those travel requirements as independent grounds for further adverse employment action, up to and including termination. United's ban thus creates a continuing professional obligation to disclose -- not merely a foreseeable one -- that exists entirely independent of which carrier Plaintiff is assigned to oversee.

Defendant knew exactly who Plaintiff was and what position he held. Defendant's own internal records confirm that its executive leadership identified Plaintiff as an FAA Inspector assigned to the United Airlines Certificate Management Office by the morning of May 13, 2022 -- the day after the incident. When Defendant sent the September 4, 2025 letter maintaining a travel ban against a known FAA Inspector whose oversight duties involved United Airlines, it had every reason to know Plaintiff would be compelled to disclose that ban to his federal employer.

**C.  The September 4, 2025 Letter Demonstrates Actual Malice**

The timing and content of the September 4, 2025 letter also independently establishes actual malice at the pleading stage. Actual malice requires knowledge of falsity or reckless disregard for truth. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). United sent this letter ten weeks after the ALJ found its witnesses "*not credible*," its allegations "*without merit*," and Plaintiff's conduct a "*required*" regulatory duty. (Exhibit 1 at 26, 29, 39, 41). United cannot plausibly claim it was unaware of those findings. Maintaining and republishing a defamatory narrative with actual knowledge that a federal tribunal has found it false strongly supports a plausible inference of actual malice at the pleading stage. That inference is made inescapable by what followed: United transmitted the September 4, 2025 PIRC letter to Plaintiff via email -- purporting to deny an appeal he had never filed -- and when Plaintiff immediately notified Robert Rivkin (United's Chief Legal Officer) and James Conneely (United's Deputy General Counsel for Regulatory, Facilitation, and Aviation Security) directly and in writing that no appeal had been filed and that the letter appeared

to have been issued without their knowledge, they took no action. They did not retract it. They did not correct it. They did not respond. United's top lawyers were placed on explicit written notice of a procedurally fabricated denial and chose to let it stand. That is not reckless disregard -- it is knowing maintenance of a false narrative. The malice inference is further reinforced by the fact that United's Chief Legal Officer, who authorized Conneely's August 28 response and thus the PIRC referral that produced the September 4 letter, previously served as General Counsel of the U.S. Department of Transportation and possessed specific insider knowledge of the FAA enforcement process that United's submissions were designed to exploit.

Plaintiff filed this action on January 30, 2026. The September 4, 2025 defamation claim is timely, independently stated, and supported by actual malice. Defendant's motion fails as to this claim regardless of how the Court resolves the tolling arguments that follow.

## IV.  THE BROADER CLAIMS DID NOT ACCRUE UNTIL THE FAA PROCEEDING CONCLUDED

### A.  McDonough Applies Here by Close Analogy

Defendant argues that *McDonough v. Smith*, 588 U.S. 109 (2019), does not apply because the FAA proceeding was civil rather than criminal. That distinction does not defeat the analogy. McDonough holds that accrual turns on when the plaintiff has a "complete and present cause of action," and that a fabricated-evidence claim does not accrue until favorable termination because earlier filing would create parallel litigation over the same disputed facts with the risk of conflicting judgments. *McDonough*, 588 U.S. at 116-19. That same problem exists here. The Complaint does not allege only that United did something wrongful on one day in May 2022. It alleges that United created and transmitted a false narrative that was actively being used against Plaintiff in a federal enforcement proceeding for nearly three years. Plaintiff should not have been required to sue United over the truth of that narrative in civil court while the FAA was

simultaneously prosecuting him based on that same narrative. Had Plaintiff filed this civil action in 2022 or 2023, two proceedings would have been litigating the same core question -- whether United's account of the May 12, 2022 incident was true -- simultaneously and independently, with the risk of inconsistent findings.

The ALJ's findings demonstrate precisely why earlier filing would have been premature. The record developed in the FAA proceeding showed that United's PIRC submissions were not sworn, signed, or verified; identified no actual decisionmakers; gave Plaintiff no meaningful opportunity to confront his accusers; cited no legal authority for the PIRC's quasi-tribunal role; and were unreliable in terms of probative content. None of those findings could have been established before the proceeding concluded. The full scope of United's evidentiary manipulation was not knowable until the ALJ ruled.

**B.  California Authorities Support the Same Timing Logic**

California law points in the same direction. In *Babb v. Superior Court*, 3 Cal. 3d 841, 845-47 (1971), the California Supreme Court held that a malicious prosecution claim does not accrue until the underlying proceeding terminates favorably, in part to avoid inconsistent judgments and overlapping litigation. In *Hardy v. Vial*, 48 Cal. 2d 577, 582-84 (1957), the California Supreme Court recognized that these principles apply to proceedings before administrative bodies with power to affect protected interests.

The Ninth Circuit applies the same logic. In *Bradford v. Scherschligt*, 803 F.3d 382, 388-89 (9th Cir. 2015), the court held that a deliberate fabrication claim accrued when the plaintiff was no longer subject to the underlying charges. These authorities do not convert Plaintiff's claims into formal malicious prosecution claims. They establish a broader principle that both federal and California law recognize -- a plaintiff whose legal position depends on the outcome of an ongoing adversarial proceeding built on the same disputed facts should not be forced to litigate those facts

simultaneously in two forums. Plaintiff's claims challenging the truth of United's narrative were not complete until the FAA proceeding ended in his favor on July 8, 2025, when the ALJ's June 27, 2025 ruling became final. Defendant cites two district court decisions in support of its contention that *McDonough* is inapplicable to civil proceedings: *Valle v. Morgado*, 2021 U.S. Dist. LEXIS 226877 (N.D. Cal. Nov. 24, 2021), and *Jimenez-Bencebi v. Arizona,* 2024 U.S. Dist. LEXIS 102484 (D. Ariz. June 10, 2024). Neither is binding authority, and neither is factually analogous. Valle involved a civil rights claim arising from a single discrete event with no ongoing parallel proceeding litigating the same facts. Jimenez-Bencebi involved a civil immigration proceeding entirely distinct in character from a federal enforcement action built on a false narrative submitted by a third party. Neither case involved an FAA enforcement proceeding in which the same disputed factual narrative that forms the basis of the civil claims was being actively adjudicated in a parallel forum for nearly three years. The core *McDonough* concern -- avoiding simultaneous litigation over identical disputed facts with the risk of inconsistent judgments -- was squarely present here and is not addressed by either authority Defendant cites.

## C.  Earlier Filing Would Have Been Practically Impossible

Beyond the legal arguments, practical considerations confirm that earlier filing was not reasonable. The FAA enforcement proceeding was actively pending, and the factual record was still being developed. FAA CMO Manager Frable -- the same official who received United's June 2, 2022 package -- ordered two internal investigations. ASH closed its ROI with a non-punitive coaching session, clearing Plaintiff of any wrongdoing. Frable then contacted AGC enforcement director Cynthia Dominik and requested the EIR be dropped in light of that clearance. Dominik declined. Frable told her he felt it was a "*foolish decision*." Frable was acting with authorization from his superior in the FAA's flight standards division when he contacted Dominik to request the EIR be dropped. The situation was internally contested within the FAA itself. Filing a civil lawsuit against United while the FAA's own manager was actively opposing the enforcement action would have

been premature by any reasonable standard. The claims accrued on July 8, 2025. This action filed on January 30, 2026 is timely.

## V.  ADDISON EQUITABLE TOLLING APPLIES AS A FALLBACK

Even if the Court concludes that some claims accrued before the FAA proceeding concluded, the Complaint plausibly pleads equitable tolling under *Addison v. State*, 21 Cal. 3d 313 (1978). Equitable tolling requires timely notice to the defendant, lack of prejudice, and reasonable good faith conduct by the plaintiff. All three elements are satisfied here.

### A.  United Had Continuous and Documented Notice

United's claim that it lacked notice of Plaintiff's intent to pursue civil litigation is not credible given the record. From the night of the incident, United's own internal systems notified multiple executives simultaneously. By May 13, 2022, United's Director of Global Aviation Security, VP of Corporate Safety, and Associate General Counsel were all personally engaged. United's Associate General Counsel deliberately transmitted the June 2, 2022 PIRC package to FAA Manager Frable for "*awareness and action as appropriate*" [Exhibit 3] -- initiating the enforcement channel that ran for nearly three years. United monitored the FAA proceedings through its own witnesses, was formally served with a federal *Subpoena Duces Tecum* in August 2023, and its witnesses testified at the October 2024 hearing in Phoenix. Before the ALJ decision, Plaintiff sent a formal demand letter to Deputy General Counsel Conneely on February 12, 2025. After the ALJ's June 27, 2025 ruling, Plaintiff sent a demand letter to Chief Legal Officer Rivkin on August 7, 2025 -- enclosing the ALJ decision and asserting defamation, whistleblower retaliation, and tortious coercion claims -- received via FedEx on August 11, 2025. Plaintiff separately notified the Board of Directors on August 17, 2025, received August 20, 2025.

On August 28, 2025, Rivkin directed Conneely to respond -- acknowledging the August 7 letter and referring the matter to PIRC for an "*appeal*" Plaintiff had never requested. That referral produced the September 4, 2025 PIRC letter purporting to deny a non-existent appeal and declaring the matter "*closed.*" Plaintiff immediately notified Rivkin and Conneely in writing that no appeal had ever been filed and that the letter was procedurally improper. United's leadership neither retracted nor corrected it. Plaintiff then issued a formal preservation request, transmitted a draft complaint with exhibits directly to Rivkin, and set a specific cure deadline of December 8, 2025. On that date United acknowledged receipt, stated the matter was "taken under advisement," and refused to lift the ban or withdraw the restitution demand. Plaintiff filed this action on January 30, 2026. A party whose Chief Legal Officer personally directed responses to pre-litigation demand letters, whose Deputy General Counsel for Regulatory, Facilitation, and Aviation Security received a formal demand letter as early as February 12, 2025, whose Board of Directors received the adverse ALJ ruling and August 7 demand letter on August 20, 2025, and who was given a specific filing deadline cannot plausibly claim it lacked notice of Plaintiff's claims and intent to litigate. *Saint Francis Memorial Hospital v. State Dept. of Public Health*, 9 Cal. 5th 710, 726-27 (2020).

**B. United Suffers No Prejudice**

United cannot demonstrate prejudice. The critical documents in this case are United's own records -- its internal emails, PIRC communications, IOR reports, executive correspondence, and financial calculations. United preserved all of these records, produced them in response to the federal subpoena, and relied on them throughout the FAA proceeding. United has had continuous possession of every relevant document. United's own conduct forecloses its evidence-gathering prejudice argument: it produced those same documents under federal subpoena in 2023, actively litigated the FAA proceeding through October 2024, received Plaintiff's formal demand letters and a full draft complaint with exhibits before suit was filed, and had its Chief Legal Officer personally evaluate and respond to Plaintiff's claims. Moreover, United's own Chief Legal Officer

-- a former DOT General Counsel with deep knowledge of the FAA regulatory system -- personally evaluated Plaintiff's claims, received the draft complaint with exhibits, and made a deliberate, counseled decision to refuse. United was not surprised by this litigation. It was prepared for it. It chose to proceed.

**C. Plaintiff Acted Reasonably and in Good Faith**

Plaintiff's conduct throughout this period exemplifies reasonable good faith pre-litigation conduct. He did not rush to court. Within ten weeks of the incident he escalated the off-duty status issue directly to the DOT General Counsel. He cooperated with the FAA's internal investigation. He waited for the ALJ's final ruling before asserting that United's narrative had been judicially determined to be false. He then gave United multiple formal opportunities to resolve the matter without litigation -- demand letters before and after the decision, transmission of the ALJ ruling, a preservation request, a draft complaint with exhibits, personal notification to United's top lawyers of a procedural defect in their own PIRC process, and a specific cure deadline. Only after United's deliberate, counseled refusal on December 8, 2025 did Plaintiff file suit on January 30, 2026. Filing a civil lawsuit against United while Plaintiff's own FAA manager was actively working to terminate the enforcement action -- describing it as a "*foolish decision*" -- and while Plaintiff was simultaneously engaging the DOT's top lawyer on the underlying policy question, would have been premature and counterproductive. Plaintiff's sequencing was not gamesmanship. It was the objectively reasonable course under the circumstances.

**VI. RESPONSE TO THE COUNTS**

Defendant's motion challenges each count primarily on limitations grounds and, as to several counts, on pleading sufficiency. Each count survives for the reasons stated below.

**Count I: Defamation Per Se**

Count I survives for the reasons stated in Sections II, III, and IV. The September 4, 2025 letter independently states a timely defamation claim filed within one year of the January 30, 2026 filing date. The continuing tort doctrine provides an additional basis for timeliness as the ban remains in effect today. The defamatory statements are specifically identified by content, speaker context, and date -- satisfying the requirement that words constituting an alleged libel be specifically identified. *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 31 (2007). Those statements include the false claim that Plaintiff used profane language, a factual allegation the ALJ expressly found the FAA failed to prove, and the false characterization of Plaintiff as a threat to the safety of United's employees and passengers, a designation United's own internal records contradict with a contemporaneous "Safety Risk: N" assessment made the same night of the incident. Actual malice is supported by United's knowing republication of the narrative after the ALJ's final ruling -- a ruling that found Mr. Asmus was "*required*" to document any safety-related issues that he observed, whether on duty or off duty. (Exhibit 1 at 41).

United's argument that the internal records designation is "*facially true*" because Plaintiff is banned misses the point. The defamatory statement is not the label "*banned*"  it is the false narrative beneath it: that Plaintiff was a safety threat who used profane language and engaged in conduct justifying removal. Those characterizations are what the ALJ found not credible and without merit. A ban imposed for false reasons is itself the defamatory act regardless of whether the ban exists. Defendant's argument that internal communications are privileged under *Cal. Civ. Code* § 47(c) fails for two independent reasons. First, the privilege does not apply where actual malice is present. *Noel v. River Hills Wilsons, Inc.*, 113 Cal. App. 4th 1363, 1369 (2003). The ALJ's findings establish actual malice at the pleading stage. Second, and independently, the communications were not purely internal. United's Associate General Counsel transmitted the PIRC package directly to FAA Manager Frable for "awareness and action as appropriate." External transmission to a third-party federal agency is publication. Whatever internal privilege might

otherwise apply evaporated the moment United deliberately routed its narrative to Plaintiff's employer.

**Count II: Tortious Interference with Employment**

Count II survives because the Complaint plausibly alleges that United's conduct was specifically aimed at inducing adverse FAA action against Plaintiff and that adverse employment consequences directly followed. The causal chain is documented. United's Associate General Counsel transmitted the PIRC package to Plaintiff's FAA manager for "awareness and action as appropriate." [Exhibit 3]. The FAA reassignment memo issued November 16, 2022 states explicitly that the action was "*solely based on a real/perceived conflict of interest with United Air Lines*" due to the "*open FAA Civil Penalty and current ban*." [Exhibit 4]. United's conduct was the direct and proximate cause of Plaintiff's removal from United Airlines oversight duties.

Defendant argues Plaintiff failed to allege an actual breach of his employment relationship because he was reassigned rather than terminated. That argument fails under California law. In *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004), the California Supreme Court confirmed that intentional interference with an employment relationship is actionable where the defendant's conduct disrupts an identifiable term or condition of that relationship. United's argument that reassignment without termination cannot satisfy the fourth element is the precise position the Supreme Court rejected in *Muldrow v. City of St. Louis*, 601 U.S. 346, 144 S. Ct. 967 (2024), which held that an adverse employment action requires only "some harm" to the terms and conditions of employment -- not termination, demotion, or pay reduction. The fourth element is directly satisfied here: the FAA's own reassignment memo states explicitly that the action was "*solely based on a real/perceived conflict of interest with United Air Lines*." That document is United's own evidence confirming actual disruption of Plaintiff's contractual duties. While Plaintiff's rank and pay remained the same, his specific oversight authority over United Airlines was eliminated, his open MAX FOD investigation was terminated, and his ability to perform the regulatory duties for which he was

trained and assigned was permanently removed. Under *Reeves* and *Muldrow*, that documented disruption to identifiable terms and conditions of employment satisfies the fourth element and supports Count II at the pleading stage.

On timeliness, the claim accrued no earlier than November 16, 2022. Under delayed accrual principles the claim did not become complete until July 8, 2025, when the ALJ's June 27, 2025 ruling became final and established that United's submissions were false and unreliable. The filing on January 30, 2026 is timely.

**Count III: Fraudulent Misrepresentation**

Count III survives because the Complaint plausibly alleges that United, acting through counsel and management, transmitted false and materially misleading submissions to FAA officials with specific intent to induce FAA action against Plaintiff, and that the FAA did in fact act on those submissions to Plaintiff's detriment. As a threshold matter, United's attempt to treat fraudulent misrepresentation and statutory deceit under *Cal. Civ. Code* §§ 1709 and 1710 as separate causes of action requiring independent pleading misstates the law. They are alternative theories resting on the same factual predicate. California courts treat them together at the pleading stage, and the Complaint's allegations satisfy the elements of both.

United's reliance argument is factually incorrect on its face. The June 1, 2022 PIRC letter was sent directly to Plaintiff, not only to the FAA. [Exhibit 2]. That letter falsely characterized Plaintiff's conduct, imposed a $3,153 monetary demand, and conditioned his future travel on payment -- all directed to Plaintiff personally. A defendant cannot claim there was no communication to the plaintiff when its own exhibit proves otherwise. Defendant argues Plaintiff cannot establish reliance because the misrepresentations were directed to the FAA rather than to Plaintiff. California law rejects that argument. Deceit liability extends to false statements made to a third-party decisionmaker where the defendant intended the third party to act on the misrepresentation

and the plaintiff was the intended target of that induced action. *Randi W. v. Muroc Joint Unified Sch. Dist.,* 14 *Cal. 4th 1066, 1082-85 (1997); Geernaert v. Mitchell*, 31 Cal. App. 4th 601, 605-06 (1995). That Plaintiff disputed United's representations to the FAA is irrelevant under this standard. *Randi W.* requires only that the third-party decisionmaker rely on the false statement -- not the plaintiff. The FAA's own counsel confirmed that reliance on the record at the October 2024 support in California law.

The reliance element is further established by the record. At the October 2024 hearing, FAA counsel stated on the record that the FAA investigator was "*entitled to rely*" on reports received from the airline and had "*no reason to dispute the authenticity*" of airline-submitted reports. Tr. 233. United knew this was the FAA's standard practice. United's executive leadership specifically directed the preparation and submission of its PIRC package to exploit that known reliance. The ALJ subsequently found those submissions contained "*unreliable anonymous hearsay*" given "*no weight*." The gap between what United submitted and what the ALJ found is the fraud. The point is sharpest on the profanity allegation: the ALJ noted in a specific finding that although the FAA alleged profanity in its own Complaint, not one witness testified to hearing Plaintiff use profane language -- directly or within their hearing range -- and the FAA failed to prove the allegation entirely. (Exhibit 1 at 28, n.33). United's defamatory characterization of Plaintiff as "*rude and verbally combative*" using "*profane language*" was thus not merely unproven -- it was affirmatively contradicted by every witness who testified.

The three-year limitations period runs from June 2022. Under delayed accrual the claim did not become complete until July 8, 2025, when the ALJ's June 27, 2025 ruling establishing the falsity of United's submissions became final. The filing on January 30, 2026 is timely.

**Count IV: Civil Extortion / Wrongful Coercion**

Count IV survives as a claim for wrongful coercion under California common law. United argues that Plaintiff improperly attempts to enforce *California Penal Code* §§ 518 and 523 as a civil cause of action. That argument misreads the Complaint in the same way as its assault argument. The Penal Code references appear in the count heading, but the body of the Complaint pleads the common law elements of wrongful coercion -- conditioning restoration of travel rights on payment through wrongful use of fear. Private parties have long maintained civil actions for wrongful coercion under California common law independent of any criminal statute. Plaintiff does not seek to enforce *Penal Code* §§ 518 or 523 directly. The Complaint's allegations -- that United conditioned restoration of Plaintiff's travel rights on payment of US$3,153 based on conduct the ALJ found was a mandatory regulatory duty -- state a viable claim for wrongful use of economic pressure regardless of the statutory label. *CrossTalk Productions, Inc. v. Jacobson*, 65 Cal. App. 4th 631, 644 (1998).

The coercive structure is explicit in United's own letters. The June 1, 2022 PIRC letter states: "*only after United receives full restitution in the amount of US$3,153.00 will you be allowed to travel*." [Exhibit 2]. The September 4, 2025 letter repeats the identical demand verbatim [Exhibit 5] -- after the ALJ had ruled that the conduct for which United was demanding payment was a mandatory regulatory duty. Furthermore, under 49 U.S.C. § 44902(b), the primary federal statutory basis for refusing transportation to a passenger, a carrier must make a reasonable determination that the passenger is or might be inimical to safety. That determination is subject to review and cannot be arbitrary or capricious. *Schaeffer v. Cavallero*, 54 F. Supp. 2d 350, 352 (S.D.N.Y. 1999).

The ALJ's final ruling further established that the aircraft's Pilot in Command was "*convinced*" of Plaintiff's identity as a federal aviation safety inspector before the removal was completed -- a finding that substantially undermines any good faith defense to United's subsequent safety determination under 49 U.S.C. § 44902(b). [Exhibit 1 at 40].  Moreover, the ALJ found that Plaintiff's conduct was a mandatory regulatory duty, establishing at the pleading stage that United's safety determination was not reasonable. The PIRC itself has no statutory or regulatory basis -- no

federal statute, FAA regulation, or DOT rule authorizes a private internal committee to make quasi-judicial findings of liability, impose monetary penalties, or condition future travel on payment. Conditioning Plaintiff's travel rights on payment based on conduct already adjudicated as lawful constitutes wrongful coercion. The September 4, 2025 letter reaffirming this demand is within one year of filing and states a timely claim.

**Count V: Intentional Infliction of Emotional Distress**

Count V survives because the Complaint plausibly alleges outrageous conduct extending well beyond the initial incident. Defendant correctly notes that the May 12, 2022 removal and the June 2022 ban are outside the two-year limitations period. However the Complaint does not rest solely on those initial acts. The IIED claim is independently supported by United's post-ALJ conduct -- specifically, maintaining a travel ban and repeating a monetary demand against a federal official whose conduct a federal tribunal had already found to be a mandatory regulatory duty, and doing so through United's own Chief Legal Officer who possessed specific knowledge of the FAA regulatory system.

Continuing to brand a verified federal safety inspector as a security threat after a federal tribunal has ruled his conduct was legally required, and continuing to demand payment as a condition of travel based on that same conduct, goes beyond all reasonable bounds of decency. *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009). The professional harm Plaintiff suffered -- permanent removal from United Airlines oversight, loss of regulatory authority, and career disruption -- constitutes cognizable injury under any standard, including the "*some harm*" standard recently articulated by the Supreme Court in *Muldrow v. City of St. Louis*, 601 U.S. 346, 144 S. Ct. 967 (2024). The post-ALJ conduct -- including the September 4, 2025 letter and the December 8, 2025 refusal -- is within the two-year limitations period and independently supports this claim. United's argument that the SSI breach was caused by the FAA rather than United, citing *Potter v. Firestone Tire & Rubber Co.,* 6 Cal. 4th 965 (1993), fails because Potter requires that outrageous conduct be directed

at the plaintiff or occur in plaintiff's presence. Here the relevant outrageous conduct -- transmitting a false narrative to Plaintiff's supervisors specifically designed to trigger enforcement action -- was directed squarely at Plaintiff. United cannot instigate federal proceedings against Plaintiff and then disclaim responsibility for the foreseeable consequences of those proceedings, including the handling of Plaintiff's sensitive information within the proceeding United set in motion.

**Count VI: Civil Assault**

United argues that Plaintiff improperly attempts to enforce *California Penal Code* § 240 as a civil cause of action. That argument misreads the Complaint. The Penal Code reference appears in the count heading, but the body of the Complaint at paragraph 151 expressly pleads the California common law standard: "*Civil assault occurs when a defendant intentionally threatens another with the apparent ability to inflict injury, causing a reasonable apprehension of immediate bodily harm.*" That is the common law tort of assault, not a criminal enforcement action. California civil assault is a well-recognized common law cause of action wholly independent of *Penal Code* § 240, and Plaintiff's allegations plainly satisfy its elements. United cannot defeat a properly pleaded common law tort by pointing to a statutory citation in a heading while ignoring the substantive pleading in the body.

Count VI survives because the Complaint plausibly alleges that United intentionally caused Plaintiff to suffer a reasonable apprehension of imminent harmful or offensive contact while he was engaged in the performance of his official duties as a federal officer. Civil assault requires no physical contact -- only that the defendant's intentional conduct caused a reasonable person in Plaintiff's position to fear imminent physical harm. United's argument that Count VI improperly enforces *California Penal Code* § 240 misreads the Complaint. The Penal Code reference appears only in the heading; the body of the Complaint at paragraph 151 expressly pleads the California common law standard. California civil assault is a well-recognized common law cause of action wholly independent of *Penal Code* § 240.

Plaintiff's apprehension of imminent forcible removal was objectively reasonable. United had a documented and widely publicized history of calling law enforcement to physically remove passengers -- including the April 2017 forcible removal of Dr. David Dao, an incident known to virtually every air traveler in America by May 2022. The flight crew suspected Plaintiff's identity as an FAA Aviation Safety Inspector before he even identified himself; the aircraft was returned to the gate; and the Pilot in Command was already aware of Plaintiff's federal officer status when he carried out the removal -- a fact the ALJ specifically noted. Plaintiff was physically shaking from the physiological effects of acute stress when he encountered the captain in the jetway. That physical response is itself evidence of the severity and reasonableness of his apprehension. The Ninth Circuit standard confirms that reasonable apprehension of immediate bodily harm is determined with reference to a reasonable person aware of the circumstances known to the victim. *United States v. Acosta-Sierra*, 690 F.3d 1111, 1121 (9th Cir. 2012). Plaintiff knew he was a federal officer performing official regulatory duties. He knew United's history of forcible removal. He knew law enforcement could be summoned at any moment. And critically -- the captain knew who he was. The ALJ's finding that the Pilot in Command was "*convinced*" of Plaintiff's identity as a federal aviation safety inspector before the removal was completed forecloses any good faith defense. (Exhibit 1 at 40).

On timeliness, the assault claim is subject to the same delayed accrual and equitable tolling arguments set forth in Sections IV and V. Plaintiff could not have fully established the wrongfulness of the removal -- including the falsity of the safety threat characterization that justified calling law enforcement -- until the ALJ ruled that his conduct was a mandatory regulatory duty and United's narrative was not credible. The claim did not become complete until that ruling became final on July 8, 2025.

**Count VII: Tortious Interference with Federal Duties**

Count VII survives because the Complaint does not attempt to privately enforce 49 U.S.C. § 40113 or 14 C.F.R. § 13.2 as free-standing damages provisions. Those statutes identify the federal duties, public policy framework, and protected operational role that United allegedly obstructed through its false narrative, punitive ban, and resulting interference with Plaintiff's performance of FAA responsibilities. United's own MTD contains a critical admission that independently supports this count. United states that it "*urg[ed] Plaintiff to share its refusal with the FAA on December 8, 2025.*" That admission defeats United's characterization of December 8 as a private communication between two parties. United directed Plaintiff to carry its refusal to the FAA -- making the FAA the intended recipient of United's continued ban. That is not a private bilateral communication. It is United using Plaintiff as a publication conduit to deliver its narrative directly to the agency overseeing his employment. Furthermore, United's framing conflates two distinct restrictions. The FAA's November 2022 work restriction -- which prohibited Plaintiff from flying on United in performance of official duties -- was an FAA employment consequence. United's personal travel ban, imposed June 1, 2022 and conditioned on payment of US$3,153, is entirely separate and exists independent of anything the FAA ordered. United alone imposed it. United alone can lift it. United's December 8 refusal to lift that personal ban, and its direction to inform the FAA of that refusal, extended and compounded the existing interference with Plaintiff's federal duties -- it did not merely communicate a pre-existing FAA restriction.

The statutory framework is also broader and more direct than United acknowledges. 49 U.S.C. § 40113 grants the FAA Administrator sweeping authority to take any action necessary to carry out the aviation safety mission, including conducting investigations, prescribing regulations, and issuing orders. This is an open, broad grant of administrative authority. The Administrator cannot personally board every aircraft or inspect every carrier operation. Aviation Safety Inspectors are the Administrator's designated representatives in the field --they exercise the Administrator's own statutory authority when performing inspections and investigations. The 2008 Federal Register rulemaking establishing 14 C.F.R. Part 153 expressly recognizes this, defining an ASI as an individual "*authorized under the provisions of 49 U.S.C. § 40113 to perform inspections and*

*investigations.*" 73 Fed. Reg. 47824 (Aug. 15, 2008). When United obstructed Plaintiff, it did not merely interfere with a passenger -- it obstructed the exercise of the Administrator's own statutory authority.

49 U.S.C. § 44713(b) sharpens the point further. That statute mandates that the Administrator "*shall employ inspectors who shall inspect aircraft... when in use by an air carrier in air transportation, to enable the Administrator to decide whether the aircraft... are in safe condition and maintained properly.*" This is not a permissive grant -- it is a statutory command. Plaintiff was aboard United Flight 1684, an aircraft in use by a certificated air carrier in air transportation. He observed a safety defect and discharged precisely the duty § 44713(b) imposes. United then removed him, banned him permanently, and transmitted a false narrative to his supervisors designed to strip him of all regulatory authority over United's operations. The interference was not incidental -- it achieved the precise result United sought -- Plaintiff was administratively reassigned and his open MAX FOD investigation terminated.

Defendant argues no private right of action exists under these statutes. That is correct as a matter of direct enforcement -- but the Complaint does not seek direct enforcement. It asserts a state law tort claim informed by settled federal safety obligations. California recognizes tort claims for interference with the performance of public duties where the defendant's conduct violates substantial public policy. *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167, 172 (1980). The ALJ's own analysis confirms that reporting aviation safety concerns falls within a mandatory regulatory duty under 14 C.F.R. § 13.2, and the Complaint plausibly alleges that United's conduct was specifically designed to obstruct Plaintiff's performance of those duties and to remove him permanently from any position of regulatory oversight involving United Airlines. Because the Merit Systems Protection Board lacks jurisdiction over private third-party commercial torts, this Court is the sole available forum for redress. Count-by-count dismissal is unwarranted. The motion fails as to Counts I, II, III, IV, V, VI, and VII.

## VII.  LEAVE TO AMEND

Should the Court conclude that any specific count is not presently pleaded with sufficient precision, the proper remedy is leave to amend, not dismissal with prejudice. *Chang* v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996). Leave to amend should be freely granted when amendment would not be futile. *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011). Dismissal with prejudice is particularly inappropriate here. The Complaint is supported by an extensive documentary record including a final federal administrative ruling, United's own internal communications produced in discovery, authenticated corporate correspondence, and a documented pre-litigation exchange spanning multiple demand letters, a preservation request, and a draft complaint transmitted to United's Chief Legal Officer. Any count the Court finds insufficiently pleaded can be cured by amendment with greater specificity -- not by termination of the action.

Defendant argues leave to amend should be denied because the viable claims are time-barred on their face. For the reasons stated throughout this opposition, that premise is wrong. The claims are timely under the continuing tort doctrine, delayed accrual, the September 4, 2025 republication, and equitable tolling. Because timeliness is plausibly pleaded, amendment would not be futile and leave should be granted as to any count the Court finds insufficiently stated.

## VIII.  CONCLUSION

Defendant's motion should be denied in its entirety.

The Complaint does not allege a one-day airline dispute. It alleges a continuing course of wrongful conduct -- a false narrative created by United, transmitted to Plaintiff's federal employer, maintained through nearly three years of adversarial federal proceedings, reaffirmed after a federal tribunal demolished that narrative, and still in effect today. Three independent grounds defeat the

motion: the September 4, 2025 letter states a timely defamation claim on its face; the broader claims did not accrue until the ALJ's ruling became final on July 8, 2025; and equitable tolling applies under Addison v. State, 21 Cal. 3d 313 (1978). The ALJ found United's witnesses not credible, their allegations without merit, and Plaintiff's conduct a mandatory regulatory duty. Those findings are final. United reaffirmed its ban anyway, refused settlement, refused after receiving a draft complaint, and refused after a specific filing deadline. This Court should deny the motion to dismiss in its entirety.

Respectfully submitted,

/s/ Paul D. Asmus

Plaintiff in Pro Per

P.O. Box 60755

Palo Alto, CA 94306

(650) 935-2105

pdasmus@protonmail.com

Dated: March 24, 2026

//

//

**EXHIBIT LIST**

**Exhibit 1**: U.S. Department of Transportation Administrative Law Judge Initial Decision, Paul D. Asmus, Case No. 2022FS050423 (served June 27, 2025).

**Exhibit** 2: United Airlines Passenger Incident Review Committee Letter to Paul D. Asmus (June 1, 2022).

**Exhibit 3**: Letter from United Airlines Associate General Counsel James Conneely to FAA CMO Manager Keith Frable (June 2, 2022).

**Exhibit 4**: FAA Notice of Administrative Reassignment (November 16, 2022).

**Exhibit 5**: United Airlines Passenger Incident Review Committee Letter to Paul D. Asmus (September 4, 2025).

//

//

**CERTIFICATE OF SERVICE**

I hereby certify that on March 24, 2026, I served a true and correct copy of the foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss upon counsel for Defendant via the Court's CM/ECF electronic filing system:

Richard A. Lazenby

Nicole A. Poltash

VICTOR RANE

9350 Wilshire Blvd., Suite 308

Beverly Hills, California 90212

rlazenby@victorrane.com

npoltash@victorrane.com

  /s/ Paul D. Asmus

Paul D. Asmus

Plaintiff in Pro Per

//

//

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

PAUL D. ASMUS,

Plaintiff,

v.

UNITED AIRLINES, INC.,

Defendant.

Case No.: 5:26-cv-00962-BLF

# EXHIBIT 1

*U.S. Department of Transportation Administrative Law Judge Initial Decision,*
*Paul D. Asmus, Case No. 2022FS050423 (served June 27, 2025)*

**SERVED: June 27, 2025**

**U.S. DEPARTMENT OF TRANSPORTATION**
**OFFICE OF HEARINGS**
**WASHINGTON, DC**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | FAA Docket No. G13-22-73 |
| Paul D. Asmus | ) | |
| | ) | Case No. 2022FS050423 |
| Respondent | ) | |

**INITIAL DECISION OF**

**U.S. ADMINISTRATIVE LAW JUDGE**

**Charge:**     One violation of 14 C.F.R. § 121.580 (the Interference Rule).

**Held:**        Charge dismissed.

## I.    INTRODUCTION

### A.  Overview

The parties' dispute in this Interference Rule case raises two (2) questions: 1) did the FAA prove the charged violation by a preponderance of the evidence; and 2) what process(es) should an FAA employee follow when s/he sees a potential aviation safety violation when traveling off-duty on a regulated air carrier.

On May 12, 2022, the Respondent, Mr. Paul D. Asmus, boarded United Airlines Flight 1684 at the San Francisco, California airport ("SFO"). Mr. Asmus was an off-duty FAA Aviation Safety Inspector ("ASI"), traveling for vacation as a paying passenger.  When he boarded the aircraft, Mr. Asmus did not introduce himself to the flight crew as an off-duty ASI. During the boarding process (i.e., while the aircraft remained parked at the SFO gate), Mr. Asmus saw and reported to a flight attendant some seatback pocket damage. He also told the flight attendant that he worked for the FAA.  During aircraft pushback (i.e., while the aircraft was being towed into position), and while the aircraft was "stopped," Mr. Asmus took a photograph of a passenger

standing in the aisle in the forward aircraft cabin, while the lighted seatbelt sign was on.  A male flight attendant, seated slightly behind and "catty-corner" to Mr. Asmus, began to question Mr. Asmus about the photograph. This questioning continued while the aircraft began taxiing to the SFO runway (i.e., while the aircraft was moving under its own power). When asked to produce his FAA 110A ASI identification badge, Mr. Asmus stated that he did not have it with him. Ultimately, the Captain returned the aircraft to the SFO airport gate. Mr. Asmus was asked to leave the aircraft. A United Airlines gate agent rebooked Mr. Asmus on a different United Airlines aircraft. Mr. Asmus was subsequently charged with one (1) violation of the Interference Rule (14 C.F.R. § 121.580).

### B.  Pleadings Summary

#### 1. The FAA's December 9, 2022 Complaint

In its December 9, 2022 Complaint, the FAA alleged that on or about May 12, 2022, Mr. Asmus was a passenger on board United Airlines Flight 1684, a Part 121 domestic airline travelling from San Francisco, California ("SFO"), to Lihue, Hawaii.  Compl. 1 § II ¶¶ 1-2.  The FAA alleged that Mr. Asmus, an FAA employee, engaged in improper conduct during the boarding process and during aircraft taxiing. The FAA charged Mr. Asmus with one (1) regulatory safety violation of 14 C.F.R. § 121.580 (the Interference Rule), alleging his actions "intimidated" and/or "interfered" with one or more crewmembers in the performance of their duties.  The FAA proposed a total civil penalty amount of $10,000 for the alleged violation, if proven.  Compl. 3.

#### 2. Mr. Asmus' December 15, 2022 Answer

In his December 15, 2022 Answer, Mr. Asmus admitted that he had been a passenger on board United Airlines Flight 1684 on May 12, 2022. Ans. 1, § II ¶ 1.  Mr. Asmus generally denied the FAA's charges against him, specifically, that he intimidated or interfered with one or more crewmembers in the performance of their duties in violation of the Interference Rule.  Ans. 4-5, § II ¶ 6; § III ¶ 1. Among other things, Mr. Asmus affirmatively alleged that when he told the flight attendants about aviation safety violations, they reacted negatively. Ultimately, he

Page **2** of **44**

alleges that he was removed from the flight as "retaliation" for reporting two (2) safety violations to the flight attendants. Ans. 5-6, § III, ¶ 3.

### C. The Parties' Pre-Hearing Witness Dispute

On May 2, 2023, Mr. Asmus identified three (3) FAA employee witnesses in his Initial Disclosures.[1]  Approximately one (1) year later, on June 24, 2024, Mr. Asmus filed a Request for Subpoenas, in which Mr. Asmus requested the issuance of three (3) Hearing witness subpoenas for the attendance of the three (3) previously disclosed FAA employee witnesses. On June 28, 2024, an Order Granting the Respondent's Request for Hearing Witness Subpoenas ("Order") was filed, issuing three (3) Hearing witness subpoenas for service upon Mr. Frable, Mr. Neal, and Mr. D'Urso.  *Paul D. Asmus*, G13-22-73, 2024 WL 3326312 (June 28, 2024).

On September 9, 2024, approximately six (6) weeks before the October 22, 2024 Hearing, the FAA filed the Complainant's Motion to Quash Respondent's Subpoenas Issued for FAA Employees' Testimony ("Motion"), citing both regulatory and factual grounds. On September 18, 2024, Mr. Asmus filed the Respondent's Response to the Complainant's Motion to Quash Subpoena's [sic] ("Response"), opposing the FAA's September 9, 2024 Motion. Thereafter, oral argument was scheduled for October 2, 2024 (i.e., twenty (20) days prior to the Hearing dates).  *Paul D. Asmus*, G13-22-73, 2024 WL 4331673 (Sept. 24, 2024).

On October 2, 2024, the FAA and Mr. Asmus appeared and presented oral arguments on the Motion to Quash and Response. On October 3, 2024, an Order Granting Motion to Quash, Denying Motion to Dismiss, and Granting Other Relief ("Order") was filed.  *Paul D. Asmus*, G13-22-73, 2024 WL 4413782 (Oct. 3, 2024).  Among other things in this October 3, 2024 Order, the Presiding Judge gave Mr. Asmus a deadline of October 4, 2024 to notify the Presiding Judge and the FAA by informal email whether he wished to: a) proceed with the Hearing as scheduled on October 22-24, 2024; or b) continue the October 22-24, 2024 Hearing to allow him an opportunity to reopen discovery and/or obtain alternate witnesses in support of his defenses to

---

[1] Specifically, on May 2, 2023, Mr. Asmus identified the following witnesses: 1) Mr. Keith Frable, an FAA employee who was Mr. Asmus' second line supervisor and the Manager of the FAA's United Airlines Certificate Management Office ("CMO") ; 2) Mr. Brian C. Neal, an FAA employee who was Mr. Asmus' Front Line Manager assigned to the United Airlines CMO; and 3) Mr. Steve D'Urso, an FAA Aviation Safety Inspector and representative of the Professional Aviation Safety Specialist Union.

the FAA's charges. *Paul D. Asmus*, 2024 WL 4413782, at *9. On October 3, 2024, Mr. Asmus informally emailed the Office of Hearings ("OH") (cc to the FAA), stating that he would proceed with the October 22, 2024 Hearing as scheduled. On October 4, 2024, an Order Reconfirming the October 2024 Hearing Dates ("Order") was filed. *Paul D. Asmus,* G13-22-73, 2024 WL 4449390 (Oct. 4, 2024).

### D.  Pre-Hearing Procedural Matters

On October 22, 2024, the parties convened in Phoenix, Arizona for the scheduled in-person Hearing. The Hearing took two (2) days and concluded on October 23, 2024. At the beginning of the Hearing, the parties: a) stipulated to Mr. Asmus' employment status; b) identified two (2) expert witnesses; and c) requested a ruling on a discovery dispute.

#### 1. Party Stipulation

The parties stipulated that at the time of the May 12, 2022 incident, Mr. Asmus was a Federal Administration Aviation ("FAA") employee, assigned to the United Airlines Certificate Management Office ("CMO"). Tr. 21:4-22:7.

#### 2.  FAA Identified Experts

At the beginning of the October 22, 2024 Hearing, FAA identified two (2) FAA expert witnesses: Ms. Beth Pritchard and Mr. Randall Prine. The Presiding Judge held that these two (2) FAA employee expert witnesses could remain in the courtroom so that they could listen to other witness testimony. Tr. 9:1-18. Thereafter, the FAA called Ms. Pritchard to testify as a lay witness in its case in chief. It did not call Mr. Prine as a witness.

#### 3.  Motion to Exclude Evidence Granted

At the beginning of the October 22, 2024 Hearing, Mr. Asmus moved, over the FAA's objection, to prohibit the FAA from introducing any evidence about who made the ultimate decision on May 12, 2022 to remove Mr. Asmus from the airplane. Tr. 11:13-15. It was undisputed that on July 14, 2023, the FAA provided Mr. Asmus with Captain Nastri's unsigned and unsworn narrative statement, in which Captain Nastri asserted that he contacted the "FODM" about removing Mr. Asmus from the aircraft. Tr. 13:13-5; 18:9-10.  Thereafter, on

August 22, 2023, the FAA responded to Mr. Asmus' first discovery request with an amended response, in which the FAA affirmatively stated that it did not know who made the ultimate decision to remove Mr. Asmus from the aircraft. Tr. 11:13-15; 12:8-10. At the Hearing on October 22, 2024, the FAA acknowledged that after serving its August 22, 2023 discovery response, it did not provide any supplemental disclosure to Mr. Asmus on this issue. The Presiding Judge held that the FAA was bound by its discovery responses and granted Mr. Asmus' motion to prohibit the FAA from introducing any evidence regarding who made the ultimate decision to remove Mr. Asmus from the airplane. Tr. 18:20-19:7.

### E. Post-Hearing Judicial Notice

Judicial notice is hereby taken of the following matters:

1. <u>Regulatory Duty to Report Aviation Safety Violations</u>

14 C.F.R. §13.2(a) provides: "Any person who knows of any violation of 49 U.S.C. subtitle VII, 49 U.S.C. chapter 51, or any rule regulation, or order issued under those statutes, should report the violation to FAA personnel." In accord with statutory laws[2] and the FAA's regulatory requirement, the FAA's published staff manual for FAA employees working in the FAA's compliance and enforcement programs requires that any FAA employee who becomes aware of an apparent aviation safety violation "by any regulated person" is tasked to "report[] such information" to the FAA program office or the FAA Hotline. FAA Order 2150.3C, *FAA Compliance and Enforcement Program*, Chapter 2, 2.7 § 6.a (Sept.30, 2021).[3]

2. <u>Face Mask Requirement</u>

On May 12, 2022, the use of face masks while traveling aboard commercial aircraft in the United States was optional, due to an April 18, 2022 U.S. District Court decision vacating the

---

[2] Title 49 of the United States Code codifies certain federal transportation law enacted by the U.S. Congress. Subtitle VII of 49 U.S.C. codifies aviation programs approved by the U.S. Congress, including Part A "Air Commerce and Safety", which contains both Part A, Subpart III (codifying specific aviation safety statutes), and Part A, Subpart IV (codifying aviation safety investigations, enforcement, and penalties).

[3] The Sept. 30, 2021 version of FAA Order 2150.3C was in effect on the date of the May 12, 2022 incident.

February 3, 2021 federal requirement (i.e., the "Mask Mandate") [4] for individuals to wear face masks while aboard passenger aircraft traveling throughout the domestic United States. *Health Freedom Def. Fund, Inc. v. Biden,* 599 F. Supp. 3d 1144, 1154 (M.D. Fla. 2022), *vacated as moot sub nom. Health Freedom Def. Fund v. Pres. of U.S.,* 71 F.4th 888 (11th Cir. 2023).

## II.    HEARING WITNESSES AND EXHIBITS

### A.  The FAA's Witnesses and Exhibits

During the October 2024 Hearing, the FAA presented four (4) lay witnesses: three (3) United Airlines employee lay witnesses and one (1) FAA employee lay witness, specifically: 1) Ms. Dianne Meacham, a flight attendant; 2) Mr. Mathew Materne, a flight attendant; 3) Mr. John Kallen, an off-duty United Airlines pilot who was a ticketed passenger aboard the flight;  and 4) Ms. Mary Elizabeth Pritchard, an FAA Aviation Safety Inspector. The FAA moved to admit ten (10) exhibits into evidence, identified as Exhibits C-1, C-2, C-3, C-4, C-5, C-6, C-9, C-10, C-11, and C-25.  Mr. Asmus objected on multiple grounds to the admission of six (6) Exhibits, specifically: Exhibits C-4, C-5, C-6, C-9, C-10, and C-11.  His hearsay objections to admissibility were overruled, and all ten (10) of the FAA's exhibits were admitted into evidence, subject to other objections and/or judicial rulings (*see, e.g.,* Tr. 18:1-8).

### 1.  Legal Standard - Unsworn Hearsay Statements

Our legal system is based on fundamental notions of fairness. Foremost among these concepts is the principle that accused persons should not be allowed to be convicted, or held legally liable, on the basis of unsworn testimony. The U.S. Supreme Court has held that to "allow men to be convicted on unsworn testimony of witnesses [is] a practice which runs counter to the notions of fairness on which our legal system is founded." *Bridges v. Wixon,* 326 U.S. 135,

---

[4] In the winter of 2020, the Secretary of Health and Human Services ("HHS") determined that the threat posed by the novel SARS-CoV-2 virus  ("Covid 19") constituted a public health emergency. *Determination of Public Health Emergency*, 85 Fed. Reg. 7316-01 (Feb. 7, 2020). On January 21, 2021, the President issued an executive order, directing federal officials to require masks on various forms of transportation and while in transit hubs. *Executive Order 13998. See Promoting COVID-19 Safety in Domestic and International Travel*, 86 Fed. Reg. 7205 (Jan. 21, 2021). On February 3, 2021, pursuant to executive order, the Center for Disease Control and Prevention ("CDC") published a requirement, pursuant to presidential directive, that persons traveling in the United States on public conveyances wear a face mask. This requirement was commonly known as the "Mask Mandate." *Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs*, 86 Fed. Reg. 8025-01 (Feb. 3, 2021).

153–154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103, 2115 (1945). Thus, it is well-established that "unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof of wrongdoing." *U.S. v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975) (except for cases tried on agreed statements of facts, defendants pleading not guilty "should not be allowed to be convicted on the basis of unsworn testimony"); *U.S. v. Hawkins*, 76 F.3d 545, 551 (4th Cir. 1996) ("testimony taken from a witness who has not given an oath or affirmation to testify truthfully is inadmissible"); Fed. R. Evid. 603; *see also*, Rule 103 of the Model Code of Evidence (every witness, prior to offering testimony, shall be required to express his purpose to testify only to the truth, by oath or by other means "that is binding upon the conscience of the witness"). Both the oath and affirmation should be stated in a solemn manner, in order "to awaken the conscience and remind the witness of her duty to speak the truth." Wright & Miller, 27 Fed. Prac. & Proc. Evid. § 6044 Form of Oath or Affirmation (2d ed., May 2025 Update); *see also,* FAA Order 2150.3C, *FAA Compliance and Enforcement Program*, Chapter 4, 4.17 § 9.d (Sept.30, 2021) (even though hearsay is admissible in DOT Hearings, such evidence is "frequently given little weight," and counsel is encouraged to present the witness at the Hearing).

2.  Unsworn But Adopted Hearsay Narratives – Considered

Three (3) United Airlines employees, who each wrote unsworn narrative statements, testified at the Hearing as FAA lay witnesses. Each lay witness identified and adopted certain content in their previously written, unsworn, hearsay narratives. Thus, these unsworn hearsay narrative statements (i.e., Ex. C-2: Mr. Materne's narrative; Ex. C-3: Ms. Meacham's narrative; and Ex. C-9: Mr. Kallen's narrative) have been considered in conjunction with each witness's sworn testimony and given some limited weight, when in accord with and not contradicted by, a witness's sworn testimony.

3.  Unsworn and Unverified Hearsay Narratives – No Weight

As noted *ante*, Mr. Asmus' general hearsay objection to the admissibility of Exhibits C-4, C-5, C-6, and C-10 was overruled, because the FAA's Rules of Practice ("ROPs")[5] specifically

---

[5] The FAA's Rules of Practice for civil penalty enforcement proceedings may be found in Title 14 of the Code of Federal Regulations ("C.F.R."), Chapter 1, Subchapter B, Part 13, Subpart G (14 C.F.R. §§ 13.201-13.236).

allow for the admission and consideration of various hearsay material. 14 C.F.R. § 13.222(c).

However, in order to consider such material, if relevant, it must be shown to be reliable, probative, and substantial. 14 C.F.R. § 13.223. In the instant case, Mr. Asmus' additional objections to the admitted hearsay narratives are sustained, because Exhibits C-4, C-5, C-6, and C-10 do not bear sufficient indicia of reliability.[6] For example, Exhibits C-4, C-5, C-6, and C-10 are all typed on boilerplate forms (typist unidentified). None of the admitted hearsay statements are in affidavit[7] or declarative[8] form. They are all unsigned, unsworn, and unverified by the alleged speakers. *See, e.g.,* FAA Order 2150.3C, Chapter 4, 4.21 § 10.a. ¶ 3 (at minimum, written witness statements should be signed, dated, and verified). None of the speakers were called to testify or subjected to cross-examination. *See, e.g.,* FAA Order 2150.3C, Chapter 4, 4.17 § 9.d (witnesses should be presented for sworn testimony at Hearing). Further, in Exhibits C-4, C-5, and C-6, there is additional boilerplate language, stating that the speaker's narrative could be edited "slightly" ("slightly" undefined; criteria for "editing" unknown) by an "analyst" (unidentified). It appears that neither the narrator nor the reader of the narrative is notified of such "analyst edits," since the boilerplate form refers all readers to seek out "the original" to determine what, if anything, was edited by person(s) unidentified. *See, e.g.*, Ex. C-4, 3.

As discussed *ante*, consideration of such unreliable hearsay material to address proof of liability in this case would violate fundamental concepts of due process, as defined by the U.S. Supreme Court. Thus, the following hearsay exhibits were given no weight and not considered: a) Exhibit C-4: Ms. Nadine Ostroski Narrative; b) Exhibit C-5: Ms. Rebecca Wrinkle Narrative;

---

[6] *See*, 27A Fed. Proc., L.Ed. § 62.649, FEDPROC § 62:649 (Mar. 2025 Update); Steven Baicker-McKee & William M. Janssen, 1175 (Thomas Reuters 2025) (the court generally will not consider unsworn affidavits or improper declarations).

[7] An "affidavit" is a voluntary written statement of fact under oath, sworn to or affirmed by the person making it, before some person who has authority under the law to administer oaths, such as a public notary or a court clerk. 3 Am. Jur. 2d Affidavits § 1, AMJUR AFFIDAVITS § 1 (Jan. 2025 Update); *see also*, FED. R. EVID. 603; 27A Fed. Proc., L.Ed., at § 62.649. The FAA's regulations recommend the use of affidavits (or declarations) in Subpart G proceedings. *See, e.g.*, 14 C.F.R. 13.218 ("affidavit" to be attached to a motion).

[8] A "declaration" is a statement certified or declared to be true under penalty of perjury by the person making it, which has not been sworn before someone authorized to administer oaths. 3 Am. Jur. 2d Affidavits at § 1. Pursuant to 28 U.S.C. § 1746, unsworn statements submitted under the penalty of perjury are permitted in lieu of affidavits. In modern federal litigation practice, a declaration satisfies the "affidavit" requirement. *See, Kersting v. United States*, 865 F. Supp. 669, 676 (D. Haw. 1994) (as long as an unsworn declaration contains the phrase "under penalty of perjury" and states that the document is true, the verification requirements of 28 U.S.C. § 1746 are satisfied).

c) Exhibit C-6: Captain Mitchel Nastri Narrative; and d) Exhibit C-10: Other Passenger Narratives (i.e., Mr. Corbin Byers, Mr. Stephen Marquez, and Ms. Erin Harding).

    4.   <u>Exhibit C-11: United Airlines Hearsay Material – Limited Consideration</u>

Exhibit C-11 was a two (2) page document. It included: a) a one (1) page June 2, 2022 Letter from United Airlines to FAA CMO Manager Mr. Keith Frable; and b) a one (1) page June 1, 2022 email from United Airlines to Mr. Paul Asmus.

*a)  The one (1) page June 2, 2022 Letter – Limited Consideration*

The June 2, 2022 Letter is on United Airlines letterhead, with the pre-printed name and address of a United Airlines' Associate General Counsel in the upper right hand corner. However, the June 2, 2022 Letter does not identify the author of the Letter by name, and the signature under the word "Sincerely" is illegible. (Ex. C-11, 1.)

Within the June 2, 2022 Letter, there are a variety of various findings, opinions, and/or conclusions about the May 12, 2022 incident. It is hearsay material that is not sworn or verified by any individual, and could not be challenged in cross-examination by the accused. It offers unreliable anonymous hearsay on disputed issues in this case. Thus, parts of the June 2, 2022 Letter may not considered. However, the June 2, 2022 Letter has been considered reliable evidence in this limited capacity: 1) it is a United Airlines' written communication to FAA employee Mr. Frable; 2) it identifies as attaches a United Airlines' June 1, 2022 Passenger Incident Review Committee ("PIRC") informal email communication to Mr. Asmus; 3) the June 2, 2022 Letter informs Mr. Frable that the United Airlines' PIRC (persons unidentified) reviewed statements from "six crewmembers and three passengers" as well as from Mr. Asmus; and 4) based on the PIRC members' (persons unknown) review of this written material, and a comparison of the May 12, 2022 incident to "other comparable incidents" (undated and undescribed), the PIRC utilized certain criteria (undescribed) to reach a decision (legal authority for decisionmaking unknown) about Mr. Asmus and the May 12, 2022 incident.

b) *The one (1) page June 1, 2022 Email – Limited Consideration*

The June 1, 2022 PIRC informal email communication ("Email") to Mr. Asmus is on the United Airlines letterhead. This offers some limited reliability that this hearsay material originates from United Airlines. It then identifies the author of the Email as the "Passenger Incident Review Committee" ("PIRC"). Due to the informality of email communications, the Email is not in affidavit or declaration form. It is not a sworn, signed, or verified hearsay statement. Notably, no individual PIRC representative or participating members are identified. Thus, no PIRC representative or member accepted responsibility for authoring the Email or exercising semi-tribunal authority in reviewing unsworn hearsay statements. No PIRC representative or member endorsed the various PIRC member findings, opinions, or conclusions contained within the Email. (Ex. C-11, 2.) Based on the hearsay material presented, it appears that the PIRC (number of members unknown) reviewed unsworn narratives from crewmembers (unidentified) and some passengers (unidentified). It considered a written statement by Mr. Asmus (unidentified). It is unknown whether Mr. Asmus was aware, at the time of his written statement, that the PIRC was considering unsworn hearsay materials, or the content/extent of such hearsay. It appears that the PIRC did not convene an informal hearing, or allow Mr. Asmus to confront and question any of his accusers.  It is unknown whether any PIRC members were current or former United Airlines employees, who might be subject to bias motivations. Further, in the June 1, 2022 Email, the PIRC did not identify any legal authority it was exercising, to make findings of legal liability against Mr. Asmus, based on a documentary review of unsworn narratives. The June 1, 2022 Email is unreliable in terms of probative content. Further, any findings or opinions in the Email about Mr. Asmus' legal liability on the issue of the Interference Rule, even if such could be deemed reliable, would improperly trespass on the decisional authority of the Presiding Judge on the merits of the case.

The June 1, 2022 Email has been given limited consideration as follows: 1) it is a United Airlines informal email communication that states the United Airlines' PIRC (members unidentified, number unknown, tribunal training unstated) reviewed written materials (dates unknown, number and persons unspecified, content unknown) about the May 12, 2022 United Airlines incident; 2) the PIRC also reviewed Mr. Asmus' written material (date unknown, content unspecified); 3) based on the PIRC members' written record review (review criteria

unknown), the PIRC members (potential bias unknown) reached multiple negative conclusions and opinions (unsworn, undated, and unverified) about Mr. Asmus; 4) the PIRC found Mr. Asmus liable for misconduct (authority to make legal finding unstated, liability criteria unknown); 5) the PIRC imposed a $3,153 monetary punishment against Mr. Asmus (legal authority to impose monetary calculation method unknown); 6) the PIRC conditioned Mr. Asmus' future travel on United Airlines on his payment of the $3,153 monetary punishment (legal authority for causal condition unknown); and 7) the PIRC provided a method for Mr. Asmus to file an appeal from the PIRC decision (no information specified about appellate process or non-judicial appellate forum).

### B.  Mr. Asmus' Hearing Witnesses and Exhibits

In his responsive case, Mr. Asmus presented himself as his sole witness.  During the Hearing, Mr. Asmus also offered (9) exhibits into evidence, identified as A, B, D, H, I, J, K, L, and N.  The FAA objected to the admission of four (4) Exhibits, specifically, Exhibits A, B, H, and J.  Exhibits A, B, D, I, K, L, and N were admitted into evidence, and Exhibits H and J were denied admission. (Note: Exhibit G was referenced during Mr. Kallen's testimony, but not offered for admission.)

### III.   INTERFERENCE LEGAL STANDARD

The FAA has charged Mr. Asmus with one (1) regulatory violation of 14 C.F.R. § 121.580 (i.e., the "Interference Rule").  (Compl. 3 § III.)  The Interference Rule[9] provides:

> No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated under this part.

14 C.F.R. § 121.580.

---

[9] The "Interference Rule" is repeated in similarly worded regulations in other parts in Title 14. *See*, Part 91 (14 C.F.R. § 91.11); Part 125 (14 C.F.R. § 125.328); and Part 135 (14 C.F.R. § 135.120).

In the instant case, the FAA did not allege that Mr. Asmus had violated the first two (2) prongs of the Interference Rule (i.e., assault or threats)[10] while aboard United Airlines Flight 1684. Instead, the FAA alleged that Mr. Asmus violated the Interference Rule by intimidation and/or interference with one or more crewmembers in the performance of their duties. Compl. 2 § II ¶ 6. Under either alleged prong of the Interference Rule, the charged offense must be supported by sufficiently reliable, probative, and substantial admissible evidence. 14 C.F.R. § 13.223. While the FAA herein asserted that its evidentiary proof for the two (2) separate violation prongs were "all rolled into one count" (Tr. 29:2-3), each alleged prong must be supported by evidentiary proof.

## A. Applicable Definitions

To understand the scope and applicability of Section 121.580, a review of definitions is helpful. First, the Federal Aviation Regulations ("FARs") define an aircraft "crewmember" as "a person assigned to perform duty in an aircraft *during flight time*." 14 C.F.R. § 1.1 ("Crewmember" definition, emphasis added). "Flight time" of an aircraft is defined (in part) as "pilot time" that begins "*when an aircraft moves under its own power* for the purpose of flight and ends when the aircraft comes to rest after landing." 14 C.F.R. § 1.1 ("Flight time" definition, emphasis added). The "critical" phases of a Part 121 "flight" include "all ground operations involving taxi, take-off and landing, and all other flight operations conducted below 10,000 feet, except cruise flight." 14 C.F.R. § 121.542(c). An aircraft "being operated" includes any use of an aircraft for the purpose of air navigation. 14 C.F.R. § 1.1 ("Operate" definition).

## B. Aircraft Physical Movement

To prove a violation of the Interference Rule under any of the four (4) prongs, the act(s) of interference must occur when the aircraft is operated "in flight," that is – during physical movement or navigation of the aircraft under its own power.  14 C.F.R. § 1.1 ("Flight time"

---

[10] Section 121.580 is written in the disjunctive, so a person may be liable -- separately -- for assault, for threatening behavior, for intimidation, and for interference. *See, e.g.*, *Evgeniy V. Ignatov,* FAA Order No. 96-6, p. 8, 1996 WL 210098 (Feb. 13, 1996); *Artem Aylyarov*, FAA-2005-23017, 2006 WL 3147905, at *3 (Nov. 2, 2006); *Linda Johnson,* G13-22-45, 2024 WL 3849885 (Aug. 15, 2024).

definition); 14 C.F.R. § 121.542(c); *see*, *Careless or Reckless Ground Operation of Aircraft*, 32 Fed. Reg. 9640, 9640-41 (July 4, 1967) (the general meaning of "operate" for aviation safety means to impart "some physical movement to the aircraft" or involve "the manipulation of the controls of the aircraft such as starting or running an aircraft engine"); *see also*, *Demario Driver*, G13-22-37, 2023 WL 2423481, at *4 (Mar. 8, 2023) (FAA regulations specifically provide that "flight time" for Part 121 aircraft includes all operation of an aircraft moving under its own power, both on the ground and in the air).

In 2000, the FAA published a Legal Interpretation on the question of how to define "flight time" within the meaning of 14 C.F.R. §§ 1.1 and Part 121. The FAA explained that the regulatory definition in 14 C.F.R. 1.1 mandated that "flight time <u>starts</u> at the moment when the aircraft taxies under its own power from the gate" and "flight time <u>continues</u> until the moment the aircraft comes to rest at the next point of landing." FAA Legal Interpretation 1001-3, 2000 WL 35499413 (Jun. 2, 2000), 2000 WL 35499413 (emphasis in original). This is called "block to block" time. *Id.* Referring to a prior 1972 FAA Memorandum, the FAA also emphasized that "time spent in moving an airplane from the loading point to another point, not under the airplane's own power, but by means of a tractor or other conveyance that pulls the airplane into position to begin a flight" was <u>not</u> "flight time." *Id., citing* Oct. 18, 1972 FAA Memorandum to AGL-7 (emphasis added).

Ten (10) years later, in 2010, the Third Circuit Appeals Court examined the statutory and regulatory definitions of flight time "operations" that were applicable to the Interference Rule under Part 91.[11] In *Elassaad v. Independence Air, Inc.*, 613 F.3d 119 (3d Cir. 2010), the Third Circuit found that flight time "operations" principally applied "*to the takeoff*" of an aircraft, *"the 'piloting' that occurs during the flight,*" and the "*landing of an aircraft." Elassaad*, 613 F.3d at 130 (emphasis added).  In reviewing the facts of the case, the *Elassaad* Court held that no violation of the Interference Rule was proven, because the aircraft had not been "operated in flight" as required by law. Rather, at the time of the alleged incident, "the aircraft had landed, taxied to the gate, and come to a complete stop." *Id.*; *see also*, *United States v. St. Amour*, 886 F.3d 1009, 1015 (11th Cir. 2018) (the word "operate" means the use of an aircraft moving on the

---

[11] The Interference Rule in Part 91 provides:  "No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated." 14 C.F.R. § 91.11.

ground, which "*include[ed] the starting, taxiing, or parking of an aircraft*"); *Flores v. SkyWest, Inc.*, No. 20-17393, 2022 WL 193011, at *3 (9th Cir. 2022) (the word "operate" refers to "the pilot's operation of controls associated with navigation").

### C. Various Crewmember Duties

The Interference Rule does not identify specific flight crewmember duties covered by the Rule, but other regulations in Part 117[12] and Part 121[13] do provide guidance. For example (not inclusive), the "critical" phases of a Part 121 "flight" operation includes "all ground operations involving taxi, take-off and landing, and all other flight operations conducted below 10,000 feet, except cruise flight." 14 C.F.R. § 121.542(c). During such *critical* phases of a Part 121 flight, a flight crewmember is required to perform only "those duties required for the safe operation of the aircraft."[14] 14 C.F.R. § 121.542(a). Further, Part 121 identifies various safety responsibilities for Part 121 certificate holders, which include (but are not limited to): a) crewmembers "briefing" passengers on safety issues (14 C.F.R. § 121.571); and b) crewmembers performing various safety duties during aircraft taxiing (14 C.F.R. § 121.391(d)).

### D. Safety Risk to Aircraft Flight or Flight Personnel

The FAA's regulations do not provide a specific definition of what action (or inaction) constitutes "interference" by an aircraft passenger with a crewmember's duties under Section 121.580. Rather, the prohibited act of "interference" has been interpreted on a case-by-case basis. *See, e.g.*, Graham Keithley, *The Federal Powers to Fight Back Against Unruly Airline Passengers*, 34 No. 3 Air & Space Law 6 (2022) (the "nature of unruly [passenger] behavior will continue to evolve" as cases are charged and tried). Nevertheless, certain guidance is available.

---

[12] Part 117 may be found in Title 14 of the Code of Federal Regulations ("C.F.R."), Chapter 1, Subchapter G, Part 117 ("Flight and duty limitations and rest requirements: flightcrew members").

[13] Certain Part 117 flight attendant flight times, duty limitations, and rest provisions are incorporated into Part 121. 14 C.F.R. § 121.467(c); *see also* 14 C.F.R. §§ 117.1 and 117.3 ("Flight duty period").

[14] Thus, the flight attendant cannot perform, during critical phases of a Part 121 flight, non-safety related duties required by the airline company (e.g., ordering galley supplies, confirming passenger connections, filling out records, etc.) or "non-essential" activities (e.g., eating, casual conversations in the galley, etc.). 14 C.F.R. § 121.542(a) and (b). Flight attendants taking a rest "period" are not engaged in duty activities at all. 14 C.F.R. § 117.5 ("Rest period").

In the criminal context, "interference" with performance of a crewmember's duties "may be satisfied by proof of either an interference with the target's duties *or* a lessening of the target's ability to perform his or her duties." *United States v. Flores*, 968 F.2d 1366, 1370 (1st Cir. 1992) (emphasis in original). For example, "grabbing and shoving a flight attendant, coupled with a diatribe of profane remarks, are actions which could inhibit the performance of an attendant's duties." *United States v. Tabacca*, 924 F.2d 906, 913 (9th Cir. 1991); *see also, United States v. Hicks*, 980 F.2d 963, 975 (5th Cir. 1992) (finding of interference supported by testimony and "other evidence" that showed that "flight crew members, including a member of the cockpit crew, were forced to ignore their duties as a result of the [passenger's] intimidating words and conduct."). However, "only intimidating acts or words that actually interfere with a crew member's duties are penalized." *Hicks*, 980 F.2d at 972.

The FAA has relied on these general evidentiary proof requirements in civil penalty adjudications. For example, in 1997, the FAA Administrator held that evidence demonstrating that a passenger had repeatedly been "noncompliant" with a flight attendant's instructions and had displayed a "disregard for the safety rules" supported a finding of interference with a crewmember. *David H. Mayer*, FAA Order No. 97-12, 1997 WL 93233 at *6 (Feb. 19, 1997). In 2008, the FAA Administrator found that a passenger committed interference by verbally berating a flight attendant and refusing to comply with crewmember instructions. *Hillard Abroms*, FAA Order No. 2008-2, 2008 WL 345387, at *6 (Jan. 28, 2008). Notably, not all potentially problematic conduct rises to the level of a violation, either criminally or civilly. The FAA Administrator has also found that evidence of a "momentary and inconsequential interference" by an aircraft passenger was insufficient to prove a violation of the Interference Rule. *Sharon Dorfman*, FAA Order 99-16, 1999 WL 1279833 (Dec. 22, 1999) (passenger slow to comply with crewmember instructions did not amount to interference); *see also*, *Gabriel Arroyo*, G13-22-71, 2024 WL 1255298, at *6–7 (Mar. 20, 2024) (admitted evidence insufficient to prove interference).

In 2016, the D.C. Circuit Court of Appeals provided more guidance when it reviewed an FAA civil penalty adjudication and held that the FAA's regulatory prohibition against "interference" with a crewmember aboard an operating aircraft prohibits "behavior that puts at

risk" either "the safety of the 'physical aircraft or [the] air carrier personnel.'" *Wallaesa v. Fed. Aviation Admin.,* 824 F.3d 1071, 1081-82 (D.C. Cir. 2016), *cert. denied*, 137 S.Ct. 389 (Oct. 31, 2016). In that case, Mr. Wallaesa was charged with violating both seatbelt regulations (14 C.F.R. § 121.317(f) and (k)), and the Interference Rule (14 C.F.R. §121.580). The Appeals Court emphasized that Mr. Wallaesa had specifically violated the Interference Rule, separately from the charged seatbelt violations, during the final hour of the flight when Mr. Wallaesa: 1) "disrupted the crew's ability to provide a safe and orderly environment," 2) "forced the crew to stand during a potentially turbulent descent in violation of the captain's command to remain seated," and 3) "put[] at risk the safety of [the] flight." *Wallaesa*, 824 F.3d at 1081, 1084; *see also*, *Michael Lankford*, FAA-G13-22-52; 2023 WL 183474, at *8 (Jan. 12, 2023).

## IV.   SEATBACK POCKET INCIDENT

In its December 9, 2022 Complaint, the FAA identified two (2) distinct interactions the flight attendants had with Mr. Asmus while he was aboard United Airlines Flight 1684, that the FAA alleged supported its Interference Rule charge. Based on the FAA's fact pleadings[15] and witness testimony, the first incident occurred during passenger boarding, when United Airlines Flight 1684 was parked at the San Francisco California ("SFO") airport gate. Mr. Asmus was seated in his assigned seat in Row 22. He reported seatback pocket damage to the flight attendant standing in the aircraft aisle at Row 21.

### A. Preliminary Matters

1.  Aircraft Parked at the Gate

During the seatback pocket incident, a variety of individuals (e.g., passengers, gate crew, and even a mechanic) were boarding and/or leaving the parked aircraft. Flight 1684 was not in

---

[15] In its Complaint, the FAA improperly alleged the following pleading as a fact in Section II, ¶ 6: "Respondent's above-described actions intimidated or interfered with one or more crewmembers in the performance of their duties aboard an aircraft being operated under 14 C.F.R. part 121." (Compl. 2 § II ¶ 6.)  The FAA then reiterated this pleading as a legal conclusion. (Compl. 2-3 § III ¶ 1.) Section II, ¶ 6 in the FAA's fact allegations is not included in the discussion of facts herein, because it is not a fact allegation – it is a legal conclusion. *See*, *e.g.*, *Deidrea Philbrick*, G13-22-024, 2024 WL 4331671, at *5 (Sept. 24, 2024) (allegation in the fact section of the FAA's Complaint that respondent committed the regulatory offense of "interference" is not a fact, rather, it is a legal conclusion).

"flight operations" during the "seatback pocket" incident (i.e., the first alleged incident), because the aircraft was parked at the gate and not moving under its own power. 14 C.F.R. §§ 1.1. and 121.542(c); *Elassaad*, 613 F.3d at 130. Thus, any proof offered about this seatback incident, which occurred while the aircraft was parked at the gate, is not proof of an Interference Rule violation, because the incident did not occur during flight operations, and did not impact the aircraft during flight, or impact the safety of the flight personnel during flight. *Elassaad* at 130; *Wallaesa,* 824 F.3d at 1081-82.  However, evidence about this alleged seatback pocket incident may serve as background for the second alleged incident (i.e., "the photograph incident") that is alleged to have occurred during aircraft "pushback" and taxiing.

### 2.   FAA Pleadings and "Threat" Evidence

As discussed *ante*, the FAA specifically pleaded that Mr. Asmus violated two (2) prongs of the Interference Rule: intimidation and interference. (Compl. 2 § II ¶ 6.) The FAA did not plead that Mr. Asmus violated the Interference Rule by "threats." The FAA is bound by its pleadings. Therefore, any testimonial evidence offered by United Airline witnesses who asserted they felt "threatened" by Mr. Asmus cannot be utilized to prove that Mr. Asmus violated the Interference Rule under the "threat" prong. Such evidence may, however, be evaluated as part of a claim of interference by "intimidation."

### 3.   United Airline Witnesses' Discussions About Mr. Asmus

The evidence demonstrates that on May 12, 2022, Ms. Meacham and Mr. Materne were "flying partners" on Flight 1648, working in tandem in the aft section of the aircraft. Mr. Kallen, a United Airlines pilot flying as a passenger on the aircraft, introduced himself and his United Airlines employee status to them (and the other flight crewmembers) when he boarded the aircraft. After Mr. Asmus was re-seated in the back of the aircraft in Row 38, Ms. Meacham returned to Row 21 to talk with Mr. Kallen (who was seated in the middle seat in Row 21). They discussed Mr. Asmus' claim that he was an FAA employee. During that first discussion, Mr. Kallen recommended to Ms. Meacham that she ask Mr. Asmus to produce his FAA 110 ASI identification badge.

Once all passengers were boarded and were seated,  Ms. Meacham and Mr. Materne seated themselves directly across from each other in their jumpseats, in the back of the aircraft. They were located behind Mr. Asmus and the aft lavatory. They talked quietly about Mr. Asmus and their concerns about him.  Once the aircraft began its "pushback," Mr. Materne took the lead in approaching Mr. Asmus. He questioned Mr. Asmus about a photograph Mr. Asmus had taken. In between his interactions with Mr. Asmus, Mr. Materne consulted with both Ms. Meacham and the Captain in the cockpit. Mr. Materne ultimately asked Mr. Asmus to produce his FAA 110 ASI identification badge.

Once the Captain returned the aircraft to the gate, Ms. Meacham gave Mr. Asmus permission to leave his seat to talk with the Captain. After Mr. Asmus went up to the jetway, Ms. Meacham and Mr. Materne walked up to Row 21 to talk with Mr. Kallen, who remained seated in Row 21 amidst other passengers. Ms. Meacham, Mr. Materne, and Mr. Kallen discussed their perceptions, opinions, and conclusions about Mr. Asmus. Mr. Kallen then left his seat and went up to the cockpit to talk with the Captain. After Mr. Asmus left the aircraft, the United Airlines flight was delayed on the tarmac for approximately two (2) hours, before the aircraft flew to Hawaii, which took approximately five (5) hours. It is unknown what other conversations (if any) occurred between Ms. Meacham, Mr. Materne, and Mr. Kallen about Mr. Asmus, before the aircraft landed in Hawaii. In light of their known shared discussions about Mr. Asmus on May 12, 2022, their post-flight unsworn narratives, as well as their subsequent testimonial statements, must be carefully reviewed and considered.

4.  Mr. Kallen's "Frightened Passenger" Allegations – No Weight

Mr. Kallen alleged in both his 2022 unsworn narrative and 2024 sworn testimony that passengers around Mr. Asmus in Row 22 were frightened or scared. *See, e.g.*, Tr. 103:18-25. This testimony is given no weight for multiple reasons. First, Ms. Meacham, who interacted directly with Mr. Asmus in Row 22, did not corroborate Mr. Kallen's assertion about "frightened" passengers.  Second, Ms. Meacham conducted part of her seatback pocket conversation with Mr. Asmus from both Row 21 and Row 20, over the heads of multiple passengers (including Mr. Kallen). This casual behavior by Ms. Meacham, while Mr. Asmus was seated in Row 22 surrounded by other passengers, does not demonstrate that Ms. Meacham

perceived Mr. Asmus' statements as inciting fear in others. Third, none of the passengers aboard Flight 1648, within hearing distance of Mr. Asmus in Row 22 (or Mr. Kallen in Row 21) were called to testify as witnesses. Thus, any "fright" attribution by Mr. Kallen to unnamed passengers (who Mr. Kallen may not have even seen from his seated position) is pure speculation. Fourth, Mr. Asmus' statements reporting seatback pocket damage do not support, under an ordinary reasonable person standard, any reasonable presumption that other passengers, overhearing Mr. Asmus's report of seatback pocket damage, would fear that Mr. Asmus was a threat, or alternatively, that the aircraft was not "safe" or "airworthy." Fifth, any concerns passengers might have experienced on Flight 1648 about Mr. Asmus might equally be attributed to Mr. Kallen, Ms. Meacham, and/or Mr. Materne, when they gathered in Row 21 to talk negatively about Mr. Asmus.

### B. Undisputed Fact Testimony - Seatback Pocket Incident

Ms. Meacham testified that on May 12, 2022, there were four (4) Flight Attendants and two flight deck crew assigned to United Airlines' Flight 1684. Tr. 37:18-21. The flight to Hawaii was scheduled to last five (5) hours. Tr. 32:23-24. Ms. Meacham was designated as Flight Attendant No. 2, at position "Two Right." Tr. 36:8-22; 37:9-13. Her "Two Right" position meant she worked in the back (or aft) of the aircraft, on the right side facing the cockpit. Tr. 32:16-17. During the passenger boarding process at the SFO gate, Ms. Meacham was standing in the aisle, near the exit rows. Ms. Meacham observed Mr. Asmus when he boarded and took his window seat. At that time, she had no problems or concerns at all with him. Tr. 60:15-25.

Mr. Kallen, a United Airlines pilot employee, testified he and his fiancé were passengers aboard Flight 1684. They were flying to Hawaii to get married. When Mr. Kallen boarded Flight 1684, he "flashed his [pilot] badge to the flight attendants" and got them to hang up his fiance's wedding dress. Tr. 81:8-9. He sat down in his seat, which was the middle seat. Tr. 75:19-76-8; 105:5-11. Mr. Asmus was seated "behind me and to my right." Tr. 82:15-17; 105:8-11.

## C. Discussion of Witness Evidence – Seatback Pocket Incident

All three (3) United Airline employee witnesses, as well as FAA employee Ms. Pritchard, testified as lay witnesses. Only certain testimonial highlights will be discussed, to assist the reader to understand the decision.

### 1. Mr. Asmus' Damage Report

Mr. Asmus was seated in Row 22, Seat F, a "non-economy plus" window seat. Tr. 38:2-6; 42:17-19. According to Ms. Meacham, Mr. Asmus caught Ms. Meacham's attention (while Mr. Asmus remained seated) and said: "Excuse me. This seat back pocket is going to impede me in an evacuation." Tr. 38:2-6; 43:8-10. Both Ms. Meacham and Mr. Kallen concurred that Mr. Asmus had used polite language in reporting his concern.[16]

### 2. FAA Employee Status and Authoritative Tone

Upon hearing Mr. Asmus' damage report, Ms. Meacham told Mr. Asmus that the damaged seat back pocket would "probably" not be replaced before the aircraft departed, because it would delay the flight. Tr. 38:18; 39:10-15; *see also*, Ex. C-3, 2. In response, Mr. Asmus then told Ms. Meacham that "I work for the FAA." Tr. 39:21-22; Tr. 311-13. Ms. Meacham agreed that Mr. Asmus acted as if he worked for the FAA. Tr. 49:29-23. Mr. Kallen characterized Mr. Asmus' as speaking "gruffly," Tr. 88:14-17, but Mr. Asmus was clearly someone "in the industry." Tr. 82:25-83:18. Mr. Asmus' "tone" of voice demonstrated he was "somebody of authority," like "a mechanic." Tr. 83:11-18. Mr. Kallen recalled thinking that since Mr. Asmus had the ability to check the maintenance log, he either "works for us in some sort of an oversight position, or he works for the FAA – right?"[17] Tr. 87:3-7.

---

[16] Mr. Kallen recalled Mr. Asmus stating: ""Excuse me. My seatback is torn, and it's going to affect my ability to egress the aircraft in the case of an emergency." Tr. 82:19-22.

[17] Inconsistent with his sworn testimony, Mr. Kallen opined in his unsworn narrative that Mr. Asmus couldn't have been an FAA Inspector, because Mr. Asmus didn't appear to understand that "the deferral of a furnishing would be quickly dispatched and would cause little delay." Ex.C-9, 3.

### 3.   Mr. Asmus' Offer to Move to Different Seat to Avoid Flight Delay

Mr. Kallen consistently reported, both in his narrative and sworn testimony, that Mr. Asmus told Ms. Meacham that if he could move to a different seat, the seatback pocket matter could be resolved without any delay to the flight.[18]  Ex.C-9, 2; Tr. 124:11-21. This indicates that Mr. Asmus understood that the seat pocket damage repair could be deferred, with the seat remaining vacant, if a different seat was found for him. Mr. Asmus also told Ms. Meacham he would check the logbook later to see that the maintenance was performed.[19] However, both Ms. Meacham and Mr. Kallen considered this logbook remark as "threatening" and intimidating. The logbook testimony is further addressed in the Intimidation section, *infra.*

### 4.   Loud Voice – Not Probative of Intimidation

Both Ms. Meacham and Mr. Kallen criticized Mr. Asmus for using a "loud" voice (volume undescribed) when speaking with Ms. Meacham while seated in Row 22, Seat F. Tr. 39:21-22; 156:10-19. The evidence demonstrated, however, several reasons why Mr. Asmus used a "loud" voice during a short conversation.  Specifically, Mr. Asmus was trying to talk with Ms. Meacham from his window seat. Another passenger was already seated next to Mr. Asmus in the middle seat, so Mr. Asmus could not easily stand up or move towards Ms. Meacham. During part of the conversation, Ms. Meacham was standing two (2) rows away from Mr. Asmus. Tr. 85:8-13; 86:16-24. Other passengers were boarding. Mr. Asmus was also wearing a face mask. Tr. 60:2-7; 148:13-15. Ms. Meacham conceded that passengers wearing face masks sometimes had to "speak louder" to be heard. Tr. 60:8-11. The totality of the FAA's evidence supports a finding that Mr. Asmus was speaking "loudly," but this evidence, alone, is not proof of either rudeness or intimidating behavior.[20]

---

[18] Mr. Kallen confirmed in his unsworn narrative that Mr. Asmus suggested that Ms. Meacham just assign him a different seat, so the flight would not be delayed. (Ex.C-9, 2.)

[19] At first Mr. Kallen testified that Mr. Asmus tell Ms. Meacham: "Tell them I'm going to check." Tr. 83:22-25. However, later Mr. Kallen said he could not remember exactly when Mr. Asmus talked about "checking." He said it might have been when the flight attendant had been in "Row 19, 20" and had already started making her way up the aisle. Tr. 83:6-24.

[20] Notably, during Mr. Asmus' responsive case, he recalled that Ms. Meacham also spoke "loudly." Tr. 293:24.

5.  Lay Witnesses' Damage Assessments

Both Ms. Meacham and Mr. Kallen conceded that they were not trained in mechanics. They did not make decisions about airplane maintenance safety issues.  Tr. 62:22; 130:6-19. Mr. Kallen explained that the job of pilots and flight attendants was not to diagnose mechanical damage or irregularities. Rather, pilots and flight attendants were supposed to report such matters so that "mechanical people [could] decide whether it is safe to continue." Tr. 130:6-19.  Mr. Kallen agreed that safety concerns could occur for all types of reasons. Even a broken latch on an overhead bin was a matter that the flight crew were required to report to the Captain, and at a minimum, a logbook maintenance entry was required to be made. Tr. 135:13-136:10.

Nevertheless, both Ms. Meacham and Mr. Kallen repeatedly attacked Mr. Asmus' seatback damage report. For example, Ms. Meacham acknowledged that there was "slight" damage to the seat back pocket. Tr. 38:9. She described it as "a little bit of a sag." Tr. 38:10. She perceived it as "a nonissue." Tr. 38:13. She opined that Mr. Asmus was wrong in his assertion that it was a safety issue that needed to be addressed, because, in her opinion, "[a] slight sag or a bent wire is not going to impede anybody in an evacuation." Tr. 40:19-23. Similarly, Mr. Kallen opined that Mr. Asmus' seat back complaint was "not a big…deal." Tr. 83:7.  It was just "a little tear" that could have been fixed anytime, "so long as it's not a safety hazard." Tr. 92:21-93:10. Mr. Kallen opined that Mr. Asmus made a "big deal" out of a little "bent wire." Tr. 101:22-24. Mr. Kallen also speculated that the broken wire in the seatback pocket could have been easily repaired, by just removing both the wire and the "entire seat back." Tr. 106:21-107:13. Mr. Kallen also repeatedly speculated[21] that Mr. Asmus had reported the damage to try and "get…a new seat." Tr. 83:3. Mr. Kallen's negative speculations about Mr. Asmus were neither probative, nor supported by the evidence [22], and have been accorded no weight.

---

[21] Mr. Kallen speculated in both his narrative and sworn testimony that Mr. Asmus reported the seatback damage to try and get a seat upgrade.

[22] For example, Mr. Asmus refused to accept another passenger's offer trade seats. Tr. 88:14-17.  Mr. Kallen chose to interpret this refusal as an "angry" attitude by Mr. Asmus (Tr. 88:19),  and a continuing attempt by Mr. Asmus to obtain a seat upgrade (Tr. 145:7-17), rather than trying to protect another passenger from potential harm. *See, e.g.,* Tr.308:12-24 (Mr. Asmus testifying about potential harm to another passenger). Further, Mr. Kallen interpreted Mr. Asmus' request for a $21 reimbursement of the Row 22 seat cost, if he was assigned to a less expensive "economy" seat in the back of the aircraft, as a continuing attempt to obtain a more expensive seat in the forward cabin.

Ms. Meacham and Mr. Kallen's attempts to criticize and devalue Mr. Asmus' damage report were troubling on multiple grounds. They agreed they did not have the needed expertise to assess the seatback pocket damage or its safety hazard. They also agreed that all such damage reports were supposed to be taken seriously and reported. But they assigned negative value to Mr. Asmus' report, and then offered their damage assessment opinions. Notably, during cross-examination, Mr. Kallen appeared to contradict or retreat from some of his dismissive damage opinions. For example, Mr. Kallen explained that an aircraft's seat "pitch,"[23] provided the average size adult male only two (2) or three (3) inches between his body and contact with the seatback in front of him. Tr. 138:19-139:8.  Under certain circumstances, a seatback pocket could impair someone's ability to egress from the airplane. Tr. 129:25-130:5.  Mr. Kallen then confirmed that if the damaged seatback pocket in Row 22 had had a broken spring, Mr. Asmus would have had "a realistic concern" that a wire sticking out could injure a passenger. Tr. 137:17-138:1; 143:17-19.

### 6.  New Seat Assignment

Ms. Meacham returned to Row 22 and told Mr. Asmus that the Captain had notified maintenance to come aboard, but the repair might be deferred. Ex. C-3, 2. Ms. Meacham also told Mr. Asmus that she had found an alternate seat at the back of the plane, which he accepted. He asked about the seat cost, and was told there was no difference.[24] Mr. Asmus then immediately moved to Seat D, the alternate aisle seat in Row 38, in the back of the aircraft. Tr. 44:3-6.

Mr. Kallen stated in his unsworn statement that Mr. Asmus expressed displeasure with the new seat assignment.[25]  He opined that Mr. Asmus was "angry" about the seat assignment in

---

[23] Mr. Kallen described the "pitch" of a seat as "the distance between the seat… and the passenger['s]" body. 4 Tr. 138:15-16.

[24] Mr. Asmus asked if he would get a refund for any extra money he'd paid for his seat in Row 22 (which he thought cost more than the seat in Row 38).  Ms. Meacham contacted "the CS agent" (i.e., the United Airlines gate agent), via her cell phone about the seat costs.  The CS agent checked, and then came aboard the aircraft and told Mr. Asmus that he had not paid more for Row 22 than the cost of a seat in Row 38.

[25] In Mr. Kallen's unsworn narrative, he stated that "[t]his new seat did not please" Mr. Asmus, but he did move to the new seat. Ex.C-9, 2. Mr. Kallen interpreted a "grumble" [undescribed further] by Mr. Asmus as a statement of displeasure about the new seat.

the back of the plane. Tr. 88:18-19. However, during cross-examination, Mr. Kallen amended his opinion, and stated that Mr. Asmus complied with Ms. Meacham's offer of a seat reassignment to the back of the aircraft without any hesitation or argument. Tr. 125:4-9. This amended testimony appeared in accord with Ms. Meacham's testimony.

After Mr. Asmus was reseated, Ms. Meacham testified that she returned to her "duties in the aisle." Tr. 46:7-10. The evidence demonstrates, however, that she also spent time at Row 21, discussing with Mr. Kallen her concerns about Mr. Asmus' alleged FAA employee status. This meeting is discussed in more detail, *infra*.

       7.   <u>Safety of Flight Issue and Damage Repair</u>

Mr. Kallen confirmed that once aircraft discrepancies were reported, a pilot could choose to either defer maintenance, or, if the discrepancy was a "safety of flight" issue, have a mechanic come aboard to fix it. Tr. 83:3-7; 145:23-146:3. It was undisputed that once the Captain heard Ms. Meacham report Mr. Asmus' damage concern, the Captain immediately radioed for a mechanic to come aboard to look at the seatback pocket damage. Tr. 43:6-14. This evidence supports a finding that Mr. Asmus reported a potential "safety of flight" damage issue.

After Mr. Asmus moved to the back of the aircraft, a mechanic came aboard the aircraft and examined the seat back pocket damage in Row 22. According to Mr. Kallen, this happened "quickly" (i.e., less than 15 minutes) after Mr. Asmus had reported the damage.[26] Tr. 106:21-107:13. Neither Ms. Meacham nor Mr. Kallen could state with clarity what the mechanic did to the seatback pocket when he came aboard to fix it. Tr. 132:7-8. Ms. Meacham testified, however, that after the repair was finished, the mechanic approved the aircraft for flight.[27] Tr. 63:20-64-16. After the mechanic left the aircraft, Ms. Meacham went back to Row 38 and asked Mr. Asmus if he'd like to return to Row 22. Despite Mr. Kallen's negative seat upgrade

---

[26] In Mr. Kallen's unsworn narrative, he alleged that Mr. Asmus had been disrespectful to "the Maintenance technicians". (Ex.C-9, 3.) Mr. Kallen did not offer any sworn testimony repeating this allegation. It was undisputed at the Hearing that Mr. Asmus had no contact with the mechanic who came aboard the aircraft to fix the seatback pocket.

[27] In contrast, Mr. Kallen speculated that the mechanic who came aboard the aircraft "determined" that the seat back pocket damage was "not a safety hazard." Tr. 94:10. This speculation was not probative, particularly since Mr. Kallen did not speak with the mechanic and had no knowledge of what the mechanic did to fix the damage.

speculations and opinions,[28] Mr. Asmus appeared content with his new economy seat in Row 38 and replied "no." Tr. 44:10-12.

    8.  <u>Alleged Interference</u>

Ms. Meacham testified that Mr. Asmus interfered with her "safety-sensitive" duties[29] as a flight attendant, because she had to leave the passenger aisle to go to the cockpit to report his complaint about the damaged seat back pocket. Tr. 45:12-46:1. According to Ms. Meacham, Mr. Asmus' seatback pocket damage report pulled her "away" from her regular duties, because she had to "swim upward" the aisle (i.e., as passengers were boarding) to go to the cockpit and report the matter to the Captain. Tr. 45:22-23. Thus, she was "no longer in the aisle" welcoming and assisting passengers who were boarding the aircraft. Tr. 45:24-46:1; 158:21-159:2.

It was undisputed that Ms. Meacham left her aisle post temporarily. However, her testimony that she <u>had</u> to leave the aisle to go to the cockpit to talk to the Captain was not true. First, when discussing Mr. Asmus' seat reassignment, Ms. Meacham admitted that she had (and knew how to use) a United Airlines' iPhone, which she possessed for the purpose of communicating with other United Airline employees. Ms. Meacham had used it to contact the gate agent (*see also*, Ex. C-2, 2: having a "chat" with gate agent). Tr. 43:17-20. Second, after Ms. Meacham finished testifying, Mr. Kallen (who had been sequestered from the courtroom during Ms. Meacham's testimony) was called as a witness. Mr. Kallen explained that Ms. Meacham did not "have" to go up in person to the cockpit to report damage (or anything else) to the Captain. Instead, Ms. Meacham could have remained in the aisle, and used her cell phone to report Mr. Asmus' damage concern to the Captain and/or to any of the other flight attendants.[30] Alternatively, instead of using her cell phone, Ms. Meacham could have: a) walked to the aft galley (i.e., moving with the flow of passengers boarding), or b) to the forward galley (moving

---

[28] In Mr. Kallen's unsworn narrative, he interpreted a "grumble" by Mr. Asmus [undescribed further] as a statement of displeasure about the new seat. Mr. Kallen also opined that Mr. Asmus had been "angry" about the Row 38 seat. Ex.C-9, 2.

[29] Ms. Meacham did not identify any specific "safety-sensitive" duties she was or should have been performing in the aircraft aisle while the aircraft was parked at the SFO gate.

[30] Using her iPhone, Ms. Meacham could have called (or chatted) with any other flight attendant on the aircraft who were close to the cockpit or to one of the aircraft galleys, to ask them to notify the Captain.

against the flow of passengers), to call the Captain via the galley intercom.  The fact that Ms. Meacham simply chose to leave her aisle post and "swim" up to the cockpit (i.e., past approximately 20 rows of seats) to speak personally with the Captain was Ms. Meacham's personal choice. Tr. 105:13-106:17.

Further, Ms. Meacham's testimony that Mr. Asmus interfered with her regular duties as a flight attendant, because she had to leave her post, was also not true. Mr. Kallen confirmed, during cross-examination testimony, that Ms. Meacham had not been diverted from her regular duties at all. Rather, it was fully part of her regular flight attendant safety duties to take Mr. Asmus' damage report, and then notify the Captain about Mr. Asmus' seatback pocket damage complaint. Tr. 162:8-24. The totality of the FAA's evidence demonstrated that Ms. Meacham's assertion that Mr. Asmus interfered with her flight attendant duties was not credible.

## V.    FIRST AISLE MEETING – MS. MEACHAM AND MR. KALLEN

In her unsworn narrative, Ms. Meacham stated that Mr. Kallen "witnessed" the entire seatback pocket interaction between herself and Mr. Asmus. Ex. C-2, 2. She did not, however, disclose (either in her narrative or in her sworn testimony) that she had also consulted with Mr. Kallen about Mr. Asmus.

Mr. Kallen testified that, after Mr. Asmus was seated in Row 38, Ms. Meacham began talking with Mr. Kallen (seated in the middle seat in Row 21) about her concerns that Mr. Asmus might be an FAA Safety Inspector. Notably, at that time Ms. Meacham did not allege any obnoxious, combative, interfering, and/or intimidation behavior by Mr. Asmus. Instead,  Ms. Meacham's focus in her discussion with Mr. Kallen was that Mr. Asmus had claimed to "work[] for the FAA." Tr. 91:8-10; 101:8-9.

Although Mr. Kallen testified at the Hearing that he had immediately recognized Mr. Asmus as "a passenger of authority" (10/22/24 Tr. 87:22-9) who worked in the industry (Tr. 82:25-83:18) and might be an FAA ASI (Tr. 92:14), he told Ms. Meacham on May 12, 2022 that he was "incredulous" to hear that Mr. Asmus might work for the FAA. Tr. 91:9-10.  Mr. Kallen testified that he had felt "incredulous" in May 2022 because the damage Mr. Asmus reported was minor and would not justify a seat upgrade. Tr. 93:2-93. It was just "a little tear" that could have

been fixed anytime, "so long as it's not a safety hazard." Tr. 92:21-93:10. According to Mr. Kallen, Mr. Asmus made a "big deal" out of a little "bent wire." Tr. 101:22-24. During his discussion at Row 21 with Ms. Meacham about Mr. Asmus' FAA employee status, Mr. Kallen advised Ms. Meacham to ask Mr. Asmus to produce "his 110A" FAA identification badge.[31] Tr. 91:11-16. Mr. Kallen testified that he also expressed doubt to multiple flight attendants on Flight 1648 (various discussion times and attendants unspecified) about Mr. Asmus' status as an FAA Safety Inspector. Tr. 146:4-10. In his testimony,[32] Mr. Kallen explained that he had specifically advised various flight crew members to ask Mr. Asmus for his 110A FAA Inspector badge, because of "the authority" Mr. Asmus projected in his communications, as well as Mr. Asmus' assertion that he would be "able to check the logbook" of the aircraft. Tr. 92:8-14.

## VI.    INTIMIDATION - LEGAL STANDARD AND DISCUSSION

### A. Legal Standard

Intimidation occurs when a person makes a targeted threat against another, which instills an objective, reasonable fear in the intended recipient. In 1996, the FAA Administrator held that proof of intimidation in passenger misconduct cases is: "sufficient" when "the conduct and words" of one person, would place the recipient of the conduct and words "in fear." The recipient's "fear" must be assessed utilizing an ordinary, reasonable person standard. *Evgeniy v. Ignatov*, FAA Order No. 96-6, 1996 WL 210098, at \*7 (Feb. 13, 1996), *quoting U.S. v Tabacca*, 924 F.2d 906, 911 (9th Cir. 1991). In passenger misconduct cases, the crewmember who is the target of the intimidating speech and/or behavior must experience it directly from the alleged wrongdoer. *See*, *Fabian Jolivet*, FAA No. CP99WP0011, 2000 WL 34229113, at \*7 (May 10,

---

[31] Title 14, Chapter 1, Subchapter 1, Part 153, Subpart A provides that "FAA Form 110A" is ""the credential[] issued" by the FAA "to qualified Aviation Safety Inspectors... for use in the performance of official duties." *See, Greater Orlando Aviation Authority*, FAA-2018-0659, 2021 WL 1237080, at \*6 (Apr. 1, 2021) (within Subpart A, Section 153.5 reiterates that the FAA Form 110A credential is the only official identification needed by FAA personnel).

[32] This particular testimony of Mr. Kallen was inconsistent with his unsworn narrative, in which Mr. Kallen opined (among other things), that Mr. Asmus could not have been an FAA Inspector because "his personal odor was offensive." Ex. C-9, 3. During his sworn testimony, however, he withdrew this (and other) narrative opinion, stating that he that he wasn't sure that the body odor he smelled had actually come from Mr. Asmus. Tr. 150:16-19; 151:3-6. Notably, neither Ms. Meacham nor Mr. Materne, who interacted directly with Mr. Asmus and sat near him, reported any body odor issues.

2000) (flight attendant could not identify individual(s) responsible for alleged intimidating acts). As discussed *ante*, the alleged intimidation must occur during flight operations (i.e., when the aircraft is moving under its own power), and it must be demonstrated that the intimidation conduct and speech impacted either the aircraft flight or the crew's "safety-related duties during the critical phases" of flight. *Robert D. Brians*, FAA No. CP02WP0007, 2003 WL 23119332, at *4 (July 14, 2003) (passenger who stood up, directed "profanity-laced threats," "snarling curses," and "thrust" his body towards the flight attendant, telling her that he "would have her job," engaged in intimidation).

### 1. Words and Conduct Elements

Words, standing alone, are insufficient to prove violation of the Interference Rule by intimidation. The words must be accompanied by some type of conduct. *Evgeniy v. Ignatov*, 1996 WL 210098; *see also*, *Howard Gotbetter*, FAA Order No. 2000-17, 2000 WL 33125270 (Aug. 11, 2000) (a passenger's words alone did not cause intimidation, but by gripping the flight attendant's shoulder, the passenger caused the flight attendant to reasonably fear that he would hit her). To prove a violation of the Interference Rule, a passenger must engage in some conduct to lend an immediate threat to any expressed language. *Peter Houtenbos*, FAA Order No. 2002-24, 2002 WL 31957047 (Nov. 18, 2002) (intimidation proved when passenger shoved flight attendant, accompanied by verbal threats, such as "[y]ou don't know what kind of trouble I can create").

### 2. Profanity Element[33]

Profanity, which is vulgar speech, can be misconduct that helps creates an "atmosphere of intimidation" sufficient to support a finding of the Interference Rule by intimidation. *Piotr T. Sikora*, FAA No. CP02EA0013, 2003 WL 23119318, at *5 (fn. 3 *dicta*) (Jan. 30, 2003) (citing to *Avigdor Shallit*, CP99EA0051,2000 WL 34229117 at *2 (Sept. 22, 2000) (respondent liable for violation of the Interference Rule under Part 91 after assaulting one flight attendant, and then threatening to kick a second flight attendant, using profanity); *see also*, *Roddy L. Cox*, FAA-

---

[33] This section on profanity is included because the FAA alleged profanity in its Complaint. Compl. § 2 ¶ 3(o). However, none of the testifying witnesses in this case alleged that Mr. Asmus utilized any profanity in his communications directly with them, or within their hearing range. The FAA failed to prove this fact allegation.

2010-0623, 2011 WL 4957394, at *1 (Oct. 14, 2011) (passenger "created a generalized and entirely reasonable fear" by acting belligerent and hostile, storming off to the rear of the aircraft, and calling the flight attendant a "f-- idiot" and using other antagonistic language); *Artem Aylyarov*, FAA-2005-23017, 2006 WL 3147905, at *3 (Nov. 2, 2006) (passenger snatched money from flight attendant's hand, threw napkins at flight attendant, and yelled in a curse-filled tirade to stay away from him or he would "smash [the flight attendant's] head"); *Christopher Bull Hench*, CP97SO0004, 1998 WL 34189518 (Jan. 27, 1998) (unruly passenger's "hostile and defiant conduct," as well as his "words, tone, and physical actions," such as "pointing his finger and standing very close to those to whom he was addressing" constituted intimidation).

### B. Alleged "Altercation"

Ms. Meacham confirmed that it was not uncommon for passengers to report "smaller, minor issues" with their seat. Tr. 41:2-23. She agreed that any passenger-reported damage issues should be repaired or deferred for repair. Tr. 41:25-42:2. Nevertheless, Ms. Meacham characterized Mr. Asmus' report of seatback pocket damage (i.e., while he remained seated in his assigned seat) coupled with his statement that he worked for the FAA, as an "altercation," in part because he had not previously identified himself as an FAA inspector to the flight crew when he boarded the aircraft. [34]  Tr. 61:4-23. She admitted, however, that she did not know whether Mr. Asmus was required to identify himself to flight crew as an FAA inspector upon boarding the aircraft when he was travelling off-duty. Tr. 68:9-19.  This testimony, asserting that Mr. Asmus was involved in an "altercation" was without merit.

### C. Alleged Intimidation

In her narrative statement, Ms. Meacham characterized Mr. Asmus as "combative," because he said he worked for the FAA and "wanted a different seat." Ex. C-3, 2.  In her testimony, Ms. Meacham agreed that Mr. Asmus appeared to be an FAA employee. She explained that Mr. Asmus used "terminology that we hear in our emergency training" when he said the seatback pocket damage would "impede" him in an evacuation. Tr. 38:24-39:3.  An

---

[34] Ms. Meacham opined that "other" passengers complaining to her about seat problems had complained differently (undescribed) than Mr. Asmus. Tr. 42:3-6. She provided no basis for the difference in these other passenger complaints, aside from Mr. Asmus' disclosure that he was an FAA employee.

ordinary passenger would never say something like that. Tr. 38:4-6. Ms. Meacham told Mr. Asmus that the damage would not be repaired because it would delay the flight. Tr. 38:17-19; 39:21-23. She testified that Mr. Asmus then got "verbal" about it. Tr. 38:19.

In short, Ms. Meacham had assessed the seatback pocket damage as minor. Mr. Asmus was "verbal" because he told Ms. Meacham that she needed to report the damage to the Captain. Ms. Meacham perceived Mr. Asmus negatively ("verbal") because he stated that the damage needed to be repaired, and he would be checking the logbook later to make sure it got repaired. Tr. 39:20-23. Ms. Meacham opined that Mr. Asmus was being "aggressive" over something that was, in her opinion, "a non-issue." Tr. 40:19-21. She felt "intimidated" because Mr. Asmus didn't have his FAA credentials, and therefore, she didn't know "who this man is." Tr. 50:1-4. Because Ms. Meacham felt "a little bit intimidated" by Mr. Asmus (Tr. 40: 13-14), she decided to go up to the cockpit to talk to the Captain.

## 1. Alleged Attack on United Airlines and its Employees

Mr. Kallen testified that he perceived Mr. Asmus' statement that he would later "check the logbooks" as an "attack[]" on the flight crew. Tr. 103:8. He characterized Mr. Asmus' "tone" as "threatening." Tr. 93:23-24. Mr. Kallen testified that, as a United Airlines employee, he was offended on behalf of the crew, who, he opined, had done "everything properly according to vetted FAA policies and procedures." Tr. 103:7-11. Mr. Kallen also testified that he himself, as a United Airlines employee, felt personally threatened by Mr. Asmus. He opined that Mr. Asmus was "questioning whether the job was going to be done properly." Tr. 103:1-3. Mr. Asmus "was making us [i.e., United Airlines and its employees] look bad in front of all these paying passengers and making them feel like the airplane was somehow not airworthy." Tr. 103:12-16. According to Mr. Kallen, Mr. Asmus' statement that he would "check the logbooks" was "kind of threatening. Right?" Tr. 84:1-2. Mr. Kallen generally characterized Mr. Asmus as "threatening" and "disruptive." (Id.) In his narrative statement, Mr. Kallen opined that Mr. Asmus had "embarrassed" both United Airlines (the commercial regulated air carrier) as well as the flight crew of Flight 1648 (the air carrier employees), "in front of the entire aircraft" by inferring that the seatback pocket damage "would not be handled correctly." Ex. C-9, 1. Mr.

Kallen expressed outrage, on behalf of United Airlines and its multiple airline crews, about how passengers have become "increasingly brazen and disrespectful." *Id*.

2.  Brief Discussion

First, as noted *ante*, Mr. Asmus' seatback pocket damage report occurred while the aircraft was parked at the gate. Thus, any allegedly expressed "intimidation" that may have occurred during this incident cannot be proof of an Interference Rule violation, because the alleged intimidation did not occur during flight operations and did not impact the safety of the aircraft or the flight personnel during flight. *Elassaad*, 613 F.3d 119. Second, if any intimidation speech and conduct had occurred, and Ms. Meacham felt threatened in any way, she could have reported it promptly to the Captain when she went up to the cockpit. Here, no such report is in evidence.[35] Third, Ms. Meacham's "intimidation" allegation arises from Mr. Asmus: a) using polite language,[36] b) reporting seatback pocket damage; c) identifying himself as an FAA employee; and d) stating that he would later check to make sure that United Airlines took action to repair the damage he saw and reported. None of Mr. Asmus' statements targeted Ms. Meacham, nor offered any targeted threat against the aircraft and/or Ms. Meacham.[37]  Fourth, Ms. Meacham's claim that she felt "intimidated" centered on Mr. Asmus disclosure of his FAA employee status and telling her that he expected her to do something she is required to do (i.e., listen to his safety concern and report aircraft damage to the Captain).

Fifth, as summarized *ante*, intimidation occurs when a person makes a targeted threat against another, which instills an objective, reasonable fear in the intended recipient. The recipient's "fear" must be assessed utilizing an ordinary, reasonable person standard.  *Evgeniy V. Ignatov*, 1996 WL 210098, at *7. In the instant case, the evidence shows that Mr. Asmus did not engage in any words or conduct that, under an objective reasonable person standard, would have

---

[35] If Ms. Meacham had made such a report, the Captain could have immediately and easily removed Mr. Asmus from the aircraft, while the aircraft was still parked at the gate with its front passenger door open.

[36] Both Ms. Meacham and Mr. Kallen agreed that Mr. Asmus stated: "Excuse me," when seeking Ms. Meacham's attention to report the seatback pocket damage.

[37] Mr. Kallen's testimony that, as a United Airlines employee, he also felt personally threatened by Mr. Asmus (even though Mr. Asmus was not speaking with him or to him), is not probative evidence of what Ms. Meacham might have felt, or whether Ms. Meacham's feelings were reasonable, under an ordinary reasonable person standard.

instilled personal fear in Ms. Meacham, the person to whom Mr. Asmus' directed his report of seatback pocket damage. At best, Mr. Asmus told Ms. Meacham he was an FAA employee, and he planned to confirm that United Airlines complied with its regulated safety duties. An ordinary reasonable person, upon hearing such a statement, would have no fear of imminent bodily or personal harm, or fear there was imminent harm to the aircraft. Rather, an ordinary reasonable person might respond simply, by saying: "okay", or "thanks for letting us know" and/or "feel free to check anytime." Mr. Asmus acted to ensure the safety of the aircraft during passenger boarding. He did not say or do anything that put the aircraft, or Ms. Meacham's personal safety, at risk.

Lastly, Mr. Kallen's bright line and reiterated defense of United Airlines' honor and reputation, in arguing that intimidation by threat occurred, shows that any alleged "intimidation" was not about the aircraft or Ms. Meacham's personal safety. Instead, it was about United Airlines, and – in Mr. Kallen's perception – a belief that Mr. Asmus, as a perceived person of authority, had verbally slighted United Airlines' safety program in front of paying passengers when Mr. Asmus made a damage complaint and said he would later check the logbooks.

## VII.    THE PHOTOGRAPH INCIDENT

The photograph incident began while United Airlines Flight 1684 was in in "push back" mode and continued while the aircraft was taxiing to the runway. While the aircraft was in "pushback" or stop mode (i.e., being towed from the gate and then stopped) Mr. Asmus took a photograph of a passenger standing in the aisle while the seatbelt sign was lighted. Tr. 296:14-18; 308:25-309:10. After the photograph was taken, Mr. Materne initiated a discussion with Mr. Asmus.  This discussion continued as the aircraft began taxiing to the runway. Only certain testimonial highlights will be discussed, to help explain the decision.

### A.  Undisputed Facts – Photograph Incident

Ms. Meacham and Mr. Materne were travel "partners," who worked together in the aft section of the aircraft. The evidence demonstrates that, before the photograph incident occurred, Ms. Meacham had told Mr. Materne about Mr. Asmus (and possibly her discussion with Mr.

Kallen).[38]  Notably, neither Ms. Meacham nor Mr. Materne approached Mr. Asmus to simply ask him to produce his FAA 110A badge. Instead, they prepared the aircraft cabin for "pushback" before the doors were "armed", and then they sat down in their jumpseats, behind Mr. Asmus and the lavatory, while the aircraft engaged in "push back."

Mr. Kallen explained that cabin preparation for "push back" required flight attendants to make sure that passengers were seated. Flight attendants then notified the Captain of that fact, so that the Captain would approve closure of the aircraft door and release the aircraft brake.[39] Tr. 133:14-135:8. Mr. Kallen explained that "push back" after brake release also involved a ground vehicle "that's hooked up the nose wheel of the aircraft." Tr. 155:1-2.  Even after releasing the brake for "push back," the Captain was not moving the aircraft under its own power. Instead, the Captain releases:

> [T]otal control of the aircraft to the person that's driving that ground vehicle, and they push the aircraft backwards, and then sometimes pull us forward into a proper position or spot. From that point, we set the brakes and release them. We [then] start the engines and go under our own power.

Tr. 155:1-10.

During ground vehicle "pushback" and aircraft taxiing (i.e., when the aircraft moves under its own power), the seatbelt sign is on, and all passengers in the aircraft are supposed to comply with the seatbelt sign. Passengers could get injured if they stand in the aisle during taxiing. Tr. 137: 9-16. If a passenger ignores the seatbelt sign and gets up while the aircraft is moving, the flight attendants "should immediately tell the person to take their seat [and] comply with the seatbelt sign." Tr. 156:19-25.  If a passenger fails to comply, the flight attendants must call the flight deck and notify the Captain. Tr. 157:1-4.

---

[38] Ms. Meacham confirmed that after she and Mr. Materne were seated in the back of the aircraft, Mr. Materne took the lead in talking to Mr. Asmus. Ms. Meacham recalled Mr. Materne describing their joint knowledge of Mr. Asmus as: "we have [already] had all this…negative interaction" with Mr. Asmus. Tr. 48:16-18. They then decided that Mr. Materne would call the Captain and report their continuing concerns about Mr. Asmus.

[39] Mr. Kallen testified that before "pushback," the gate agent will ask if all is ready and secure, and if it is okay to close the doors. The Captain won't release the aircraft brake to begin "pushback" "until the flight attendants have assured [the Captain] that all the passengers are secured." Tr. 154:9-12.  If the flight attendants confirm everything is okay, the Captain will approve door closure and release the aircraft brake. Tr. 152:8-153:21.

### B.  Mr. Asmus' Alleged "Odd" Behavior

On May 12, 2022, the flight attendants confirmed with the Captain that all passengers were seated, and the aircraft was ready for "pushback." Both Ms. Meacham and Mr. Materne then took their seats in the back of the aircraft, to watch the safety video. Ms. Meacham explained that their jumpseats were behind both Mr. Asmus' seat and the lavatory. Tr. 47:25-48:4. Mr. Materne explained that Mr. Asmus was in Row 38, Seat D (i.e., the aisle seat), which was "catty-corner" in front of him (past the lavatory). Tr. 208:6-7; 211:12-14.

Mr. Materne testified that he "first noticed" Mr. Asmus when he sat down. Tr. 172:15-23. This "first noticed" testimony was inconsistent with the totality of the FAA's evidence. Based on the totality of evidence, by the time Mr. Materne decided to watch Mr. Asmus, Ms. Meacham had already told Mr. Materne all about her interaction with Mr. Asmus, and the fact that Mr. Asmus claimed to be an FAA employee.[40] Mr. Materne was also likely aware, either from Ms. Meacham or from Mr. Kallen directly,[41] that Mr. Kallen recommended asking Mr. Asmus to produce his FAA 110A ASI identification badge

Mr. Materne then opined that Mr. Asmus appeared "visibly agitated and annoyed" (Tr. 173-1-2), and "looking over his shoulder." Tr. 173:10. Mr. Materne thought it was "odd" that Mr. Asmus was looking "into the aisle, over the seats in front of him[,] and behind him." [42] Tr. 180:23-181:1.  He decided to keep "a close eye" on Mr. Asmus and began watching him. Tr. 173:3-5.

---

[40] *See* fn. 37.

[41] *See* Section V, *ante*. Mr. Kallen confirmed that he spoke with "multiple flight attendants" about Mr. Asmus and his claim that he was an FAA Safety Inspector. Tr. 146:4-10. Mr. Kallen recommended to "multiple" flight attendants that they should ask Mr. Asmus to produce his FAA 110A ASI Identification badge.

[42] Based on Mr. Materne's testimony, any single passenger sitting in an aisle seat who was looking ahead or across the aisle, or around themselves (and not looking down at a book, movie, telephone, or sleeping), would be behaving "oddly".

### C.  The Photograph and Flight Crew Anxiety

Ms. Meacham confirmed that she and Mr. Materne had "just armed our doors" and "completed the final safety checks for the flight." Tr.47:13-19. They took their jumpseats and waited for pushback. After the United Airlines Flight 1684 door closed, Mr. Asmus took a photograph of a passenger who was standing in the aisle while the seatbelt sign was on.  Compl. 2 § II ¶ 3(h); Ans. 2-3 § II ¶ 3(h).

Mr. Materne testified that he saw Mr. Asmus raise his cell phone to take a photo. Tr. 173:14-16; 174:21-175:1-2; 176:10-11.  He opined that Mr. Asmus was taking "a selfie" which might include Mr. Materne and Ms. Meacham. Tr. 173:14-16; 175:14-18. Mr. Materne asserted that taking this photograph "didn't reconcile with the surroundings and the people around him and the environment" (no further explanation). Tr. 173:17-20.  According to Mr. Materne,  Mr. Asmus turned around, saw Mr. Materne watching him, and then "abruptly" put his phone down. Tr. 17:14-16.

Mr. Materne said he was "confused" about why he (Mr. Materne) would be in "a selfie" photograph, and/or whether Mr. Asmus had taken "a selfie."  Tr. 177:14-16. He testified that it didn't seem like a "normal selfie," since Mr. Asmus was traveling alone.[43] Tr. 178:14-16; 19.  He asked Mr. Asmus if he had included Mr. Materne and his flying partner (Ms. Meacham) in "that selfie." Tr. 173:22-25;176:10-11; 179:1-9.  Mr. Asmus said "no" in a firm tone. Tr. 179:10-11; 178:14-15. Mr. Materne characterized Mr. Asmus' "no" response to his question as "aggressive" behavior (no explanation).[44] Tr. 180:1-15.

Mr. Materne conferred quietly with Ms. Meacham. He asked her if she felt "safe" with Mr. Asmus continuing to be aboard the flight. Ms. Meacham said "no." Tr. 48:16-20. Mr. Materne then called the lead flight attendant (also referenced as the purser), to express his concern and discomfort about Mr. Asmus. Tr. 181:5-12; 19-20. A few minutes later, the Captain

---

[43] No evidence was proffered to support the idea (or implied policy) that a single traveler taking a photograph aboard an aircraft should be viewed with suspicion because s/he was travelling alone.

[44] Mr. Materne did not offer any "non-aggressive" alternative speech that he believed Mr. Asmus should have used to answer his question.

called on the aft galley intercom. The Captain asked if "the passenger at 38 Delta was still seated." Mr. Materne said, "he is." Tr. 182:6-8. The Captain directed Mr. Materne to tell Mr. Asmus to show Mr. Materne the photograph, or the Captain was going to return to the SFO gate. Tr. 182:9-12. Mr. Materne repeated the Captain's instructions to Mr. Asmus. Tr. 182:14-19. Mr. Asmus showed Mr. Materne a photograph of the cabin, with a woman standing in the aisle. Tr. 182:20-24. The Captain asked Mr. Materne to ask Mr. Asmus to explain why he had taken that photo. Mr. Asmus explained that he worked "with the FAA, and I need to report a violation that I witnessed." Tr. 183:3-9; *see also*, 14 C.F.R. § 13.2. Mr. Materne testified that he was "confused and intimidated" because he "wasn't sure" that there was "a violation that needed to be reported."[45] Tr. 189:14-190:4. According to Ms. Meacham, the Captain then "asked us to ask him to show us his FAA license, and he told us he did not have it." Tr. 49:21-23.

### D. Alleged Intimidation

After Mr. Asmus took the photograph, Ms. Meacham said she felt "intimidated" because Mr. Asmus was taking "pictures," and acting like he worked for the FAA, but didn't "have proof" that he worked for the FAA. Tr. 50:3-8. She noted that they were scheduled to be in the air for a "five-hour flight." Tr.49:2-3. She testified, "If all this is bothering him right now, what else could transpire once we get in the air?"[46] Tr.49:4-5. She and the other flight attendants wanted to make sure that all the passengers were "safe and secure," and that there would be "no distractions or harm" during the flight to Hawaii. Tr. 50:22-24.

Mr. Materne echoed Ms. Meacham when he testified that he "didn't feel safe" because Mr. Asmus said he didn't have his FAA credentials with him. Tr. 184:20. Mr. Materne thought FAA aviation safety inspectors (ASI) were required to identify themselves to the flight deck or

---

[45] This testimony reveals part of the underlying tension on May 12, 2022 between the United Airlines employees and Mr. Asmus. Ms. Meacham, Mr. Kallen, and Mr. Materne all perceived that the two (2) matters Mr. Asmus was concerned about were minor in nature. Based on the evidence, both Ms. Meacham and Mr. Materne also believed that such problems either did not "need" to be reported or, alternatively, did not rise to the level of concern that Mr. Asmus expressed about them.

[46] This testimony reveals Ms. Meacham's and Mr. Materne's shared underlying concern about Mr. Asmus. They were prepared for a routine five (5) hour flight to Hawaii. They were not prepared, however, for a five (5) hour flight with Mr. Asmus, an FAA employee who appeared to have authoritative regulatory knowledge, where he might see and record multiple safety problems (or violations) for which they might later be held accountable.

the gate agent, so that the crew could be informed that an FAA official was on board. Tr. 204:14-18. Mr. Materne opined that Mr. Asmus' actions in the back of the aircraft, without showing any FAA identification, were "suspicious" and created a "safety issue" for the flight. Tr. 185:1-21.

During cross-examination, however, Mr. Materne retreated from his testimony that Mr. Asmus' act in taking a photograph was "odd." For example, Mr. Materne agreed that other passengers took photos while on aircraft. Tr. 197:11-18. He normally did not demand that passengers show him any photographs they took. Tr. 197:19-20. It was not part of his flight attendant duties to demand that passengers delete any photographs they take. Tr. 197:22-24. Further, Mr. Materne retreated from his "safety issue" testimony, and admitted that the fact that Mr. Asmus had taken a photograph did not create a security risk. Tr. 202:14-19; 208:8-11. He agreed that Mr. Asmus had remained in his seat while the aircraft was taxiing when he took the photograph. Tr. 208:8-14. He also admitted that he did not know what, if any, identification needed to be shown by an off-duty FAA Inspector who flew as a passenger. Tr. 204:19-24. Further, Mr. Materne admitted that if the photograph had been taken while the aircraft had been taxiing, it would show a safety violation committed by the standing passenger. Tr. 200:11-15. He believed that Mr. Asmus took the photograph while the aircraft was taxiing.[47] Tr. 200:16-18.

As discussed *ante*, intimidation occurs when a person makes a targeted threat against another, which instills an objective, reasonable fear in the intended recipient. The standard for review of the recipient's fear is an objective, reasonable person standard. The alleged intimidation must also show that it impacted the crew's "safety-related duties during the critical phases" of flight. *Robert D. Brians*, FAA No. CP02WP0007, 2003 WL 23119332, at *4 (July 14, 2003). Here, even if it was assumed that Mr. Asmus took the photograph during taxiing, the evidence demonstrates that Mr. Asmus did not engage in any speech or conduct targeted at Mr. Materne that an objective, reasonable person would find intimidating.[48] Further, Mr. Materne

---

[47] Mr. Asmus testified that he took the photograph during pushback, while the aircraft was moving under tow. Tr. 296:14-15. Taking a photograph during a tow is an action that occurs prior to the aircraft being in "flight." *See, e.g.*, FAA Legal Interpretation 1001-3, 2000 WL 35499413 (Jun. 2, 2000) ("time spent in moving an airplane from the loading point to another point, not under the airplane's own power, but by means of a tractor or other conveyance that pulls the airplane into position to begin a flight" was not "flight time.")

[48] *See, e.g., Michael Bengry*, FAA Order No. 2003-9, 2003 WL 22480445 (Sept. 10, 2003). Mr. Bengry "attempt[ed] to take a photograph [of flight attendants] with threats to use the photograph for a lawsuit." Mr. Bengry was "angry," "loud," "actively hostile," and created an "ongoing disturbance" on the flight. *Id*. at *1, 2. The FAA

testified that he was primarily worried about being in a "selfie." Thus, after he checked Mr. Asmus' phone and saw that neither he nor Ms. Meacham had been photographed, Mr. Materne's stated "selfie" worry should have been completely assuaged. But, as the evidence demonstrates, both he and Ms. Meacham reported to the Captain that they did not "feel safe," and wanted further action taken about Mr. Asmus. Lastly, Mr. Asmus did not interact with Ms. Meacham directly at all during the photograph incident, so her feelings of "intimidation" because of a photograph Mr. Asmus took of a passenger standing in the aisle are simply non-probative regarding the "photograph" incident.

### E.  Alleged Interference

Mr. Materne testified that his "duties were to ensure that the aircraft was ready for take-off," which involved "making sure that exit rows and the aircraft in general was ready to be evacuated in the very unlikely event that there was a sudden evacuation." Tr. 4-8.  Specifically, Mr. Materne's duties were "to make sure that everyone had their seat belts on, that the tray tables were all stowed away properly, [and] that all seat backs were fully upright." Tr. 188:9-12.

Mr. Materne alleged in his testimony that Mr. Asmus had violated the Interference Rule during the photograph incident. According to Mr. Materne, his attention while seated in his jumpseat was supposed to have been "on the cabin…to make sure that its safe and secure for take-off" instead of on Mr. Asmus. Tr. 187:17-19. According to Mr. Materne, his attention was drawn away from cabin passengers, because he needed to watch Mr. Asmus' actions while Mr. Asmus was seated in Row 38. Tr. 187:19-24. Mr. Materne testified that because he was watching and talking with Mr. Asmus, he wasn't able to complete his review and safety check of "all the rows" prior to take-off. Tr. 188:23-189:9.

There were multiple problems with this testimony, but only a few highlights will be discussed. First, as discussed *ante*, Mr. Materne decided he would watch Mr. Asmus while Mr.

---

Administrator found that "many ordinary, reasonable people would find it intimidating to be photographed by someone threatening them with a lawsuit and negative media exposure."  *Id*. at \*2.  The FAA Administrator also found that Mr. Bengry had exhibited "antagonistic and intimidating" behaviors sufficient to satisfy a violation of 14 C.F.R. § 91.11 (the companion Interference Rule regulation of 14 C.F.R. § 121.580). *Id*.

Asmus was seated in Row 38. There is no evidence to show that Mr. Materne could not have scanned the aircraft cabin at the same time.  Second, if there had been any passenger who needed assistance, nothing prevented Mr. Materne (or Ms. Meacham) from addressing such concerns. The evidence demonstrates that Mr. Asmus sat in his assigned seat, had his seatbelt on, and complied with all crewmember instructions. Third, Mr. Materne's assertions that his safety checks were interrupted and incomplete was directly rebutted by Ms. Meacham, his flying partner. She testified that all their safety checks had been completed before she and Mr. Materne had seated themselves in their jumpseats. Tr.47:13-19. Fourth, during cross-examination, Mr. Materne began changing his "safety check" testimony.  He first testified that he would have performed his final safety checks after the safety video was finished. He then admitted, however, that in his written narrative he had affirmed that he had finished his safety checks before he saw Mr. Asmus take a photograph from his seat. Tr. 195:1-25. In additional cross-examination testimony, Mr. Materne then claimed that his "final" safety checks were "fluid" and could be done twice, once before the video, and once after the video. Tr. 196:15-18. Notably, neither Ms. Meacham nor Mr. Kallen offered any support for Mr. Materne's contradictory assertions.

Mr. Materne's testimony that he wasn't able to complete his review and safety check of "all the rows" prior to take-off, because of his interactions with Mr. Asmus, was not supported by the evidence. It was also directly rebutted by Ms. Meacham (and indirectly rebutted by Mr. Kallen in describing flight attendant duties to secure the cabin). Mr. Materne's testimonial assertion that a violation of the Interference Rule had occurred (based on alleged general interference) during the photograph incident is not credible and without merit.

## VIII.   AIRCRAFT RETURNS TO THE GATE

It was undisputed that after Mr. Asmus told Mr. Materne that he did not have his FAA identification with him, the aircraft sat for "about 15 minutes" on the terminal. Tr. 302:18-22. The Captain then returned the aircraft to the SFO gate, shut the engines down, and opened the aircraft doors. Tr. 186:13-16; 303:3-6; 328:17-21. Mr. Asmus asked Ms. Meacham if he could go up and talk with the Captain. Tr. 187: 7-9. Mr. Materne recalled that Ms. Meacham said okay, but to "make sure you bring all your stuff with you." Tr. 187:11-13.  According to Mr. Asmus, Ms. Meacham just said "Sure." Tr. 303:13.

Page **39** of **44**

**A. Second Meeting at Row 21 – Ms. Meacham, Mr. Materne, Mr. Kallen**

Shortly after Mr. Asmus left his seat to go the jetway, Ms. Meacham and Mr. Materne walked up to Row 21 to discuss with Mr. Kallen (who remained seated in his middle seat) their most recent interactions with Mr. Asmus in the back of the aircraft. Mr. Kallen recalled that one of the flight attendants "mentioned" that Mr. Asmus had reiterated that he worked for the FAA. The second flight attendant then reported to Mr. Kallen that Mr. Asmus had "continu[ed]" behaving "disruptively" (undescribed) in the back of the aircraft. Tr. 83:3-7. Mr. Kallen testified: "They asked me to go up and talk to the captain." Tr. 101:5-13. Mr. Kallen left his seat and went up to the front of the aircraft to talk to the Captain about Mr. Asmus.

**B.  Jetway Discussion with the Captain**

It is not known whether Mr. Kallen spoke to the Captain before, during, and/or after the Captain met with Mr. Asmus. It is undisputed, however, that when Mr. Asmus spoke with the Captain on the jetway bridge, the flight attendants were "right nearby" standing "in the galley, watching." Tr. 337:23-25.  Mr. Asmus told the Captain that he didn't have his FAA 110 ASI identification badge, but he did have his green "AoA" badge. Tr. 301:5-10. Mr. Asmus testified that he re-entered the aircraft, retrieved his bags, found his green AoA badge, and returned to the jetway with his bags. He showed his green "AoA" badge to the Captain. Tr. 27:5-8; 303:25-304:5. Mr. Asmus explained that he worked for the FAA and was assigned to the FAA's United Airlines Certificate Management Office ("CMO"). The Captain said: "I'm convinced." Tr.304:11-13. The Captain then walked away, and Mr. Asmus heard the Captain repeat "exactly what I said" to someone else (unidentified). Tr.301:23-25. Mr. Asmus was then asked to leave Flight 1648. Tr. 328:24-25. The Captain did not give any "other" reason[49] for asking him to leave the flight. Tr.329:12-14. Mr. Asmus complied without any argument or challenge. He was later rebooked on another United Airlines flight to Hawaii. Tr. 304:14-25.

---

[49] The evidence did not demonstrate whether the Captain provided any reason to Mr. Asmus when he asked Mr. Asmus to leave the aircraft.

Page **40** of **44**

## IX.   BRIEF ADDITIONAL DISCUSSION

First, it is not intimidation or interference behavior for a passenger to orally report a potential violation of aviation safety.  Rather, it is every person's regulatory duty, including aviation passengers, to report aviation safety concerns. 14 C.F.R. 13.2. It is also well established that ensuring safety and compliance with aviation safety regulations is part of the flight crew's normal job flight responsibilities.  Part of these required flight crew safety-related duties is to listen to a passenger (or other person's) report of aircraft damage and/or safety concerns, and to relay such reports to the Captain for logbook entry and action.  Second, it should not matter whether Mr. Asmus was an FAA employee or an off-duty FAA Safety Inspector, or just an anonymous traveler. Any passenger on any regulated aircraft should be able to report any perceived potential safety violations without fear of dismissal, reprisal, public criticism, or personal vilification. Third, passengers should be encouraged to be mindful of safety issues, and report aircraft damage and/or safety concerns, even if such issues might later be deemed "minor" by either knowledgeable mechanics or other aircraft experts.  Fourth, if passengers are faced with possible charges of intimidation or interference for reporting potential safety violation problems, "gruffly," assertively, firmly, or "loudly," then no passenger would ever wish to tell the flight attendants about any safety problems. Chilling passenger complaints about safety issues, by negatively responding to such complaints, will lead to negative impacts. Inevitably, unreported matters will impact the safety of the aircraft and the lives of all passengers on board.  In short, flight crewmembers who take pride in saying that safety is their "number one priority" should be willing to hear and act upon passenger safety complaints, and be appreciative of such proffered assistance in carrying out their safety duties.   Tr. 33:12-15; 168:13-16.

Fifth, Mr. Asmus was correct when he testified that  FAA employees are tasked to "say something" if they "see something." Tr. 337:8-13; *see also*, 14 C.F.R. §13.2; FAA Order 2150.3C, Chapter 2, 2.7 § 6.a (Sept.30, 2021).  As an FAA Inspector, Mr. Asmus was "required" to document "any safety-related issues" that he observed, whether on duty or off duty. Tr.334:21-23. After May 12, 2022, Mr. Asmus did "follow[] up" and checked United Airlines Flight 1648 logbook to "see if the seat back issue" had been reported. Tr. 329:19-22. He also testified, without dispute, that the FAA assigned Mr. Asmus to open an investigation about the

May 12, 2022 incident. Tr.330:11-25. Ms. Pritchard confirmed that Mr. Asmus asked United Airlines to provide any/all reports about the flight from crewmembers and ground personnel involved in the May 12, 2022 incident. Tr. 221:24-222:6; 222:23-24; 224:9-21; *see also*, Ex. C-1. However, sometime thereafter (date unspecified) the FAA temporarily reassigned Mr. Asmus to a different air carrier. Tr.332:11-23. It is unknown if any further safety investigation of United Airline Flight 1648 occurred after Mr. Asmus was re-assigned.

Sixth and finally, this case reveals certain discord between: 1) the broad scope of the FAA's mission to ensure safety in aviation; 2) its directive to its employees (and others) to report air carrier regulatory safety violations whenever observed; 3) its commitment to work collaboratively with its commercial, regulated air carriers; and 4) United Airlines expectations, as a regulated air carrier, for formal notice and partnership collaboration when the FAA engages in safety inspections, investigations, and regulatory enforcement actions.

In this case, the evidence shows that Mr. Asmus was rejected as a passenger aboard Flight 1648, not because he engaged in acts of intimidation and interference, but because he straddled the fence between being a paying passenger and acting as an FAA official, without an FAA 110A identification badge or notification to United Airlines that a safety inspection might occur on Flight 1648. The Captain and the flight attendants did not know, when Mr. Asmus first gained Ms. Meacham's attention, that they had an FAA employee on board, or that they should be prepared to collaborate with an FAA ASI's regulatory scrutiny. Thus, when Mr. Asmus did identify himself as an FAA employee, Ms. Meacham (and others) were unsettled and uncertain. Mr. Asmus had not identified himself formally when he had first boarded the aircraft, as they believed should always occur.  Further, when asked to produce his FAA 110A ASI identification badge, Mr. Asmus was unable to produce it.

There was no evidence to show that Mr. Asmus was wrong in reporting seatback pocket damage to Ms. Meacham. Mr. Asmus' reporting of a potential seatback pocket safety violation was not to *divert* Ms. Meacham from performing her safety-related duties, but rather to *ensure* that she and United Airlines continued to perform their safety-related duties. There was also no evidence to show that Mr. Asmus was wrong in taking a photograph while he sat in Row 38.  As

noted *ante*, there is no basis to assert that a single traveler may not take a photograph on the aircraft, whatever the subject.

It should be noted that the FAA might wish its FAA Inspectors to monitor regulated air carriers' safety programs by both open partnership and/or by surveillance.  In this case, there was no intent for surveillance. Rather, Mr. Asmus saw problems and began to report and/or record them. The flight attendants were unprepared when Mr. Asmus morphed from an anonymous paying passenger into an unexpected FAA authority on the aircraft.  It is no surprise that Ms. Meacham and Mr. Materne expressed uncertainty and anxious feelings. They did not know how to respond to Mr. Asmus' sudden announcement of FAA employment, coupled with his investigative behavior. The evidence shows they communicated their distress repeatedly to the Captain. They did not want Mr. Asmus to take their photographs. They also did not want the "distraction" of dealing with Mr. Asmus on a five-hour flight to Hawaii, unless he absolutely proved that he had FAA ASI credentials, and showed that he had the right to watch and criticize the events and/or crew actions on the aircraft.

It is beyond the scope of this proceeding for the Presiding Judge to address the underlying problems that this case has revealed, and/or to suggest certain steps to avoid such problems in the future. Nevertheless, it might be helpful for the FAA to review and consider the issues raised in this case, both by Mr. Asmus and the United Airlines employees.  In short, FAA employees need to be able to perform their required safety violation reporting even when traveling off-duty, while at the same time, regulated air carriers want to have clear guidelines about investigative practices for off-duty FAA personnel, so that air carriers can communicate such guidelines to their employees and continue to serve as collaborative regulatory partners with the FAA on aviation safety related issues.

## X.    CONCLUSION

Pursuant to 14 C.F.R. §§ 13.205 and 13.223, and having reviewed the case file, all pleadings and motions, all relevant caselaw, statutes, regulations, rules, and authority, and being fully advised;

**IT IS HEREBY ORDERED:**

1. The FAA failed to prove, by a preponderance of the evidence, that on May 12, 2022, Mr. Paul D. Asmus committed a violation of the Interference Rule (14 C.F.R. § 121.580) either by intimidating or interfering with a crewmember in the performance of the crewmember's duties.

2. The Interference Rule charge (14 C.F.R. § 121.580) against Mr. Paul D. Asmus is dismissed with prejudice.

3. Pursuant to 14 C.F.R. § 13.232(d), this Initial Decision shall be considered a final order unless either party files a notice of appeal within 10 days of service of this Initial Decision pursuant to 14 C.F.R. § 13.233.

Judge J.E. Sullivan
U.S. Administrative Law Judge

Attachment: Service List

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

PAUL D. ASMUS,

Plaintiff,

v.

UNITED AIRLINES, INC.,

Defendant.

Case No.: 5:26-cv-00962-BLF

# EXHIBIT 2

*United Airlines Passenger Incident Review Committee*

*Letter to Paul D. Asmus (June 1, 2022)*



June 1, 2022

Via Email
Paul Asmus
(b) (6)

Dear Paul Asmus,

United Airlines, Inc. ("United") is in the business of providing the safest and highest level of service. We prefer to avoid situations in which our relationship with one of our passengers becomes adversarial. At the same time, we have a duty to our employees and passengers to provide a safe working and travel environment. As you have been informed, United's policy, in compliance with our contract of carriage and our legal obligations as a common carrier, is to delay or refuse to carry any passenger whose conduct or condition threatens the safety of its employees or other passengers.

United's Passenger Incident Review Committee (PIRC) has reviewed the reported incident that occurred onboard flight 1684 on May 12, 2022. Included in this investigation was a review of your written version of what occurred. Our review of the reported incident revealed that you exhibited harassing behavior onboard our aircraft when you were rude and verbally combative towards our crew members, using profane language, and interfered with the departure duties of the crew. You also claimed to be working for the FAA, but then failed to present your official FAA credentials when asked. Based on your disruptive conduct you were asked to exit the aircraft. As a direct result of your actions our flight returned to the gate and incurred an unnecessary delay for your removal.

Based on the severity of this incident, we believe that your presence onboard future United flights creates a threat to the safety of our employees and passengers. Consequently, your future travel on United and United Express flights is conditional upon your payment of US$3,153.00, the operational costs you caused United to incur as a result of your behavior. We do not take this action lightly. To be clear, only after United receives full restitution in the amount of US$3,153.00 will you be allowed to travel. Payment must be submitted by mail in the form of a check or money order to: United Airlines, Inc. Attn: WHQSE-PIRC, 233 S. Wacker Dr. Floor 28, Chicago, IL 60606.

Further, and after you've paid this amount, should another incident occur, we will conclude that your presence aboard future United flights creates an unsafe working environment for our employees and a sustained threat to the security and well-being of our passengers. Obviously, we hope that this will not become necessary. We are sure you can appreciate that we must take whatever reasonable steps are necessary to satisfy our safety responsibility.

If you believe there is a reason that this decision was made in error, please submit a written appeal concerning this matter to United's Passenger Incident Review Committee by email at pirc@united.com.

Sincerely,

Passenger Incident Review Committee
United Airlines

Willis Tower, 233 South Wacker Drive-WHQSE, Chicago, IL 60606

 A STAR ALLIANCE MEMBER

G13-22-73 Paul D. Asmus

C-12    Page 1 of 1

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

PAUL D. ASMUS,

Plaintiff,

v.

UNITED AIRLINES, INC.,

Defendant.

Case No.: 5:26-cv-00962-BLF

# EXHIBIT 3

*Letter from United Airlines Associate General Counsel James Conneely*
*to FAA CMO Manager Keith Frable (June 2, 2022)*



James Conneely
Associate General Counsel-
Regulatory, Environmental,
and Facilitation
Phone: (872) 825-8311
james.conneely@united.com

June 2, 2022

Mr. Keith Frable
Manager - United Airlines Certificate Management Office
Federal Aviation Administration
2300 E. Devon Avenue, Suite 350
Des Plaines, IL 60018

Re: Passenger Incident Involving Mr. Paul Asmus (UA Flight 1684, May 12, 2022)

Dear Mr. Frable,

Attached for your awareness and action as appropriate are three documents related to the above incident. First, attached is a letter from United's Passenger Incident Review Committee ("PIRC") to FAA employee Mr. Paul Asmus. United's PIRC considered the incident involving Mr. Asmus as having been severely disruptive. To reach this conclusion, the PIRC committee evaluated statements from six crewmembers and three passengers, compared the facts of this incident to other comparable incidents, and rendered its decision based upon long-standing criteria. As stated in the letter, Mr. Asmus may appeal the PIRC's decision. Second, attached are statements from passengers who witnessed the incident involving Mr. Asmus. Finally, attached for your awareness, is email correspondence that demonstrates that Mr. Asmus sought documents in his official capacity as an FAA inspector related to an incident in which he was personally involved.

Please let me know if you require any additional information or have any questions.

Sincerely,



Attachments:

       PIRC Letter to Mr. Asmus
       Passenger Statements
       E-mail dated May 16, 2022 @ 11:43 a.m.

cc:    James Tegtmeier

233 South Wacker Drive, Chicago, IL 60606         A STAR ALLIANCE MEMBER

G13-22-73 Paul D. Asmus                C-11   Page 1 of 1

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

PAUL D. ASMUS,

Plaintiff,

v.

UNITED AIRLINES, INC.,

Defendant.

Case No.: 5:26-cv-00962-BLF

# EXHIBIT 4

*FAA Notice of Administrative Reassignment*

*(November 16, 2022)*



# Federal Aviation Administration

# Memorandum

Date:     November 16, 2022

To:       Paul D. Asmus, Assistant PPM, AFC-400-D/GL33

From:     Brian Neal, Front Line Manager, AFC-400-D/GL33
          THRU: Keith A. Frable, Manager, AFC-400-D/GL33

BRIAN C NEAL  Digitally signed by BRIAN C NEAL Date: 2022.11.16 12:10:49 -07'00'

Subject:  Notice of Administrative Reassignment

This memorandum is to inform you that you will be administratively reassigned from your current position of ACM Assistant Partial Program Manager (APPM), FG-1825-13, at the United CMO, Mtn View, CA (Santa Clara County), to the equivalent position of ACM Geographic Program Manager, at the PAC Certificate Manage Office (PAC CMO), no change in duty location. There is no change to your current base pay rate of $92,044.00; adjusted salary $131,384 (includes 42.74% for locality pay).

This reassignment will not require PCS funds. Employee remains in current duty location.

This action is determined to be in the best interest of the Agency. Your reassignment is solely based on a real/perceived conflict of interest with United Air Lines (United). Based on your open FAA Civil Penalty and current ban to fly as a passenger on United we feel your position at the CMO has become untenable.

You are required to complete the attached Statement of Intent, declaring whether or not you intend to accept this administrative reassignment. Your options are as follows:

(1) Accept the administrative reassignment, which will be effective December 4, 2022.

(2) Decline the administrative reassignment and resign or, if eligible, retire under optional retirement procedures or discontinued service retirement.

If you decline the administrative reassignment and subsequently fail to initiate a resignation or retirement action, you will be given a separate 30 calendar day notice of proposed separation.

2

This 30 calendar day notice is required before your separation from the Federal service may be effected. If separated through this means, the decision notice will inform you of the avenues of appeal.

Please complete and return the **Statement of Intent to me by November 23, 2022**. In the event you are considering retirement, you may contact the Benefits Operations Center at (855) 322-2363 to obtain a retirement estimate and other retirement information. You may also contact Krystiana Nelson, Human Resources Specialist, Employment Services Branch at 718-553-3112 for general questions.

This administrative reassignment notice is not an adverse action. This action is in accordance with HRMP EMP-1.14 Permanent Internal Assignments and in accordance with PASS CBA Article 43 – Realignment of Work Force.

I realize that this may be a difficult decision for you. Nonetheless, as a valued employee, I am certain you will bring the same level of professionalism and excellence to the new position. However, should you choose not to accept the reassignment, I wish you the best of luck in your future endeavors.


Attachment:
Statement of Intent

3

## Statement of Intent – Administrative Reassignment

To:    Paul D. Asmus

From:  Brian Neal (FLM)

I have reviewed the information contained in my Notice of Administrative Reassignment and elect the following:

_X_  I accept the administrative reassignment. *See note below*

_____  I decline the administrative reassignment. I understand I will be separated from the Federal service in accordance with adverse action procedures.

_____  I decline the administrative reassignment and elect to exercise my eligibility for optional retirement effective _____.

_____  I decline the administrative reassignment and elect to exercise my eligibility for discontinued service retirement effective _____.

_____  I decline the administrative reassignment and elect to resign my position effective _____.

_____          11/23/2022
Employee's Signature                                    Date

\* NOTE: I RESPECTFULLY DISAGREE. THIS IS AN ADVERSE ACTION AND I SIGN THIS UNDER DURESS. PDA
Nov. 23, 2022

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

PAUL D. ASMUS,

Plaintiff,

v.

UNITED AIRLINES, INC.,

Defendant.

Case No.: 5:26-cv-00962-BLF

# EXHIBIT 5

*United Airlines Passenger Incident Review Committee*

*Letter to Paul D. Asmus (September 4, 2025)*



September 4, 2025

Via Email
Paul Asmus
p.asmus@att.net

Dear Paul Asmus,

United Airlines, Inc. ("United") is committed to the safety of both our passengers and employees. To this end, United's Passenger Incident Review Committee has considered the appeal you submitted regarding the incident onboard flight 1684 on May 12, 2022.

Our review of your appeal is now complete, and the decision has been made to uphold your travel restrictions pending restitution payment of US$3,153, the operational costs you caused United to incur as a result of your behavior. To be clear, only after United receives full restitution in the amount of US$3,153 will you be permitted to travel on United and United Express flights.

Payment must be submitted by mail, with a tracking number, in the form of a check or money order to: United Airlines, Inc. Attn: WHQSE-PIRC, 233 S. Wacker Dr. Floor 16, Chicago, IL 60606.

Please be advised that United's Passenger Incident Review Committee considers this matter closed.


Sincerely,

Passenger Incident Review Committee
United Airlines

Willis Tower, 233 South Wacker Drive-WHQSE, Chicago, IL 60606

